UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------x
                                 :
UNITED STATES OF AMERICA       :
                                 :
v.                                      :
                                 :     Case No. 3:14-CR-79 (JBA)
JOHN G. ROWLAND          :
                                 :
                                 :     Dated: December 4, 2014
------------------------------------------------------x

**DEFENDANT JOHN G. ROWLAND'S**
**<u>SENTENCING MEMORANDUM</u>**

Reid H. Weingarten
William L. Drake
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, D.C. 20036
(202) 429-8082

Michelle L. Levin
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

Peter G. Billings
BILLINGS & BARRETT, LLC
941 Grand Avenue, 2nd Floor
New Haven, CT 06511
PH: (203) 562-0900
FAX: (203) 562-0902
peter@billingsandbarrett.com
*Counsel for Defendant John G. Rowland*

# Table of Contents

**Page**

Table of Authorities .................................................................................................. iii

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     JOHN ROWLAND'S PESONAL HISTORY AND CHARACTER ................................. 2

     A.      Early Life .............................................................................................. 2

     B.      Public Service ....................................................................................... 3

     C.      John's Commitment to Family and Friends ........................................ 6

     D.      John's Charitable Work and Civic Engagement .................................. 9

     E.      Mentorship ........................................................................................... 13

III.     THE OFFENSE CONDUCT ............................................................................ 14

     A.      The Greenberg Proposal – Count 1 .................................................... 15

         1.      Mr. Rowland Proposes a Broad Contract to Work for, and Be Paid by, Mr. Greenberg that Presupposes a Public Association with  Mr. Greenberg's Campaign ................................................................. 15

         2.      Mr. Greenberg Shreds the Proposal but Continues to Engage with Mr. Rowland about a Public Role on Mr. Greenberg's Campaign and More Generally ........................................................................... 18

         3.      Mr. Greenberg Publicly Accuses Mr. Rowland of an Improper Proposal  19

         4.      Mr. Greenberg's Trial Testimony ......................................................... 19

         5.      Mr. Greenberg's Confusion ................................................................... 20

     B.      Mr. Rowland's Paid Work for Apple and Volunteer Efforts for Ms. Wilson-Foley ................................................................................................. 21

         1.      Mr. Rowland Serves as a High-Level Advisor to Ms. Wilson-Foley ........ 21

         2.      Mr. Rowland Proposed to Work in a Paid Capacity for Ms. Wilson-Foley; Mr. Foley Offers Mr. Rowland a Job at Apple .............................. 22

         3.      Apple Drafts a Contract .......................................................................... 24

4.      Mr. Rowland Continues to Volunteer on the Campaign, and Begins Work at Apple ............................................................................................. 25

       a.     Mr. Rowland's Volunteer Efforts ..................................................... 25

       b.     Mr. Rowland's Work at Apple ........................................................ 27

5.      Mr. Rowland Ends His Relationship with the Campaign and Apple ........ 30

6.      The Foleys Defend the Propriety of the Agreement until Their Friends, Family, and Children Face Exposure for Unrelated Conduct .................. 30

IV.     SENTENCING ANALYSIS ........................................................................................ 32

    A.     The Probation Department's Guideline Calculation is Incorrect .......................... 32

    B.     A Guidelines Sentence is Unwarranted Even Under the Correct, Lower Guideline ............................................................................................................. 34

V.      CONCLUSION ............................................................................................................ 37

## Table of Authorities

Page(s)

CASES

*Pepper v. United States*,
   131 S. Ct. 1229 (2011)................................................................................................34

*United States v. Abbadessa*,
   848 F. Supp. 369 (E.D.N.Y. 1994),
   *vacated on other grounds by United States v. DeRiggi*, 45 F.3d 713 (2d Cir. 1995) ..............33

*United States v. Barraza*,
   655 F.3d 375 (5th Cir. 2011) .......................................................................................34

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008).........................................................................................34

*United States v. Collier*,
   07-cr-0182 (D.D.C. 2007)............................................................................................37

*United States v. Dye*,
   07-20144 (S.D. Fla. 2007)............................................................................................37

*United States v. D'Souza*,
   1:14-cr-00034-RMB (S.D.N.Y. 2014)..........................................................................37

*United States v. Feldman*,
   09-cr-75 (E.D. Pa. 2009)..............................................................................................37

*United States v. Huizar-Velazquez*,
   720 F.3d 1189 (9th Cir. 2013) ......................................................................................32

*United States v. Orsburn*,
   525 F.3d 543 (7th Cir. 2008) ........................................................................................33

*United States v. Pena*,
   268 F.3d 215 (3d Cir. 2001)..........................................................................................33

*United States v. Pierce O'Donnell*,
   2:08-cr-00872 (C.D. Cal. 2012)....................................................................................37

*United States v. Preacely*,
   628 F.3d 72 (2d Cir. 2010)............................................................................................34

*United States v. Raffol*,
   10-cr-10268 (D. Mass. 2010)........................................................................................36

*United States v. Sapoznik,*
    161 F.3d 1117 (7th Cir. 1998) ...................................................................33

*United States v. Schwartz,*
    1:05-cr-000157-RMU (D.D.C. 2005) ........................................................37

*United States v. Snapper,*
    1:10-cr-00325-PLF (D.D.C. 2010) ............................................................37

*United States v. Troha,*
    07-cr-00050 (E.D. Wis. 2007) ....................................................................37

*United States v. Wickett,*
    07-cr-20145 (S.D. Fla. 2007) .....................................................................37

*United States v. Winn,*
    1:11-cr-10350-JGD-1 (D. Mass. 2012).....................................................37

## STATUTES AND FEDERAL SENTENCING GUIDELINES

2 U.S.C. § 437g ..................................................................................................33

18 U.S.C. § 371 .............................................................................................33, 32

18 U.S.C. § 1001 ................................................................................................33

18 U.S.C. § 1519 ................................................................................................33

18 U.S.C. § 3553(a) ......................................................................................32, 34

18 U.S.C. § 3553(a)(1) .......................................................................................35

18 U.S.C. § 3553(a)(2)(A) ..................................................................................35

18 U.S.C. § 3553(a)(2)(B) ..................................................................................35

18 U.S.C. § 3553(a)(2)(C) ..................................................................................35

18 U.S.C. § 3553(a)(6) .......................................................................................36

USSG § 1B1.2 ...............................................................................................32, 33

USSG § 3D1.3(a) ................................................................................................33

USSG § 2B1.1 .....................................................................................................34

USSG § 2C1.1............................................................................................32, 33, 34

USSG § 2C1.1(a)(2).............................................................................................32

USSG § 2C1.1(b)(2) ................................................................................................32, 33

USSG § 2J1.2 ....................................................................................................32, 33, 34

USSG § 2X1.1 .............................................................................................................33

Defendant John G. Rowland ("Mr. Rowland" or "John") respectfully submits this memorandum of law in connection with his sentencing, presently scheduled for January 7, 2014.

## I.   PRELIMINARY STATEMENT

Larger than life.  Polarizing.  A lightning rod.  All words that have been used to describe John Rowland and all true.  But, reviewing the many letters offered in support of John at sentencing, a fuller picture emerges.

These letters, many of which show John in quieter moments, reveal a man that is not easily reduced to broad strokes.  They share John's compassion for others, his concern for society's most vulnerable populations, and his dedication to promoting diversity.  They reflect John's deep commitment to public service, community engagement, and charity.  They show John's care for friends and family and mentorship of young people.  Fundamentally, they show that John is a good person with much still to contribute.

The Guidelines sentence recommended by Probation would unnecessarily prevent John from doing just that.  The Probation Department incorrectly calculated John's Guideline range and even the lower, correct range is greater than necessary.  John has already been punished greatly by being criminally prosecuted for alleged conduct that is normally addressed civilly.  What he had rebuilt following his prior conviction, he has now lost.  Imposing a Guidelines sentence would also result in an unfair and unwarranted disparity between John and his alleged co-conspirators.  Three of John's alleged co-conspirators were never charged, and the other two will receive sentences no greater than one year.  John disputes the jury's verdict, and is not a danger to the public or at risk for further offenses.  John's alleged conduct had no financial victims and did not involve the corruption of elected officials.  John has no intention to return to political life and, following the jury's verdict, no practical ability to do so in any event.

For these reasons, and others described below, a lenient, below Guidelines sentence is appropriate.

## II.     JOHN ROWLAND'S PESONAL HISTORY AND CHARACTER

Throughout his life, John has shown a commitment to public service, family and friends, civic engagement, and mentoring young adults.

A.     Early Life

John was born in 1957 to Sherwood and Florence Rowland in Waterbury, Connecticut. (PSR ¶ 56).  Sherwood supported the family by operating Martin & Rowland Insurance.  (PSR ¶ 56).  At the time of John's birth, Martin & Rowland Insurance had been in business for over 100 years, and the Rowlands themselves had been a part of the Waterbury community for even longer.  (PSR ¶ 56).

John was soon joined by four siblings, Ned, Henry, Marnie, and Skip.  (PSR ¶ 56). Sherwood and Florence set an example for John and his siblings with their commitment to the community and involvement in the church.  (PSR ¶¶ 56-57).  That example has guided John throughout his life and continues to guide him today.

John was "a tough act" for his siblings to follow in elementary and high school, winning over teachers with his "high spirit and positive attitude," and friends as a "unifying force" able to find "common ground with whomever he met."  (N. Rowland Letter, Ex. 73).  John also demonstrated leadership skills early on.  He served as captain of the high school wrestling team and president of his student class.  (N. Rowland Letter, Ex. 73).

John's leadership continued in college at Villanova University.  He served as president of his fraternity and of the Young Republicans.  (T. Mahon Letter, Ex. 48).  John also found time to volunteer for a local campaign and to work part-time.  (T. Mahon Letter, Ex. 48).

B.      Public Service

Following John's graduation from Villanova, he returned home to Waterbury to run for political office, winning election to the Connecticut State Legislature at just 23 years old.  (PSR ¶ 92).  It was an obvious choice for John given his love for Connecticut and desire to serve it.  He served two terms in that office before being elected to, and serving, three terms in the United States House of Representatives. (PSR ¶ 92).  Following that, John unsuccessfully ran for Governor in 1990 before winning election in 1994.  John served as Governor until resigning in 2004.  (PSR ¶ 91).

John's time and accomplishments in government are well-reported.  John is perhaps best known for his significant contributions to the University of Connecticut system and Connecticut's strong fiscal position during his Governorship.  Three others aspects of his public service merit greater discussion here, however, because they are probative of his character.

First, John demonstrated compassion for others while in office.  While Connecticut enjoyed record economic surpluses during John's gubernatorial administration, it was no stranger to tragedy.  Both the Newington lottery shooting and the attacks of September 11, 2001 occurred during John's administration.  In both instances, in addition to his public-facing responsibilities as Governor, John played a quieter role in bringing comfort to the victims of these tragedies.  (S. Rowland Letter, Ex. 75; K. Mengacci Letter, Ex. 57; E. Gillette Letter, Ex. 33).  That concern for constituents was a hallmark of John's public life that began in his time in the Connecticut legislature, where he "went over and above" the call of duty on behalf of his constituents.  (J. Zick Letter, Ex. 89, M.Tansley Letter, Ex. 82).  As Lisa Carver, John's former administrative assistant wrote:

> [John] always made time for everyone . . . .  Many times I saw him personally pick up the phone to try and get an unemployed or homeless person a job or help a family with immigration issues stay together.  I could tell countless stories of his

3

personal involvement and of the comfort he gave many people in need. These
things were not covered by the press, but were a favorite part of John's job
because he loved the personal connection of helping people. (L. Carver Letter,
Ex. 16).

Second, John has shown a special concern for those most vulnerable in our society. John

was "particularly concerned with the plight of the underprivileged and the poor of the inner cities

of Connecticut." (D. Cicchetti Letter, Ex. 17). James Gatling, the former executive director of

NOW, Inc., recalls that, when John was a state representative, John "came to [his] office – which

was in the 72nd District – to see how he can assist with issues with people in my community.

This was impressive because while his constituents were mainly affluent and Caucasian, he took

the time to discuss the concerns and needs of people that were mainly low-income and minority."

(J. Gatling Letter, Ex. 32). That concern continued while John was in Congress where he helped

secure funding for a child development center in Waterbury. (J. Gatling Letter, Ex. 32). And it

continued too while John was Governor.

Many times as governor, he would go to the north end of Hartford and have lunch
to get to know the people in that area. He personally worked with them to better
their neighborhoods, all with no fanfare. He . . . helped welfare mothers gain
employment . . . . He volunteered in soup kitchens and slept in homeless shelters.
(C. Corey Letter, Ex. 19).

John used the power of his office to address the needs of those facing the most challenging of

circumstances. He championed ambitious city revitalization efforts in Waterbury and Hartford.

(M. Tansley Letter, Ex. 82; J. Tobin Letter, Ex. 83; F. Nido Letter, Ex. 62; M. Hanley Letter,

Ex.38; G. Oemcke Letter, Ex. 63). And, in doing so, he carefully engineered these projects to

ensure that they created jobs for people from the community. (B. Fox Letter, Ex. 29). John also

launched new programs to address substance abuse and spearheaded affordable housing for those

addicted to drugs. (M. Hanley Letter, Ex. 38; T. Kirk Letter, Ex. 41). Finally, John worked to

4

protect abused and neglected children, and implemented a healthcare plan to provide insurance to uninsured children.  (F. Brennan letter, Ex. 12; F. Nido Letter, Ex. 62).

Third, John demonstrated a dedication to diversity while in office.  Michael Martinez, an appointee to John's gubernatorial transition team charged with diversity outreach recalled that:

> Governor Rowland was very committed to making his administration look to reflect the State's population makeup . . . [and] was always pushing the envelope for more opportunities and more diversity in his administration."  (M. Martinez Letter, Ex. 50).

This was not just rhetoric.  John's commitment to diversity was felt in large ways – "[n]o other Governor appointed minorities to more positions, judgeships and boards than he did" (J. Gatling Letter, Ex. 32) – and small, such as when John successfully encouraged an individual to pursue his goal of becoming a State Marshal.  Lou Menendez recalls:

> During one of our encounters, we were talking about the need for Spanish Speaking folks to represent and serve the large Hispanic community.  I told him that I was thinking of becoming a State Marshall, and that's all he needed to begin a long and very encouraging campaign of support.  (L. Menendez Letter, Ex. 55).

That commitment to promoting diversity was also reflected in John's strong support for minority owned businesses.  (C. Robinson Letter, Ex. 68).

John's commitment to service inspired and motivated others to make public service and community engagement a part of their own lives.  A former volunteer for John, Francine Nido recalls: "His passion for service and dedication to helping others reconfirmed my belief in the political process and the need to get involved."  (F. Nido Letter, Ex. 63).  Similarly, Karen Armstrong, a former employee of John's Congressional office remembers:

> Nearly thirty years ago, I had the honor and privilege of working in John Rowland's Congressional office in Waterbury.   It was an experience that changed the course of my life because of what I learned from John.  They are lessons that have remained with me for decades, and have inspired personal qualities of which I am extremely proud.  (K. Armstrong Letter, Ex. 4).

Another former employee, Lisa Carver, writes that John's "example of public service caused [her] to change direction from the lucrative private sector to my career in the public sector . . . where [she] love[s] to come to work every day because you see and feel the difference you can make in the community." (L. Carver Letter, Ex. 16).

      C.    <u>John's Commitment to Family and Friends</u>

While John's public life carried with it great responsibility and demands, John balanced that role with an equally strong commitment to his family and friends.  As John's friend Debi Schatzle Baker writes, "[n]o matter what other pressing matters faced him, his children and family have always been the priority." (D. Baker Letter, Ex. 6).

John married Deborah Rowland in 1982, and together they have three children – Kirsten, Robert, and Julianne.  While John and Deborah later divorced, Deborah too recognizes the strong positive impact John has had on their lives.  John taught his children "compassion," "to help those in need and less fortunate," and to "serve others."  (Deborah Rowland Letter, Ex. 70).

John's daughter Kirsten remembers how John:

> tried to give us a normal life.  He never missed a high school field hockey game or a tennis match.  His secretary always joked that his meeting schedule revolved around our sports schedule.  When I went to Villanova University, his alma mater, my Dad was dragging my TV up the stairs like everyone else's Dad.  He came to my parent's weekends, he reassured me when I was certain I would fail calculus, he learned my class schedule so he knew when to call, and he drove to Philly to pick me up when I was feeling homesick." (K. Rowland Letter, Ex. 72).

Today, while John is uncertain of his future, he has worked to help Kirsten fix up her home as what he has dubbed "unskilled labor" and joined her in shopping for a wedding dress, photographer, and flowers for her wedding in January.  (K. Rowland Letter, Ex.72).

Julianne similarly recalls the strong presence John had had in her life even while in office:

> While he was in office and I was in elementary school he made time to drive

down from Hartford to Middlebury to eat lunch with me at school on Fridays (although I still wonder if it had anything to do with the cafeteria pizza). He came to my library class to read us stories, which is where he was inspired to start the Governor's Reading Program. He chaperoned field trips, hosted pasta parties, and grilled 75 cheeseburgers at my sweet 16. Throughout middle school and high school, he barely missed a field hockey game or tennis match and always remembered to bring my favorite sports drink in spite of his busy schedule. He was at the DMV while I took my drivers test and he moved me into every college dorm I lived in. He supported me through graduate school and celebrated with me when I got my dream job and moved to the big city. (J. Rowland Letter, Ex. 71).

John also plays an important role in Robert's life. Following Robert's service in the Iraq war in the Marines, Robert returned with serious medical issues. (P. Rowland Letter, Ex. 74). Robert has relied heavily on John to assist him, providing "daily support," with what has been a difficult transition to civilian life. (P. Rowland Letter, Ex. 74).

John's family expanded when he married Patricia ("Patty") Rowland in 1994. Patty had been John's high school girlfriend and brought her own two children Ryan and Scott into the fold. John's friend Kathleen Mengacci observed that John and Patty "molded" their children into an "amazing" blended family in which the children have told her that there is no "step" used to reference one another. (K. Mengacci Letter, Ex. 57).

John and Patty have faced serious challenges in their marriage. John has supported Patty when she faced significant personal challenges during John's Governorship. (PSR ¶ 67). Later, Patty weathered John's resignation from office and prison term. The two suffered a terrible loss when their son Ryan died at 23. (PSR ¶ 70). Patty's sister Gail wrote of John's support during this difficult time: "Without John's heart, hand, shoulder and unbounded support I don't believe she would have survived this unimaginable tragedy." (G. Sluis Letter, Ex. 78). Today, they face the prospect of John's return to prison. Through it all, Patty sees the same qualities in John that first brought them together as young people:

I have known John for over 37 years. We met in high school at 17 years of age,

7

and the qualities that attracted me then are the same ones that he possesses to this day; he is a loyal and kind friend, a responsible, mature and loving son, father and husband; he is a natural leader, and he freely gives his time and talent to others. He is a man of faith, and walks with God in his heart in every aspect of his life. (P. Rowland Letter, Ex. 74).

John also plays an important ongoing role in the daily lives of his mother and in-laws.  As Patty writes:

John and I both have aging parents living in close proximity to us.  It is one of the primary reasons we live where we do – so that we can be of comfort and help to them.  John's mother is nearly blind and housebound. My mother has a heart condition and my father is confined to a wheelchair.  We are both essential to their care and well-being at this stage of their lives and into the future, as most of our siblings live out of state.  (P. Rowland Letter, Ex. 74).

John's brother Sherwood and sister-in-law Deanna explain that John and Sherwood "provide [their] mother with care on a daily basis" and her care is difficult for Sherwood who suffers from a heart condition.  (Deanna Rowland Letter, Ex. 70; S. Rowland Letter, Ex. 75).  John's brother-in-law Glenn Oemcke described John as a "model of support" for his own parents.  (G. Oemcke Letter, Ex. 63).  John's sister in-law Gail had much the same to say:

My dad has been in a wheelchair for 10 years. My mother has been sole caregiver and has difficult heart issues of her own. I live out on the Cape and as much as I am in Ct I cannot be there at all times. John has a sweet and generous heart. He comes and takes my dad to breakfast or lunch. He takes him fishing. He gives my mom much deserved and needed respite. When things are confusing on medical, financial, physical issues, John always has a way of sorting through them for all of us, not just my parents.

John provided similar support for his brother Sherwood when he had medical difficulties and for other friends too.  John's sister-in-law Deanna writes, "Through John's research and contacts we were able to source a heart specialist . . . . I am thankful for John, his involvement and caring for my husband's health condition and our well-being as a family.  I credit John with helping to save his life."  (Deanna Rowland Letter, Ex. 69).  When John's friend Leslie Gregor's mother was suffering from cancer, John was a source of constant support.  "John came to the

hospital faithfully every week to sit with and visit Rosanna during her long illness.  When my wife had to say goodbye to her mother, it was John that sat beside her during that difficult time." (D. and L. Gregor Letter, Ex. 37).  John did the same when his friend Lisa Carver was diagnosed with advanced stage ovarian cancer.  She recalls:

> After my surgery, John was one of the first people to call with support.  It was a pep talk that a seasoned football coach would envy and gave me so much comfort. He made me smile and cry all at the same time at a moment when I truly needed a morale booster.  (L. Carver Letter, Ex. 16).

John has similarly been a source of comfort and support for other friends in need and for his children's friends.  He "opened his home . . . unconditionally" to his friend John Zick during a difficult time in Zick's life.  (J. Zick Letter, Ex. 89).  John's daughter Julianne's best friend Caitlyn Walker described John as "a second father" and fondly recalls John making her and the family homemade pizzas.  (C. Walker Letter, Ex. 87).  Julianne's friend Renee Vaillancourt described how John "helped [her] fill the void of emptiness [she] felt for years since my own father's passing."  (R. Vaillancourt Letter, Ex. 85).  Another friend of Julianne's, Haley McBride, struggled with an "unstable" and "unreliable" father who was suffering from an addiction.  (H. McBride Letter, Ex. 51). She describes John as "the biggest male influence in" her life and her "biggest cheerleader during [her] first few years struggling as a new teacher in the inner city of Waterbury, CT."  (H. McBride Letter, Ex. 51).

### D. John's Charitable Work and Civic Engagement

Since leaving public life, John has continued to dedicate himself to charitable work and civic engagement, working on many of the same issues that he focused on while in public life. As Patty writes:

> Both John and I have made volunteerism a part of our lives since our high school years.  We learned about service to others from our parents' examples, and we brought that commitment to our years in public service.  But I must honestly say that John goes far beyond what I am capable of doing, and I have rarely seen him

9

refuse a task or say "No" to an ask for help in the last 20 years. He is never one to shy away from a request for help – whether it be from his church, his friends, the addicted, the homeless, the jobless – anyone in need of assistance.  (P. Rowland Letter, Ex. 74).

*Families and Children in Need*

One area of continued focus for John was families and children.  He has been active in Family & Children's Aid with its director reporting that John "is one of the few people that [he] can count on to always step forward and help" and "who will drop everything to help our kids." (K. McNellis Letter, Ex. 54).  John also recently assisted Waterbury Youth Services going "above and beyond to lend a hand."  (C. Corey Letter, Ex. 19).  John has similarly volunteered for The Michael Bolton Charities for Children and Women at Risk.  The charity's leaders write:

> Around young people, he is incredibly witty and I have witnessed John "loosen up" kids who were often cynical and skeptical, kids who were charmed by his accessibility and compassion and were clearly wowed over by the fact that a Governor and then, a former Governor, would care and interact the way he did. Many of the kids, now adults, were encouraged by John to take their success to the next level, to not give up, to stay in school or our programs. John and Patty Rowland also worked with several other groups statewide and both took a special and personal interest in serving and assisting children and women who needed help, particularly in deterring ways to prevent members of this group from falling through gaps in the system.  (J. Smaga Letter, Ex. 79).

John was also proud to support the Hartford Inner City Foundation (M. Astiasaran Letter, Ex. 5) and Acts 4 Ministry, Inc. a non-profit serving low income families (R. Knebel Letter, Ex. 42).  With respect to the latter, John has contributed his time in a variety of ways from "hands-on projects in the Ministry's warehouse" to serving on the group's board.  (R. Knebel Letter, Ex. 42).

John also assisted Youth Challenge, an organization dedicated to helping troubled young men and women:

> [John] came to the center regularly and conducted seminars and coached students in resume writing, employment interviews, public speaking, and a variety of

10

related topics.   He brought other professionals with him . . .  reviewed the resumes and returned with comments showing each student the value of their contributions, and helped many develop their skills and face challenges with hope and confidence.  (P. Echtenkamp Letter, Ex. 28).

Finally, John has contributed substantially to Acts 4 Ministry as a member of its Board and as an active volunteer providing the gamut from high level advice to cleaning the floors "with a broom in one hand and a dust pan in the other."  (S. DiMeo-Carabetta Letter, Ex. 25).

[John] has provided strong governance, diplomacy and consensus building to our Board in the matters of strategic planning and overall growth for our non-profit. Not to mention his active participation as a volunteer in our furniture collaborative program, which seeks to pick up and deliver[ ] furnishings to area residents who have experienced life devastating events. John has driven the ministry box truck, picked up donated furniture and then delivered it to area residents in need.  (S. DiMeo-Carabetta Letter, Ex. 25).

*Drug Addiction*

John has similarly continued to dedicate himself to assisting those facing drug addiction. John has worked with addicts generally (W. Marotti Letter, Ex. 49) and has also used the platform of his radio show to bring awareness to this issue.  Through the radio show, he has promoted the Salvation Army's Celebrate Recover program (B. Glasco Letter, Ex. 35) and brought awareness to substance abuse issues.[1]  (A. Baldwin Letter, Ex. 7).  In one particular instance, John was successfully able to help guide someone to rehab.  Mark Glanovsky, a listener of the show, recalls how his:

oldest son in June called in to the afternoon show on WTIC on a topic of addictions. As I was driving home from work I happen to catch the conversation on air and recognized my son's voice. With my son making this contact with the Governor it helped him to get the help he needed. When he showed up at St Francis the nurse let me know that they were expecting my son. John did make the contact with the hospital. This started the process that my son needed and continued with him checking himself into a 90 day program which to our good news have heard that he is checking out this week and we are picking him up at the airport this Friday November 7. . . .

---

[1] John has also used his radio show to promote awareness of mental health and domestic violence issues.  (S. Cuddy Letter, Ex. 22).

John even though his own difficult times he was going through made it an effort to keep in touch with me though texts/email and phone calls.  (M. Glanovsky Letter, Ex. 34).

*The Church*

John has also devoted himself to engagement in the religious life of the community.  At the New Life Church, John hosted and led church services and helped the church navigate a merger and property acquisition.  (K. Bellmare Letter, Ex. 9; W. Marotti Letter, Ex. 49).  A fellow congregant of the church writes:

> John was never too proud to help in any and every way he could.  I fondly remember times when he would be vacuuming floors and joking about how Patty could never get him to do this at home!  John's encouragement and infectious enthusiasm and love for his church family is such a gift to those around him. (A. DePaolo Letter, Ex. 24).

*Dora's Hope*

John has also provided his skills and leadership recently to Dora's Hope serving as the chair of its Board.  Dora's Hope is a non-profit organization dedicated to providing senior citizens with the choice to remain in their homes rather than being forced into institutional care. (D. Carangelo Letter, Ex. 15); (J. Tobin Letter, Ex. 83); (F. Macary Letter, Ex. 47).  When John joined the organization, "he quickly sized up what actions were needed to move us forward, brought focus to concrete objectives, delegated effectively among a capable board and strong volunteer base."  (F. Macary Letter, Ex. 47).

*Other Charitable Work*

John has also devoted himself in recent years to a variety of other charitable efforts.  He has: (1) regularly volunteered at soup kitchens and food banks (R. Calabrese Letter, Ex. 14); (Deanna Rowland Letter, Ex. 69); (2) worked with former prison inmates (W. Marotti Letter, Ex. 49); (3) contributed to fund-raising at his alma mater, Holy Cross High School (T. McDonald

Letter, Ex. 52); and (4) worked with the Salvation Army (L. Cretella Letter, Ex. 21; J. Gordon Letter, Ex. 36).

John also took it upon himself recently to assist a homeless man, Stanley.  John initially hired Stanley to do work around John's home and later assisted Stanley in securing work and a home, providing Stanley with transportation, the money needed to set him up in the apartment, and furniture.  (S. Rowland Letter, Ex. 75; Stanley Letter, Ex. 90; R. Calabrese Letter, Ex. 14). Stanley writes:

> [Y]ou took me into heart and home.  But not only that you help me start a new home with no questions asked about money which you gave me to set me up in the apt. I am living now.  Got me everything to move including helping me with the ele. bill, furniture, bed, coffee pot etc. Patty and John helped buy.

E.     <u>Mentorship</u>

John has also served as a mentor to many young adults.  A former congressional staffer recounted John's mentorship: "I count these lessons among the many gifts I received from John Rowland as a mentor."  (K. Armstrong Letter, Ex. 4).  A young lawyer who worked in John's office while Governor writes, "I will forever be grateful for the level of kindness he showed to me and the confidence he placed in me.  I believe this is a testament to his ability to mentor young people and create long-lasting relationships based on mutual respect and trust." (A. Lazzaro Letter, Ex. 44).  Bryan Cafferelli, who worked on campaigns with John, explains how he and John "kept in touch . . . [and] [h]e was there for me during many of life's major decisions and I appreciated it more than he would ever know."  (B. Cafferelli Letter, Ex. 13). More recently, John helped counsel D.J. Bettencourt, a young man who had been the youngest majority leader in New Hampshire history before resigning from the position following a scandal.  (D. Bettencourt Letter, Ex. 10).  D.J. writes:

> Over the past two years John Rowland has given me guidance and wise counsel. He is a man who has worked quietly and without fanfare to help people like me

> learn from our mistakes and avoid future ones. He has donated dozens of hours to
> helping me rebuild my life and become a better person. He has taken full and
> absolute responsibility for his failures and has never once made excuses for them.
> Most importantly, he has given me a gift for which I will be forever appreciative,
> friendship and a renewal of my Christian faith.

These are just a few of the many individuals John has mentored over his many years in public

service and in private life.  As William Pizzuto, the Director of University of Connecticut

Waterbury Campus writes:

> I have personally witnessed John Rowland interacting with students from the
> University of Connecticut, Naugatuck Valley Community College, Post
> University and other educational institutions and he is genuine in his compassion
> for their well-being.  He spoke directly to them and shared life experiences, good
> and bad, and helped them to realize that whatever life throws at them and
> whatever obstacles may be in their way, they can be overcome for the betterment
> and quality of life for their families, their communities and themselves.
> (W. Pizzuto Letter, Ex. 67).

## III.    THE OFFENSE CONDUCT

On April 10, 2014, the Government charged Mr. Rowland in a seven-count Indictment.

On September 3, 2014, the case proceeded to trial.  At trial, the Government asserted that: (1) in

2009, Mr. Rowland prepared an unlawful draft contract to work for the Congressional campaign

of Mark Greenberg ("Mr. Greenberg") while being paid by a non-profit entity owned by

Mr. Greenberg – the Simon Foundation – or another entity; and (2) in 2011, Mr. Rowland entered

into an unlawful agreement to work for the Congressional campaign of Lisa Wilson-Foley

("Ms. Wilson-Foley") but be paid by the company of her husband Brian Foley ("Mr. Foley") –

Apple Healthcare ("Apple").  On September 19, 2014, a jury found Mr. Rowland guilty on all

counts.  Mr. Rowland disputes and intends to appeal the jury's verdict.  Mr. Rowland maintains

that the evidence shows that he acted lawfully at all times.[2]

---

[2]    The facts recited herein are drawn solely from the trial record and do not represent admissions by
Mr. Rowland.

A.      The Greenberg Proposal – Count 1

Count 1 of the Government's Indictment is premised on Mr. Rowland allegedly

proposing an illegal contract to Mr. Greenberg to avoid Federal Election Commission ("FEC")

reporting obligations.  That claim is belied by the evidence.  The evidence shows that the only

proposal made by Mr. Rowland to Mr. Greenberg was lawful.

1.      Mr. Rowland Proposes a Broad Contract to Work for, and Be Paid by,
        Mr. Greenberg that Presupposes a Public Association with
        Mr. Greenberg's Campaign

Mr. Greenberg and Mr. Rowland first met in the summer of 2009 at Maples Diner in

Waterbury.  (September 3, 2014 Tr. at 92:19-95:15).  Mr. Greenberg, a successful businessman

but political neophyte, had sought out Mr. Rowland for advice on a potential run for political

office.  (September 3, 2014 Tr. at 90:20-92:19).

Following that meeting, Mr. Greenberg and Mr. Rowland continued to discuss

Mr. Greenberg's potential run for office and, according to Mr. Greenberg, began discussing the

possibility of Mr. Rowland taking a formal role on Mr. Greenberg's congressional campaign.

(September 3, 2014 Tr. at 98:2-99:24).

In parallel to these discussions, Mr. Greenberg and Mr. Rowland discussed the Simon

Foundation, a non-profit animal welfare organization Mr. Greenberg had recently established.

Mr. Rowland expressed interest in the Foundation (September 3, 2014 Tr. at 106:15-18; 194:19-

195:2) and discussed with Mr. Greenberg the possibility of Mr. Rowland fundraising for the

Foundation.  (September 3, 2014 Tr. at 208:12-19; September 4, 2014 Tr. at 83:20-24).

Mr. Greenberg had made an "enormous investment" into the Foundation, which by the time of

trial had grown to $3.5 million, and had hoped to recoup his investment with contributions.

(September 3, 2014 Tr. at 90:17-19; 195:12-19).  Mr. Greenberg later hired a marketing director

15

at a salary of $86,000 per year to, among other things, bring in contributions.  (September 4, 2014 Tr. at 71:5-72:10).

Following these discussions, the two decided to meet again.  On October 17, 2009, Mr. Rowland e-mailed Mr. Greenberg that Mr. Rowland would bring a proposal to their meeting, which was scheduled for October 21, 2009.  GX500.  On October 18, 2009, Mr. Rowland e-mailed his attorney, R. Bartley Halloran, a draft proposal for his review.  The next day, on October 19, 2009, as part of Mr. Rowland's diligence on the Foundation, he visited its website and filled out a form on it asking how he could help.  GX500B.  Mr. Greenberg was impressed. GX500B.

Mr. Greenberg then met with Mr. Rowland on October 21, 2009 at the Simon Foundation. (September 3, 2014 Tr. at 104:11-14; 115:8-15).  They met there despite the fact they could have met at a location closer to each of their homes.  (September 3, 2014 Tr. at 200:21-201:24). Mr. Greenberg recalled that Mr. Rowland was a dog lover and was "very impressed with the facility." (September 3, 2014 Tr. at 106:17-18; 115:8-15).  According to Mr. Greenberg, at this meeting: (1) Mr. Rowland proposed working for Mr. Greenberg's political campaign; (2) Mr. Rowland also proposed doing work for the Simon Foundation to assist it in fundraising; and (3) Mr. Rowland presented Mr. Greenberg with a draft contract (the "Draft Contract"). (September 3, 2014 Tr. at 117:24-119:2).  GX2.

The Draft Contract is consistent with Mr. Greenberg's account that Mr. Rowland proposed to assist Mr. Greenberg on his campaign and with the Simon Foundation.  It reads in pertinent part:

**Consulting Agreement**



This Consulting Agreement (the "Agreement"). Effective the 1st day of Nov. 2009 , is made by and between JGR Associates, LLC ("Consultant") and Mark Greenberg (the "Company") or any of its affiliates.

**Consulting Services:** Consultant agrees to perform such consulting services (the "Services") for Mark Greenberg, as may be reasonably requested by him with respect to the marketing of his Company's sales and service, strategic advice, public relations , business consulting, or such other services as may be required. Consultant also agrees to these same services for "The Simon Foundation ", but also including fundraising . Consultant agrees that he shall be reasonably available to provide the Services during the term of this Agreement and shall devote an adequate portion of the Consultant's time to ensure satisfactory performance of the Services.

Examining the Draft Contract at trial, Mr. Greenberg agreed that: (1) it was between Mr. Greenberg personally and Mr. Rowland; and (2) it was "extremely broad" and included within its ambit both political consulting work and work for the Simon Foundation.  (September 3, 2014 Tr. at 206:24-207:19, 212:15-17).

The Draft Contract's pricing, timing, and structure are also inconsistent with contracts exclusively for political consulting.  The Draft Contract: (1) calls for a monthly retainer of $35,000 until January 2011 and $25,000 a month thereafter; (2) runs for over two years; and (3) calls for Mr. Rowland to be paid $105,000 in advance and 90% of the remaining retainer if the contract is canceled.  GX2.  Mr. Greenberg himself conceded that the Draft Contract is for seven times as much as most political consultants in Connecticut make and that its length would post-date the election by a year.  (September 3, 2014 Tr. at 208:24-209:1 and 210:8-9).

Finally, Mr. Greenberg agreed that Mr. Rowland's proposal contemplated a public-facing role for Mr. Rowland in connection with Mr. Greenberg's campaign, inconsistent with Mr. Rowland's alleged desire to remain hidden.  Mr. Greenberg explained that "from a practical standpoint" it "would have been a near impossibility" for Mr. Rowland's role in his campaign to

be hidden if he were performing the services the two had discussed.  (September 4, 2014 Tr. at 57:8-16).  Mr. Greenberg also recounted how Mr. Rowland himself demonstrated awareness that his work for Mr. Greenberg would be known to the public, particularly his friends and political allies whom it would upset.  (September 4, 2014 Tr. at 50:6-51:4; GX514).

      2.      Mr. Greenberg Shreds the Proposal but Continues to Engage with Mr. Rowland about a Public Role on Mr. Greenberg's Campaign and More Generally

According to Mr. Greenberg, he "ripped" up the Draft Contract the same day he received it, finding the price outrageous.  (September 3, 2014 Tr. at 210:15-19).  Notwithstanding this, Mr. Greenberg kept up a friendly dialogue with Mr. Rowland.  Mr. Greenberg continued to contemplate hiring Mr. Rowland for his campaign and to communicate with him, including about the Simon Foundation (GX510), through at least September 2011, *i.e.*, for nearly two more years.

Mr. Rowland met with Mr. Greenberg's political advisors, Marc Katz ("Mr. Katz") and Sam Fischer ("Mr. Fischer"), in December 2009.  (September 3, 2014 Tr. at 139:24-140:20).  During that meeting, Mr. Rowland discussed working with Mr. Greenberg's campaign in a totally public manner, and there was no discussion of payments to Mr. Rowland being obscured.  (September 4, 2014 Tr. at 203:20-205:4; September 5, 2014 Tr. at 55:2-58:7).  In fact, Mr. Katz explicitly raised his concern with "the baggage" a public association with Mr. Rowland would bring the campaign.  (September 4, 2014 Tr. at 247:17-21).

Mr. Rowland also met with Mr. Greenberg and Mr. Katz in June 2010.  (September 3, 2014 Tr. at 163:2-164:12; September 5 Tr. at 27:19-31:19).  During that meeting, Mr. Rowland again discussed Mr. Greenberg's campaign, and there was no discussion of Mr. Rowland being paid in an illicit manner.  (September 3, 2014 Tr. at 164:4-19).

Following the June 2010 meeting, and Mr. Greenberg's loss in the election, Mr. Rowland met Mr. Greenberg for dinner.  (September 4 Tr. at 76:1-77:17).  Following that, Mr. Greenberg

asked to, and did, appear on Mr. Rowland's radio show in September 2011.  (September 4, 2014 Tr. at 79:3-80:13).

        3.        <u>Mr. Greenberg Publicly Accuses Mr. Rowland of an Improper Proposal</u>

In 2012, Mr. Greenberg was again running for Congress.  (September 3, 2014 Tr. at 177:24-178:13).  His opponents included Ms. Wilson-Foley, who Mr. Rowland was known to be supporting and advising.  (September 3, 2014 Tr. at 180:1-183:7).  In the midst of this campaign, in April or May 2012, Mr. Greenberg suggested publicly for the first time – to the media – that Mr. Rowland had made an illicit proposal to work for the Greenberg campaign, but be paid by the Simon Foundation. (September 4, 2014 Tr. at 184:1-9).

        4.        <u>Mr. Greenberg's Trial Testimony</u>

Similarly, at trial, Mr. Greenberg claimed that Mr. Rowland had proposed to work for Mr. Greenberg's political campaign but be paid by the Simon Foundation or another entity. (September 3, 2014 Tr. at 99:16-100:16).  Mr. Greenberg also claimed that, if the Draft Contract had been signed, it would have hidden any payments to Mr. Rowland for campaign work because payments not made by the campaign are "secret."  (September 3, 2014 Tr. at 129:6-19; September 4, 2014 Tr. at 94:14-23).  At trial, the objective evidence showed that both of these claims were mistaken.

First, as discussed above, Mr. Greenberg acknowledged at trial that the Draft Contract calls for Mr. Greenberg to personally pay Mr. Rowland and includes political work as well as work for the Simon Foundation.

Second, if the Draft Contract had been executed, and if Mr. Rowland had performed political consulting work under it, Mr. Greenberg would have had an obligation to disclose the payment to the FEC.  At trial, Kathleen Guith, an FEC attorney, explained that an individual, including the candidate, can pay for a campaign's expenses from his or her own personal money

and not the campaign's coffers.  (September 12, 2014 Tr. at 192:16-193:7).  She also testified that

a candidate for office can do so in unlimited amounts.  (September 12, 2014 Tr. at 179:16-22).

She further testified that those payments are considered in-kind contributions to the campaign,

which trigger a disclosure requirement.  (September 12, 2014 Tr. at 193:3-193:24).

     5.    <u>Mr. Greenberg's Confusion</u>

Mr. Greenberg's testimony to the contrary appears to be the result of a confluence of

several factors.

First, Mr. Greenberg has a poor memory of the underlying events; Mr. Greenberg spoke

with investigators twice and also testified to the grand jury that he was "absolutely" certain that

his meeting at the Simon Foundation with Mr. Rowland took place shortly before April 2010, not

in October 2009.  (September 4, 2014 Tr. at 59:10-60:18).  At trial, Mr. Greenberg acknowledged

that he was "absolutely wrong."  (September 4, 2014 Tr. at 60:19-23).

Second, as discussed above, Mr. Greenberg's actual review of the Draft Contract was

limited because he threw it out the same day he received it.  That limited review was evidenced

in Mr. Greenberg's testimony that Mr. Rowland proposed that the Simon Foundation or another

entity pay Mr. Rowland.  Mr. Greenberg admitted at trial that the Draft Contract calls for

Mr. Greenberg to personally pay Mr. Rowland.

Third, Mr. Greenberg fundamentally misunderstands campaign finance laws.  As

discussed above, Mr. Greenberg incorrectly believes that campaign payments must be made by a

campaign to be disclosed.  That misunderstanding likely infected Mr. Greenberg's evaluation of

the Draft Contract.

       *          *          *

In sum, Mr. Rowland made a lawful proposal to work for Mr. Greenberg.  The Draft Contract was consistent with: (1) Mr. Greenberg's account that Mr. Rowland proposed to assist both Mr. Greenberg's campaign and the Simon Foundation; and (2) FEC reporting obligations.

### B.  Mr. Rowland's Paid Work for Apple and Volunteer Efforts for Ms. Wilson-Foley

Counts 2 through 7 of the Government's Indictment are premised on the claim that Mr. Rowland entered into a pre-textual contractual relationship with Apple to conceal that he was in fact working for the Wilson-Foley campaign.  This claim too is belied by the evidence.  The evidence shows that Mr. Rowland volunteered for the Wilson-Foley campaign and entered into a legitimate consulting relationship with Apple.

#### 1.  Mr. Rowland Serves as a High-Level Advisor to Ms. Wilson-Foley

Mr. Foley and Mr. Rowland first met approximately twenty years ago when Mr. Rowland was running for Governor.  (September 5, 2014 Tr. at 213:11-214:13).  Mr. Foley subsequently hosted political fundraisers for Mr. Rowland.  (September 5, 2014 Tr. at 214:15-215:14).

Later, Mr. Foley's wife, Ms. Wilson-Foley decided to launch her own career in politics running in 2010 for Lieutenant Governor of Connecticut and in 2012 for Congress in Connecticut's Fifth District.  Mr. Rowland served as a high-level, but unpaid, advisor in both campaigns.  (September 5, 2014 Tr. at 218:12-21).  Mr. Rowland voluntarily met with Ms. Wilson-Foley on six to eight occasions in connection with the 2010 campaign.  (September 5, 2014 Tr. at 217:12-218:11).  And, as of September 2011, Mr. Rowland had voluntarily met with Ms. Wilson-Foley on six to eight additional occasions in connection with her Congressional campaign.  (September 5, 2014 Tr. at 222:1-11; 225:2-11).  Mr. Foley testified that before any agreement for Mr. Rowland to work at Apple, Mr. Rowland served as Ms. Wilson-Foley's "main advisor." (September 5, 2014 Tr. at 222:20-21).

Mr. Foley testified that, throughout this time, Mr. Rowland was a "sincere supporter" of Ms. Wilson Foley (September 8, 2014 Tr. at 259:2-14) and provided her with "top to bottom wisdom." (September 8, 2014 Tr. at 255:21-24).

2.       Mr. Rowland Proposed to Work in a Paid Capacity for Ms. Wilson-Foley;
Mr. Foley Offers Mr. Rowland a Job at Apple

On September 12, 2011, Mr. Rowland met with the Foleys and proposed to enter into a paid consulting relationship with the Ms. Wilson-Foley's 2012 Congressional campaign. (September 5, 2014 Tr. at 230:19-21; 232:2-10). According to Mr. Foley, he and Ms. Wilson-Foley discussed Mr. Rowland's proposal after the meeting, and assessed both the positives and negatives of Mr. Rowland formalizing his relationship with the campaign. (September 5, 2014 Tr. at 245:23-246:12). Mr. Foley continued to think about this issue the following night, September 13, 2011, and "was trying to find a solution." (September 8, 2014 Tr. at 51:23-52:10).

Mr. Foley stated that, the next morning, on September 14, he "came up with the idea that if [he] were to hire Mr. Rowland for Apple [Healthcare, Mr. Foley's company], [Mr. Rowland] would then be supportive for the campaign and that would solve that problem." (September 8, 2014 Tr. at 52:12-16). In this way, according to Mr. Foley, Mr. Rowland would be supportive of the Wilson-Foley campaign and there would be no obligation to disclose Mr. Rowland on the Wilson-Foley campaign's FEC reports. (*See* September 8, 2014 Tr. at 52:19-53:3).

That morning, according to Mr. Foley, he told Ms. Wilson-Foley words to the effect of "I may have something for Mr. Rowland at Apple" or "I may be able to hire Mr. Rowland for some work at Apple." (September 8, 2014 Tr. at 53:6-14; 53:24-54:1). According to Mr. Foley, Ms. Wilson-Foley responded positively and the two discussed Ms. Wilson-Foley calling Mr. Rowland to relay this information. (September 8, 2014 Tr. at 54:3-12). Later that day, Mr. Foley received an e-mail from Mr. Rowland. It read: "Brian, had a brief chat with Lisa. I get

it. Let's you and I meet.  Good time for you? I am doing Ray Dunaway Friday, and next week, so I am free/flexible Friday after nine, Monday after nine, Wednesday same."  (September 8, 2014 Tr. at 55:3-18); GX109.  Mr. Foley testified that he did not know what, if anything, Ms. Wilson-Foley said to Mr. Rowland to prompt his e-mail.  (September 9, 2014 Tr. at 26:11-27:9).

Following this e-mail, Mr. Foley and Mr. Rowland met on September 16, 2011.  (September 8, 2014 Tr. at 59:18-20).  The meeting began with some "small talk."  (September 8, 2014 Tr. at 61:11-13).  Mr. Rowland then told Mr. Foley that Mr. Greenberg was offering Mr. Rowland between $7,500 and $8,500 per month to work on Mr. Greenberg's campaign, but that Mr. Rowland did not want to support Mr. Greenberg.  (September 8, 2014 Tr. at 60:24-61:3).

Mr. Foley "ignored" Mr. Rowland's entreaty and told Mr. Rowland that there was a "consulting job [Mr. Foley] could hire [Mr. Rowland] for at Apple."  (September 8, 2014 Tr. at 61:22-25).  Mr. Foley then went into "great detail" about the work Mr. Foley wished Mr. Rowland to do at Apple, making no further mention of the campaign.  (September 8, 2014 Tr. at 61:25-62:6; 62:15-19).

The two discussed topics on which Mr. Rowland had "experience" and "expertise" to share with Apple.  (September 8, 2014 Tr. at 64:4-6; 64:20-24).  Mr. Foley testified that Mr. Rowland "immediately engaged" on these issues, appeared "very interested," and "made comments about how he thought he could be helpful."  (September 9, 2014 Tr. at 30:16-25).  Mr. Foley testified that the meeting lasted approximately 30 minutes total and <u>27 minutes were spent discussing Apple issues</u>.  (September 8, 2014 Tr. at 59:22-24; September 9, 2014 Tr. at 30:4-8).

Mr. Foley testified that his primary motivation in hiring Mr. Rowland for Apple was for Mr. Rowland to "continue" to "be supportive" of Ms. Wilson-Foley's campaign.  (*See* September

8, 2014 Tr. at 52:24-53:3; September 9, 2014 Tr. 39:5-6).  Mr. Foley stated, however, that he

"saw the potential" for Mr. Rowland to assist Apple and "potential value" to Apple of having

Mr. Rowland work for it.  (September 9, 2014 Tr. at 37:8-18).

Mr. Foley testified that he never told Mr. Rowland (or anyone else for that matter), in the

two years that followed, that his hiring Mr. Rowland was a subterfuge.  (September 9, 2014 Tr. at

35:2-9).  He did, however, tell his lawyer, a "highly respected campaign finance lawyer" at

Patton Boggs LLP, in Washington, D.C., that he planned to hire Mr. Rowland for work at Apple

and that Mr. Rowland would also be volunteering for Ms. Wilson-Foley's campaign; Mr. Foley's

attorney told Mr. Foley that this was appropriate.  (September 9, 2014 Tr. at 55:21-56:19).

Mr. Foley also was open about hiring Mr. Rowland at Apple with Ms. Wilson-Foley's campaign

staff who understood there to be a legitimate need for assistance at Apple.  DX71.

### 3.   Apple Drafts a Contract

Following the September 16, 2011 meeting, Apple began drafting a contract.  The

Agreement went through several permutations before it was presented to Mr. Rowland, but these

earlier drafts, one of which included a provision for Mr. Rowland to perform political activities,

were never sent to him.  *See e.g.,* September 9, 2014 Tr. at 44:5-10.

Instead, the first evidence that any draft of a contract was presented to Mr. Rowland is an

October 27, 2011 e-mail in which proposed edits to the contract by Mr. Rowland are attached.

GX162.  Mr. Rowland's proposed edits include a broadening of his duties at Apple.  (September

9, 2014 Tr. at 49:21-50:2; *see also* September 8, 2014 Tr. at 93:19-95:5).

Several weeks later, on November 11, 2011, Mr. Rowland signed an agreement to work at

Apple (the "Agreement").  GX1.  The Agreement generally incorporates Mr. Rowland's

proposed changes. *Compare* Agreement, *with* GX162.  The Agreement broadly calls upon

Mr. Rowland to perform consulting services for The Law Offices of Christian Shelton, LLC or its clients for a six-month term.

Christian Shelton ("Mr. Shelton") served then – and serves now – as general counsel for Apple and as Apple's chief compliance officer.  (September 5, 2014 Tr. at 206:10-19; September 15, 2014 Tr. at 155:2-10).  The evidence presented at trial was that Mr. Shelton suggested the structuring of the contract through Mr. Shelton's offices.  *See, e.g.*, September 8, 2014 Tr. at 73:11-23; GX149.  Mr. Rowland was not involved in this decision, but the evidence shows that Mr. Rowland was sensitive to concern from Apple that a direct affiliation with Apple could negatively impact Apple's relationship with Connecticut's Democratic Governor's administration.  (September 9, 2014 Tr. at 52:1-55:20).

Additionally, while Apple elected to pay Mr. Shelton through another entity owned by Mr. Foley, Ridgeview Realty LLC, there is no evidence that Mr. Rowland was aware of this fact.

4.      Mr. Rowland Continues to Volunteer on the Campaign, and Begins Work at Apple

While the Agreement was being drafted by Mr. Shelton, Mr. Rowland continued to volunteer with the Wilson-Foley campaign and began working at Apple.

a.      Mr. Rowland's Volunteer Efforts

Mr. Foley testified that Mr. Rowland's efforts at the campaign increased following the September 14, 2011 meeting and Mr. Rowland did more work than expected there.  *See* September 8, 2014 Tr. at 133:9-17; September 9, 2014 Tr. at 123:25-124:9).

The record reflects that Mr. Rowland was openly assisting at the campaign's headquarters and that Mr. Rowland made several public appearances that made plain his association with, and support for, Ms. Wilson-Foley's campaign.  (*See* September 9, 2014 Tr. at 123:8-124:25).  Mr. Rowland's efforts were nonetheless relatively modest.  He worked significantly less than the

campaign's general consultant, Chris Healy, and far less than campaign staff.  (September 11, 2014 Tr. at 165:7-14).

Mr. Healy went to campaign headquarters almost every day and was available remotely. (September 11, 2014 Tr. at 152:3-15).  Christopher Syrek, a senior campaign staffer, worked 60-70 hours per week in October and November 2011, when Mr. Rowland is alleged to have increased his own involvement in the campaign, and later almost "continuous[ly]."  (September 11, 2014 Tr. at 150:17-151:18).  Christopher Covucci, another senior staffer, worked over 40 hours a week and some weekends.  (September 10, 2014 Tr. at 58:14-25).  Mr. Syrek and Mr. Healy were also reimbursed for personal expenses on behalf of the campaign.  (September 11, 2014 Tr. at 156:2-7).

Mr. Rowland's availability was irregular and erratic with staffers reporting that he worked anywhere from one to three times per week, but, sometimes, not at all in a given week. (September 11, 2014 Tr. at 164:15-22; September 11, 2014 Tr. at 196:14-19; September 11, 2014 Tr. at 163:16-22).  Mr. Rowland did not have a desk (September 11, 2014 Tr. at 166:7-9), have or use a computer at the office (*id.* at 166:10-15), or receive reimbursements for any expenses (*id.* at 156:14-19).  Mr. Rowland's efforts, the record shows, were reflected in his giving high level strategic advice[3] to help steward a campaign that was generally run by young staffers in their twenties with minimal campaign experience.[4]

---

[3]   *See*, *e.g.*, September 10, 2014 Tr. at 212:1-213:25) (Rowland offering advice on press release); September 11, 2014 Tr. at 199:6-200:23) (Rowland educating the team regarding fundraising); September 10, 2014 Tr. at 75:3-5 ("he [Rowland] had a lot of good ideas").

[4]   September 10, 2014 Tr. at 129:4-6 and September 11, 2014 Tr. at 145:1-7 (Syrek graduated college in 2008 and had worked as a paid campaign staffer on a single campaign); September 10, 2014 Tr. at 57:7-20 (Covucci was 29 years old at time of campaign and had worked on three failed campaigns); September 11, 2014 Tr. at 187:14-17 and September 12, 2014 Tr. at 21:16-20 (Lauren Casper, the campaign's finance director, was 24 years old in fall of 2011).

The record also reflects that the campaign was judicious in its deployment of Mr. Rowland.  The campaign was generally concerned with Mr. Rowland's affiliation with it becoming widely known.  (September 11, 2014 at 138:14-21).  It was particularly sensitive to Ms. Wilson-Foley's rival, Mike Clark, discovering Mr. Rowland's affiliation with the campaign because Mr. Clark had been involved in Mr. Rowland's prior prosecution.  (*See*, *e.g.*, September 8, 2014 Tr. at 263:7-24; September 5, 2014 Tr. at 141:17-142:18).  Mr. Rowland too was sensitive to this fact.  GX183.

b.   <u>Mr. Rowland's Work at Apple</u>

Both Mr. Foley and Apple's key day-to-day executive – Chief Operating Officer Brian Bedard (September 8, 2014 Tr. at 235:7-20) – agreed that Mr. Rowland performed real work at Apple.[5]

First, at a general level, Mr. Rowland provided high-level strategic advice.  While Apple was a large company with over 3,000 employees and around $200 million in annual revenue, Mr. Foley hoped to create a new advisory board to provide high-level expertise to Apple to assist it in facing new industry challenges.  (September 15, 2014 Tr. at 148:4-12; 160:25-164:15).  Mr. Rowland was the first member of this new advisory board.  (*Id.*).  Mr. Rowland met on eight to ten occasions with Apple staff in this capacity over the approximately seven-month life of the contract.  (September 15, 2014 Tr. at 181:1-25).  Mr. Rowland participated substantively in these meetings, at which he discussed issues of significance to Apple, including nursing home closing, reimbursement, unions, and the potential for Apple to be tarnished by negative ads due to Ms. Wilson-Foley's campaign.  (September 15, 2014 Tr. at 182:3-13, 188:22-189:4).

---

[5]        September 9, 2014 Tr. at 72:2-72:11; 79:22-81:8; 88:13-25; 92:6-8 (Foley); September 16, 2014 Tr. at 89:7-20 (Bedard).

These meetings included a tour of an Apple facility to assist Mr. Rowland in better understanding the company and learning more about the Apple brand.  (September 15, 2014 Tr. at 199:22-200:8).  They also included a meeting with Tim Coburn, an industry expert, and Tom Ritter ("Mr. Ritter"), a prominent lobbyist.  (September 9, 2014 Tr. at 98:9-99:7).  Mr. Rowland had been asked to recommend a new lobbyist to deal with the new Democratic administration.  (September 8, 2014 Tr. at 124:2-8).  Mr. Rowland recommended Mr. Ritter and negotiated a contract with him for Apple.  (September 9, 2014 Tr. at 69:15-69:19).  Second, Mr. Rowland assisted Apple by preparing a written analysis of a report, dubbed the Mercer Report, concerning downsizing of nursing homes.  (September 16, 2014 Tr. at 14:24-26:24).  This was an issue of great significance to Apple and Mr. Rowland's political expertise and health care experience had value to Apple in assessing the report.  (*See* September 16, 2014 Tr. at16:9-25:8).  Mr. Rowland did not prepare any similar reports for Ms. Wilson-Foley's campaign.

Third, Mr. Rowland counseled Apple on the negative potential impact of the Wilson-Foley campaign on the company.  Mr. Rowland advised Mr. Foley and Mr. Bedard of this potential, which Mr. Foley acknowledged was "real Apple business."  (September 9, 2014 Tr. at 73:8-74:16).  Mr. Rowland advised Mr. Bedard to prepare for potential attacks against Apple by collecting Apple's deficiency reports and assisted Mr. Bedard in reviewing the reports.  (September 16, 2014 Tr. at 10:6-11:1).

Fourth, Mr. Rowland helped sensitize Apple to a potential FEC compliance issue.  When Mr. Foley sought to run Apple ads featuring Ms. Wilson-Foley, Mr. Rowland counseled repeatedly against it and, ultimately, the ads were pulled.  (September 15, 2014 Tr. at 215:9-216:16).

Fifth, Mr. Foley sought Mr. Rowland's input in finding and assessing other potential outside advisor candidates.  Mr. Foley testified at trial that he earnestly sought Mr. Rowland's assistance in this regard and that this was a sincere effort.  (September 9, 2014 84:21-85:18).

Sixth, Mr. Rowland provided advice to Apple on union issues.  In particular, Mr. Bedard sought advice from Mr. Rowland on materials prepared to counter union formation attempts. (September 16, 2014 Tr. at 6:12-7:21).  More generally, Mr. Rowland provided high-level strategic advice concerning the union and Apple's interactions with the state.

Seventh, Mr. Rowland regularly kept Apple leadership apprised of new industry developments that he believed would be of interest to them.

Finally, Mr. Rowland was responsible for evaluating Mr. Bedard and Mr. Hambley. (September 8, 2014 Tr. at 136:15-19).  Mr. Rowland gave oral reviews of both Mr. Bedard and Mr. Hambley to Mr. Foley.  (September 8, 2014 Tr. at 160:11-22).

Mr. Rowland performed all of his assigned responsibilities for Apple.  Mr. Foley ensured this, withholding payments to Mr. Rowland until he was assured that Mr. Rowland was working for Apple.  (September 9, 2014 Tr. at 64:23-65:8; 66:19-67:2).  Mr. Bedard too agreed that Mr. Rowland performed all duties, and attended all meetings, that Apple requested.  (September 16, 2014 Tr. at 15:15-21).  Mr. Bedard considered Mr. Rowland's work to be substantive and his contributions to be real.  (September 16, 2014 Tr. at 89:7-20).  Mr. Bedard never questioned the authenticity of Mr. Rowland's relationship with Apple.  (September 16, 2014 Tr. at 89:7-20).

In March 2012, Mr. Rowland requested a one-year contract renewal – a renewal that would have taken the contract far past Ms. Wilson-Foley's election.  (September 8, 2014 Tr. at 201:2-11; September 9, 2014 Tr. at 115:7-116:24).  Mr. Foley ultimately agreed to a six-month extension.  (September 8, 2014 Tr. at 201:2-8).

5.      Mr. Rowland Ends His Relationship with the Campaign and Apple

Mr. Rowland did not complete the remaining portion of his contract, however.  In April 2012, news stories began to focus on Mr. Rowland's role in the Wilson-Foley campaign. (September 11, 2014 Tr. at 101:7-14).  The campaign grew concerned about public attention on Mr. Rowland's role at the campaign.  (September 11, 2014 Tr. at 101:22-25).  Mr. Syrek advised Mr. Foley that the campaign could either "dodge the issue" or choose to disclose Mr. Rowland's relationship with Apple.  (September 11, 2014 Tr. at 109:6-16).  Mr. Foley informed Mr. Syrek that the campaign would disclose the relationship.  (September 11, 2014 Tr. at 109:20-21). Mr. Foley, Ms. Wilson-Foley, Mr. Syrek, Mr. Healy, and Mr. Rowland subsequently met to discuss a strategy to handle the media in the wake of the disclosure and ameliorate any damage. (September 11, 2014 Tr. at 114:21-117:23).  To do so, they chose to downplay the extent of Mr. Rowland's involvement in the campaign and for Mr. Rowland to end his work at Apple and volunteering for the campaign.  (September 11, 2014 Tr. at 117:14-22; 120:22-121:3).

6.      The Foleys Defend the Propriety of the Agreement until Their Friends, Family, and Children Face Exposure for Unrelated Conduct

Following the disclosure of Mr. Rowland's relationship with the Foleys, the Foleys continued to defend the propriety of Mr. Rowland's work at Apple and campaign volunteering. (September 11, 2014 Tr. at 122:17-24).  Later, federal authorities began investigating Mr. Rowland's relationship with the Foleys.  (September 9, 2014 Tr. at 129:20-130:2).  The Foleys continued to vigorously defend their relationship with Mr. Rowland then too.  Mr. Foley, through his lawyer, submitted a series of letters to the Government defending the propriety of Mr. Rowland's relationship with Apple.  (September 9, 2014 Tr. at 130:3-131:21).

Mr. Foley's stance shifted dramatically, however, when he learned that straw donations he had made using his friends, sister, niece, and children were being investigated, that they had

criminal exposure, and that his own children might be brought before the grand jury.  (September 9, 2014 Tr. at 137:1-18; 153:3-158:19).  Mr. Foley then became a cooperating witness[6] and agreed to a "package deal" in which he and Ms. Wilson-Foley both plead guilty to misdemeanors related to their relationship with Mr. Rowland and no one else from the Foley family, the campaign or Apple were charged.  (September 9, 2014 Tr. at 162:14-163:5).

Both Mr. Foley and Ms. Wilson-Foley have, however, given statements that call into question their guilty pleas.  Following Mr. Foley's guilty plea, Mr. Foley told Mr. Bedard that Mr. Foley "had never made a specific deal with Mr. Rowland" and there "was no quid pro quo." (September 17, 2014 Tr. at 28:14-21).  Similarly, at Ms. Wilson-Foley's plea hearing, she engaged in a strained and lengthy colloquy that necessitated a break in the proceeding before reluctantly admitting participation in a conspiracy.[7]  During the course of the hearing, Ms. Wilson-Foley denied entering into any agreement and denied hiring Mr. Rowland for the campaign[8], before admitting to the conduct that, in her view, made her guilty of the crime charged.  According to Ms. Wilson-Foley, because Mr. Rowland's work for the campaign increased after he began getting paid by Apple, she should have reported "some of the money" to Mr. Rowland.[9]

---

[6]     Despite Mr. Foley's cooperation agreement, which obligated him to report any and all of his wrongdoing to the Government, Mr. Foley did not report a $500,000 straw donation he made to his wife.  (September 9, 2014 Tr. at 158:20-159:4).

[7]     Case No. 14-cr-00065 (JBA), Mar. 31, 2014 Wilson-Foley Plea Hr'g Tr. at 32-33.

[8]     Case No. 14-cr-00065 (JBA), Mar. 31, 2014 Wilson-Foley Plea Hr'g Tr. at 31 ("No, I did not enter into an agreement.  I had an understanding."); Id. at 34 ("He was never hired to work on my campaign.").

[9]     Case No. 14-cr-00065 (JBA), Mar. 31, 2014 Wilson-Foley Plea Hr'g Tr. at 32-33 ("When my husband offered to hire John Rowland I knew that his hiring John Rowland would increase the work that John Rowland would do for my campaign.  So I knew that I should have put some of the money that my husband paid to John Rowland towards a record of that for my campaign.").

The timing of the Foleys' dramatic reversal, and the substantial evidence of work by Mr. Rowland at Apple, demonstrate that: (1) Mr. Rowland in good faith worked at Apple and volunteered for the Wilson-Foley campaign; and (2) the Foleys' claims to the contrary are a product of tremendous pressure to extricate themselves, and their friends and family, from significant criminal exposure that is wholly unrelated to Mr. Rowland.

## IV.   SENTENCING ANALYSIS

Following Mr. Rowland's conviction, the Probation Department calculated Mr. Rowland's offense level as 18 and criminal history category of II for a Guideline range of 30-37 months.[10]  PSR ¶ 97.  Mr. Rowland disputes the Probation Department's application of the Guidelines.  And, even under the correct Guidelines, which are lower, a Guidelines sentence is not supported by the 18 U.S.C. § 3553(a) sentencing factors.

### A.   The Probation Department's Guideline Calculation is Incorrect

The Probation Department's calculation was based upon: (1) a base offense level of 12 for Count 2 under USSG § 2C1.1(a)(2); and (2) a 6-point enhancement under USSG § 2C1.1(b)(2) based upon Mr. Rowland's gain from the alleged offense.  That calculation, which Mr. Rowland previously objected to, is incorrect for two reasons.

First, it is incorrect because USSG § 2J1.2, and not USSG § 2C1.1, is the applicable guideline.  Sentencing courts are charged with using the "most appropriate" guideline for the offense conduct charged.  USSG § 1B1.2 Application Note 1 (2013).  USSG § 2C1.1 is inappropriate because that guideline is limited to offenses involving bribery or the extortion of a public official.  *United States v. Huizar-Velazquez*, 720 F.3d 1189, 1192 (9th Cir. 2013) (recognizing that USSG § 2C1.1 only applies to § 371 interference with governmental functions

---

[10]     The Probation Department correctly rejected two enhancements proposed by the Government.  If the Government raises these enhancements in its sentencing brief, Mr. Rowland will respond to them in his response papers.

offenses when the interference involves the corruption of government officials); *United States v. Orsburn*, 525 F.3d 543, 546 (7th Cir. 2008) (recognizing that USSG § 2C1.1 honest services fraud is limited to honest services fraud involving bribery or a closely related offense); USSG § 2C1.1 Background ("This section applies to a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to participate in a fraud or to influence such individual's official actions, or to a public official who solicits or accepts such a bribe.").

Instead, USSG § 2J1.2 is the appropriate guideline.  Because Count 2 is a conspiracy charge under 18 U.S.C. § 371, and the conduct at issue is not covered by any other specific guideline, USSG § 2X1.1 applies.  Under USSG § 2X1.1, the offense level for the underlying substantive offense charged applies.  In this case, there are multiple underlying substantive offenses charged in Count 2.  Under USSG §§ 1B1.2 and 3D1.3(a), the offense that results in the highest offense level is applied.  USSG § 2J1.2 applies because it has the highest adjusted offense level of the underlying offenses – 14.[11]

Second, even if USSG § 2C1.1 was potentially appropriate, USSG § 2J1.2 would still be the applicable guideline here.  This is because: (1) the 6-level enhancement is inapplicable as USSG § 2C1.1(b)(2) only pertains to benefits received "in return for [a] payment"[12] and there

---

[11]     Count 2 charges a conspiracy to commit the underlying crimes charged in Counts 3-7.  Count 3 charges a violation of 18 U.S.C. § 1519, which triggers 2J1.2 and an offense level of 14.  Counts 4 and 5 charge a violation of 18 U.S.C. § 1001, which triggers 2B1.1 and an offense level of 6.  Counts 6 and 7 charge a violation of 2 U.S.C. § 437g, which triggers 2C1.8 and an offense level of 12.

[12]     *See, e.g.*, *United States v. Pena*, 268 F.3d 215, 218 (3d Cir. 2001) (referring to "the value of the 'benefit received in return for the payment" in interpreting § 2C1.1(b)(2)); *United States v. Abbadessa*, 848 F. Supp. 369, 381 (E.D.N.Y. 1994)("Guideline [2C1.1] . . . requires that additional points be added if the value of . . . the benefit received in return for the payment . . . exceeds $2,000."), *vacated on other grounds by United States v. DeRiggi*, 45 F.3d 713 (2d Cir. 1995); *cf. United States v. Sapoznik*, 161 F.3d 1117, 1118 (7th Cir. 1998)(Posner, C.J.) ("The federal sentencing guidelines base the severity of punishment for a crime that involves taking bribes . . . on the 'benefit received' in return for the bribe.").

was no payment to a public official here[13]; and (2) with an offense level of 12 for USSG § 2C1.1, USSG § 2J1.2 would be the highest and, therefore, most appropriate guideline.[14]

Applying § 2J1.2, the correct Guideline, Mr. Rowland has an offense level of 14 and a criminal history category of II, which results in a Guidelines range of 18-24 months.

B.     A Guidelines Sentence is Unwarranted Even Under the Correct, Lower Guideline

While the Guidelines form the starting point of this Court's analysis, they are just that – a starting point. *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) ("[W]e have held that . . . 'the Guidelines are guidelines – that is, they are truly advisory.'"); *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors . . . ."). The Court has wide latitude to vary from the Guidelines based upon the factors enumerated in 18 U.S.C. § 3553(a) to ensure that the punishment "fit[s] the offender and not merely the crime." *Pepper v. United States*, 131 S. Ct. 1229, 1235, 1240 (2011). This Court should exercise that discretion here. Applying 18 U.S.C. § 3553(a)'s sentencing factors, a Guidelines sentence would be inappropriate even under the correct, lower Guideline range. Instead, a sentence below the correct, lower Guideline range is appropriate for five reasons.

---

[13]     Even if § 2C1.1 applies and this enhancement is applicable, the amount at issue is far less than the $30,000 necessary to trigger the six-point enhancement found by Probation. This is so for two reasons. First, this is because the fair market value of Mr. Rowland's services must be deducted from the amount he was paid and Mr. Rowland provided fair market value to the extent, as claimed by the Government, that he was paid for work on the Wilson-Foley campaign. *United States v. Barraza*, 655 F.3d 375, 385-86 (5th Cir. 2011)("bribery loss amount should be reduced by the fair market value of services rendered by the defendant . . . before the offense was detected"); USSG § 2C1.1 Application Note 3 (stating that loss is determined in accordance with § 2B1.1 and that it looks to the net value, i.e. profit); USSG § 2B1.1 Application Note 3(C)(i) (stating that loss is reduced by "the fair market value of . . . the services rendered"). Second, even setting this issue aside, the Government was required, and failed, to show that more than $30,000 paid to Mr. Rowland was for campaign, as opposed to Apple, work. They cannot do so here where Mr. Rowland earned $35,000 in total and both Mr. Foley and Ms. Wilson-Foley have acknowledged that Mr. Rowland did real and substantial work at Apple.

[14]     *See* Footnote 10.

First, the nature and circumstances of the alleged offense, a factor under 18 U.S.C. § 3553(a)(1), support a below Guidelines sentence.  The alleged offense is one that involved a modest gain to Mr. Rowland, particularly because the evidence was undisputed at trial that Mr. Rowland did real work for Apple.  There were no financial victims of Mr. Rowland's alleged wrongful conduct.  And Mr. Rowland's conduct did not involve the comparatively more serious corruption of political officials.

Second, Mr. Rowland's personal history and characteristics, also a factor under 18 U.S.C. § 3553(a)(1), support a below Guidelines sentence.  Mr. Rowland has lived a life of public service and civic engagement, has been a devoted husband and father, and has served as a mentor to many young adults.  The numerous letters of support attached to this memorandum uniformly attest to Mr. Rowland's integrity, generosity, and desire to help others – qualities that Mr. Rowland has evidenced throughout his life.  Mr. Rowland is also still very much needed at home to support his family and to continue to assist in the care of his mother and in-laws.

Third, a non-Guidelines sentence would nonetheless adequately reflect the seriousness of the offense and the need for deterrence, as required by 18 U.S.C. § 3553(a)(2)(A) and (B).  The simple fact that this conduct was prosecuted criminally adequately reflects the seriousness of the offense and the need for deterrence given that the conduct at issue is ordinarily addressed civilly by the Federal Election Commission.  And, whatever sentence is imposed, Mr. Rowland has already suffered significantly as a result of the charges here.  His life, which had been successfully rebuilt, has again been torn apart, and Mr. Rowland has lost his job, as well as his reputation.

Fourth, while 18 U.S.C. § 3553(a)(2)(C) requires that the Court fashion a sentence that will protect the public, a Guidelines sentence is greater than necessary to protect the public.  At

57 years old, Mr. Rowland is highly unlikely to commit any future crimes and is not a danger to society.  Mr. Rowland's alleged offenses, and the previous conduct to which he pleaded guilty in 2004, both involved politics.  Mr. Rowland has always been drawn to politics, but understands that chapter of his life is over.  Mr. Rowland has no intention to return to politics in any form in the future.  And, as a practical matter, any return would be impossible now.  In fact, far from needing protection from Mr. Rowland, Mr. Rowland's strong character and history of involvement demonstrate that Mr. Rowland can still contribute much to society.  As discussed above, since leaving office, Mr. Rowland has meaningfully contributed as a volunteer to a number of organizations with both high-level advice and by simply lending a hand when needed.  Imprisonment is not necessary to rehabilitate Mr. Rowland, and would in fact prevent him from continuing to be a productive member of society.

Fifth, a Guidelines sentence would result in an unwarranted sentencing disparity proscribed by 18 U.S.C. § 3553(a)(6).  Three of Mr. Rowland's alleged co-conspirators – Mr. Bedard, Mr. Shelton, and Mr. Healy, were not even charged with wrongdoing.  The remaining two, Mr. Foley and Ms. Wilson-Foley, pleaded guilty to misdemeanors capping their sentencing exposure at one year, despite the fact that they had significant additional criminal exposure for hundreds of thousands of dollars of conduit contributions – conduct that had nothing to do with Mr. Rowland.  A Guidelines sentence would also be inconsistent with the sentences generally imposed in more serious election law violations involving conduit contribution.  In those cases, many of which involved greater amounts and more pervasive conduct than at issue here, probation was usually ordered.  For example, in *United States v. Raffol,* the District Court imposed a sentence of probation with both conduit contributions and a witness tampering obstruction of justice offense.  *United States v. Raffol*, 10-cr-10268 (D. Mass.

36

2010).  Similarly, in *United States v. Snapper*, the District Court imposed a probation sentence with $62,100 in conduit contributions utilizing 21 different conduits.  1:10-cr-00325-PLF (D.D.C. 2010).  And in *United States v. Schwartz*, the District Court imposed probation with over $100,000 in conduit contributions.  1:05-cr-00157-RMU (D.D.C. 2005).  These lenient sentences are the norm in conduit contribution cases.[15]  *See, e.g.*, *United States v. D'Souza*, 1:14-cr-00034-RMB (S.D.N.Y. 2014) (probation sentence with $20,000 in conduit contributions); *United States v. Feldman*, 09-cr-75 (E.D. Pa. 2009) (fine imposed with $6,000 conduit contribution); *United States v. Winn*, 1:11-cr-10350-JGD-1 (D. Mass. 2012) (probation notwithstanding $64,000 in conduit contributions over an eight year period); *United States v. Troha*, 07-cr-00050 (E.D. Wis. 2007) (probation with over $250,000 in illegal contributions, much of it through conduits); *United States v. Pierce O'Donnell*, 2:08-cr-00872 (C.D. Cal. 2012) (60 days' imprisonment with $20,000 in conduit contributions); *United States v. Wickett*, 07-cr-20145 (S.D. Fla. 2007) (probation with conduit contributions using corporate funds); *United States v. Dye*, 07-cr-20144 (S.D. Fla. 2007) (probation and 180 days of home confinement with $25,000 in conduit contributions); *United States v. Collier*, 07-cr-0182 (D.D.C. 2007) (probation and 120 days home confinement with $66,000 in conduit contributions).

## V.   CONCLUSION

For all these reasons, Mr. Rowland respectfully requests that Court impose a non-Guidelines sentence below the applicable Guideline range of 18-24 months that reflects the unique circumstances of this case, acknowledges Mr. Rowland's exemplary character, and permits him to continue to help others and contribute to society.

---

[15]   This Court's recent sentencing in *United States v. Braddock*, (3:12-cr-00157-JBA) does not provide an appropriate benchmark for sentencing here because the conduct there involved an improper attempt to influence public officials.

Respectfully submitted,


/s/ Reid H. Weingarten
Reid H. Weingarten [phv01200]
William L. Drake [phv06671]
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, D.C. 20036
PH: (202) 429-8082
FAX: (202) 429-3902
rweingarten@steptoe.com
wdrake@steptoe.com

Michelle L. Levin [phv06670]
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
PH: (212) 506-3900
FAX: (212) 506-3950
mlevin@steptoe.com

Peter G. Billings [ct28629]
BILLINGS & BARRETT, LLC
941 Grand Avenue, 2nd Floor
New Haven, CT 06511
PH: (203) 562-0900
FAX: (203) 562-0902
peter@billingsandbarrett.com

*Counsel for Defendant John G. Rowland*

Dated: December 4, 2014