UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 3:14cr79 (JBA) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN G. ROWLAND | : | December 4, 2014 |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The Court has scheduled sentencing in this matter for January 7, 2015. As set forth below, the Government respectfully submits that a term of incarceration within the range of 37 to 46 months is appropriate and necessary in light of the sentencing factors set forth at 18 U.S.C. § 3553(a).

**I.     INTRODUCTION**

In 2010 and 2012, the race for Connecticut's Fifth Congressional district had national significance. In both election cycles, the balance of power in the United States of House of Representatives would be hotly contested, and, as one of the few remaining swing districts, the "Fightin' Fifth" would have a role to play in determining the majority party and the margin with which that majority might govern. Into these critical elections stepped John Rowland, the former Governor who had resigned his office in disgrace, pled guilty to federal corruption charges and served 10 months in federal prison. Mr. Rowland had hopes of rebuilding his political influence and becoming relevant in the world of Connecticut politics. This desire was so powerful that Mr. Rowland once again cast aside the public good and

his legal obligations to satisfy his own arrogance and hunger for being at the center of political action. Mr. Rowland's reentry into politics, however, was fraught because his crimes against the people of Connecticut made him toxic to many voters. So, Mr. Rowland devised a scheme to steer two Republican candidates to the United States Congress while keeping his paid role in the shadows and beyond the view of Connecticut voters and the Federal Election Commission ("FEC"). The first candidate, Mark Greenberg, ultimately rejected Mr. Rowland's invitation, but not before Mr. Rowland created a sham contract to hide campaign payments – a contract he later presented to the Department of Justice in an effort to obstruct the criminal investigation. The second candidate, Lisa Wilson-Foley, accepted Mr. Rowland's offer, but she was unwilling to suffer the public criticism that would result if she paid Mr. Rowland to help her win public office. So, she, Brian Foley and Mr. Rowland entered an illegal agreement almost identical to the arrangement that Mr. Rowland had proposed to Mark Greenberg. They drafted a sham contract, and Mr. Rowland set out to get Lisa Wilson-Foley elected to the United States Congress.

Thanks largely to Mr. Rowland's secret efforts, Ms. Wilson-Foley was in excellent position to win the Republican convention, the primary election and perhaps the general election. Then, in April 2012, a reporter uncovered the payments to Mr. Rowland, and eventually exposed Mr. Rowland's sham contract with the Law Offices of Christian Shelton. Questions about the legitimacy of the

contract and Ms. Wilson-Foley's association with the corrupt former Governor plagued her campaign through the primary election, where she finished a distant third. Had Mr. Rowland's and the Foleys' crimes not been detected and investigated, their fraud on the people of Connecticut might very well have resulted in the election of a criminal to the United States House of Representatives, who would have been responsible for representing over 700,000 constituents. And, she and the people of Connecticut would have had Mr. Rowland to thank for it.

In April 2014, a grand jury indicted Mr. Rowland on two counts of obstruction of justice by falsifying a document in a federal investigation, two counts of causing the submission of false statements to the FEC, two counts of making illegal campaign contributions and one count of conspiracy to commit these offenses and to defraud the United States. In September 2014, Mr. Rowland stood trial on these charges. On September 19, 2014, the jury convicted Mr. Rowland on all counts.

## II. FACTUAL BACKGROUND

The facts of this case are well known to the Court and accurately summarized at ¶¶ 5- 38 of the Pre-Sentence Report, dated November 24, 2014. The Government reserves the right to present additional evidence at sentencing if necessary, and submits that the Court may rely on the entire trial record in making its sentencing determinations.

## III.    THE PRE-SENTENCE REPORT & THE SENTENCING GUIDELINES

On November 24, 2014, the United States Probation Office issued its final Pre-Sentence Report ("PSR").  The PSR properly groups Counts One through Seven under U.S.S.G. § 3D1.2(b).  PSR ¶ 42.  The PSR then properly calculates that Mr. Rowland has a base offense level of 12 under U.S.S.G. § 2C1.1(a)(2), and that six levels are added under 2B1.1(b)(1)(D).  PSR ¶¶ 43-44.  The PSR concludes that the total offense level is 18.  PSR ¶51.  Because Mr. Rowland is in Criminal History Category II, the PSR calculates that he faces an advisory guideline range of 30 to 37 months imprisonment and a fine range of $6,000 to $60,000.  PSR ¶¶ 98, 104.

The Government objects to the PSR's failure to apply a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.  If that enhancement applies, the advisory sentencing range is 37 to 46 months with a fine range of $7,500 to $75,000.[1]  The Government respectfully submits that a sentence within that range is appropriate and necessary in this case.

### A.    Obstruction of Justice Under U.S.S.G. § 3C1.1

The defendant was convicted of two counts of obstruction of justice, in violation of 18 U.S.C. § 1519 (Falsification of Documents in a Federal Investigation) and one count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 371.  The convictions of the substantive obstruction counts stemmed from Mr. Rowland's

---

[1] The Government reserved its right to seek an abuse of a position of trust enhancement under § 3B1.3 based on Mr. Rowland's use of his radio show to promote Lisa Wilson-Foley's candidacy and harshly criticize her principal opponent in exchange for pay.  Although Mr. Rowland's use of his radio show was an egregious aspect of his conduct and certainly constituted an abuse of the public airwaves and a fraud on his audience, the Government is electing not to seek the two-level enhancement.

fabrication of two contracts that he created as vehicles through which he proposed to be paid to work on behalf of the Greenberg Campaign in 2009-2010 and the Wilson-Foley Campaign in 2011-2012. In convicting Mr. Rowland, the jury concluded beyond a reasonable doubt that "the defendant acted with the intent to impede, obstruct, or influence an investigation of a matter within the jurisdiction of an agency of the United States or in relation to or contemplation of any such matter or case." Jury Instructions, Doc. 138 at 11. The Government will not recite all the evidence that supported the jury's verdict, but certain facts bear emphasis: (1) In April 2013, Mr. Rowland sent the sham contract he proposed to enter with Mr. Greenberg to the United States Department of Justice for the express purpose of convincing the Government to shut down its investigation, *see* GX 520; (2) Mr. Rowland helped draft the sham contract with the Law Offices of Christian Shelton, suggested using JGR Associates to get "more cover", *see* GX 158, and agreed to structure the contract in a way that was clearly designed to conceal the mere fact of its existence; (3) Mr. Foley testified that the entire purpose of the contract was to forestall any investigation into the legitimacy of the payments to Mr. Rowland, *see* Foley Test. 9-8-14, 116:20– 117:2.; and (4) Mr. Rowland drafted a false affidavit for submission to the FEC in response to Mike Clark's complaint, *see* GX 292.[2] Given the jury's verdict and the trial evidence, there is no doubt that Mr. Rowland sought

---

[2] Mr. Rowland did not submit this affidavit to the FEC. However, he did submit a handwritten response to a separate FEC complaint filed by Ken Krayeske, which alleged that Mr. Rowland's on-air commentary about the Wilson-Foley campaign constituted an unlawful campaign contribution from CBS Radio. In his response, which was marked but not admitted as GX 404, Mr. Rowland stated to the FEC that he never gave out Andrew Roraback's cell phone number on the air. The trial evidence established that he did. After receiving Mr. Rowland's false response, the FEC closed its investigation into Mr. Krayeske's complaint.

to and did obstruct the investigation and prosecution of this matter by creating two false documents in connection with the investigation and prosecution and taking additional steps in furtherance of that obstruction.

Section 3C1.1 provides:

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

Although § 3C1.1 usually applies to conduct that occurs after the substantive crime has occurred, Application Note 1 provides:

Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.

Here, Mr. Rowland engaged in obstructive conduct both before and after the start of the criminal investigation. Given the jury's verdict, it is self-evident that the defendant acted willfully when he fabricated two documents to create a cover for his unlawful arrangement in the event he was ever investigated. That is, his conduct was "purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *See* U.S.S.G. § 3C1.1, Application Note 1.

The fact that the Government was able to overcome this obstruction and convict Mr. Rowland says nothing about whether the conduct was likely to have an obstructive impact on the investigation or prosecution. Indeed, it clearly did. The

existence of the contracts formed the entire basis for Mr. Rowland's defense against the investigation and prosecution. In May 2012, one of the conspirators' first steps to forestall any investigation was to release the Rowland/Shelton contract to the media. Likewise, in April 2013, Mr. Rowland presented the Greenberg contract to the Government to demonstrate that his proposal to Greenberg was unrelated to the campaign. The testimony at trial indicated that the conspirators were using the contract for the purposes it was designed for – to shut down an investigation into Mr. Rowland's illegal activities. At trial, Mr. Rowland used the contracts for the same purpose, repeatedly suggesting through questioning that the contracts were legitimate and designed to codify a legal relationship between Mr. Rowland and Lisa Wilson-Foley or Mark Greenberg. What the trial evidence made clear was that the existence of the sham contracts presented significant obstacles to the Government's investigation of this matter and its ability to prove its case. The Government was forced to prove through laborious investigation that the arrangement between Mr. Rowland and his co-conspirators was not the arrangement described in the contracts. Then, at trial, the Government had to overcome a forceful defense built almost entirely around the notion that the contracts were legitimate. None of these challenges would have existed had Mr. Rowland and his co-conspirators not had the criminal foresight to attempt to obstruct the investigation and prosecution.

In dealing with the Rowland/Shelton contract, the Government spent substantial time and resources probing the validity of the document, interviewing witnesses who had knowledge of the contract and trying to determine who had helped draft the contract. The contract's veneer of legitimacy presented significant challenges to the investigation and might have thwarted the investigation entirely had the Government not discovered draft versions of the contract and secured Brian Foley's cooperation.

John Rowland intended to – and did – obstruct and impede the FEC's and the Department of Justice's investigations into his campaign activities. His creation of two sham contracts demonstrates that he planned, in advance, to thwart an "investigation of a matter within the jurisdiction of an agency of the United States." His submission of false documentation to the Government during the investigations further underscores his obstructive behavior. Accordingly, the Court should apply an enhancement for obstruction of justice under USSG § 3C1.1.

IV.    **SENTENCING FACTORS UNDER 18 U.S.C. § 3553**

As a former congressional representative, governor, and radio talk-show host, Mr. Rowland displayed great political talent alongside a troubling disrespect for the law. He has repeatedly shown a willingness to manipulate the political process for his own personal benefit, undermining the fragile trust that binds citizens to each other and to their elected representatives. In this case, the section 3553(a) factors call for a significant term of imprisonment to (1) account for Mr. Rowland's personal

history and characteristics, (2) reflect the seriousness of the offense, (3) deter Mr. Rowland and others from committing similar offenses and, in doing so, promote respect for the law and protect the public and (4) avoid unwarranted sentencing disparities. The Government respectfully submits that a sentence within the range of 37 to 46 months will achieve those ends and constitute just punishment.

### A.     <u>History and Characteristics of the Defendant</u>

#### 1.     **John Rowland's Political Rise and Eventual Prosecution**

Mr. Rowland was elected to the Connecticut General Assembly at the age of 23, to the United States Congress at the age of 27 and to the Governor's Office at the age of 37. He was the youngest governor elected in Connecticut's history and the only governor to be elected to three four-year terms. Almost immediately upon becoming governor, Mr. Rowland demonstrated a disregard for the ethical obligations of his office.

In 1997, Mr. Rowland became the first governor to be fined by the Connecticut State Ethics Commission. He paid a $2,000 fine and donated an additional $1,919 to charity as part of a settlement with the Commission for his role in receiving gifts – in the form of concert tickets – from his subordinates. At the time, Mr. Rowland indicated to the press that he believed the rules against gifts from subordinates were "kind of silly" and his subsequent actions indicate that he

paid little heed to this initial reprimand.[3]  Over the course of the next seven years,
Mr. Rowland continued to accept gifts from subordinates and state contractors,
incurring a second fine from the State Ethics Commission in 2003.[4]  Unbeknownst
to the public at the time, Mr. Rowland was engaged in an ongoing conspiracy that
would eventually lead to his resignation and prosecution.

On July 1, 2004, Mr. Rowland resigned from the Office of Governor.  The
following December, he pleaded guilty to a conspiracy to receive gratuities in
connection with state business.  As part of his plea agreement, Mr. Rowland
admitted that from October 1997 to October 2003, he accepted $107,000 in illegal
gratuities and failed to report those gratuities to the IRS.  He took official actions as
Governor of the State of Connecticut to benefit his co-conspirators and repeatedly
lied to the public about his involvement in the illegal scheme. As part of the plea
agreement, the Government agreed to seek a sentence within the guideline range of
15 to 21 months.

### 2.      Post-Plea Conduct

Following his guilty plea, Mr. Rowland submitted a New Worth Statement to
his Probation Officer, which required him to disclose all bank accounts, including
"all personal and businesses checking and savings accounts, credit union, money
markets, certificates of deposit, IRA and KEOGH accounts, Thrift Savings, 401K,

---

[3] "Rowland To Pay $2,000 Ethics Fine," Jon Lender and Alan Levin, *Hartford Courant*, April 05, 1997
(http://articles.courant.com/1997-04-05/news/9704050345_1_ethics-case-ethics-commission-ethics-officials )(Last
viewed December 4, 2014.)
[4] During the same time, Mr. Rowland settled a case with the State Elections Commission for improperly using his
Republican Party credit card to make personal purchases and was embroiled in a controversy for taking military
equipment from a police barracks to the governor's mansion for his children's personal use.

etc)" and any securities that he held. Mr. Rowland disclosed only a $10,000 Bank of America account to probation and indicated that he owned $300 worth of securities, factors that the probation office took into account in determining that he had no ability to pay a fine and that his financial troubles were a motivator for his criminal activity. Mr. Rowland had, in fact, failed to disclose to the probation office a Simplified Employee Pension account worth over $416,000, despite having disclosed it every year between 1995 and 2004 on his State Ethics Disclosure.

As a result, the Government asked the sentencing court to apply an obstruction of justice enhancement, deny Mr. Rowland credit for acceptance of responsibility and impose a sentence within the resulting guideline range of 30 to 37 months.

Mr. Rowland was sentenced to a year and a day, and served 10 months in federal prison.

### 3.     Rowland's Post-Incarceration Conduct

Mr. Rowland was released from prison on February 10, 2006. In the years that followed, the former governor rebuilt a successful career. He hosted a talk show on CBS radio. He was represented in speaking engagements by Premiere Speakers Bureau, the same company that represents Magic Johnson, Richard Branson, Mike Huckabee and others. His speaking topics included programs on "Ethics in Corporate America," "The Components of Good Leadership" and "The Rise to Power, the Abuse of Power and the 'Real' Power." He earned approximately

$300,000 in both 2010 and 2011, and over $420,000 in both 2012 and 2013.[5] In 2008, Rowland told the New York Times that his appointment as Waterbury's economic development director was "not about the money. It's the public service aspect. Absolutely, I think it has qualities of redemption. The city gets a second chance. I get a second chance."

Mr. Rowland did receive a second chance, but he was not redeemed. Within a year of that statement, Mr. Rowland embarked upon the criminal ventures of which he now stands convicted. In his public statements, Mr. Rowland acknowledged the danger of arrogance and self-importance, yet the trial evidence showed that Mr. Rowland repeatedly and arrogantly advertised his political acumen, his mastery of political tactics and his political connections. *See* GX 3 and GX 513. Despite public claims of having been "humbled" by his previous fall from grace, Mr. Rowland acted in blatant disregard of the federal election laws in not one, but two congressional campaigns.

In connection with his first federal sentencing, Mr. Rowland argued for a downward departure from the guidelines, relying heavily on his record of public service. There is no doubt that John Rowland is conversant in the language of public service, good government, and humility. But, all too often, Mr. Rowland has used such language to mask his illegal activity. As the PSR notes, "[t]here is a troubling pattern that emerges from Mr. Rowland's history. Unethical behavior

---

[5] The PSR states that Rowland earned approximately $231,000 in 2011. PSR ¶ 95. This appears to be a typo. Records obtained by the government indicate that Rowland earned approximately $295,000 in 2011.

while in office, accepting things of value in exchange for his political influence, and now similar types of conduct where there are clandestine agreements made to exchange money for power and control." PSR ¶ 115. The evidence in this case indicates that Mr. Rowland learned nothing from his past transgressions.

Mr. Rowland's achievements prior to his first conviction were remarkable. His ability to get back on his feet and build a successful career following his conviction was as impressive. Not only was Mr. Rowland able to find gainful employment – an advantage that is all too often denied to ex-offenders – he achieved real personal and economic success. In 2012 and 2013, Mr. Rowland earned more money than 98% of all Americans.[6] Such success "make[s] it all the more difficult to understand Mr. Rowland's reengagement in criminal activity." PSR ¶ 114. The fact is Mr. Rowland's offense was not driven by a need for money, but a need for power, influence and political admiration. Throughout his public life, these same impulses have led to serial ethical lapses and persistent criminal behavior. Although blessed with a life full of opportunity and second chances, Mr. Rowland has chosen the wrong path too many times and this Court's sentence must finally and fully address that troubling personal history.

---

[6] Household income calculator, "What percentage are you?" (Available at http://blogs.wsj.com/economics/2011/10/19/what-percent-are-you/) (Last viewed December 4, 2014.)

**B.     Nature and Circumstances of the Offense & The Need for the Sentence to Reflect the Seriousness of the Offense**

*When we run for public office, we ask for the public trust . . . . When that trust is violated, the damage becomes in some ways permanent because it is immediately part of our popular culture and part of the public's perception. . . . The public needs to know that offenders are punished under our system of government.*

John Rowland addressed these words to the State Ethics Commission in 2000. His assessment of the harm that corruption does to a democratic society was as correct then as it is now. The public trust is a fragile good, nurtured by centuries of democratic government and social progress, but buffeted by the actions of corrupt politicians and their crooked courtiers. Corruption of the electoral system threatens the very fabric of our society and is among the most serious crimes prosecuted by the United States government. It sows cynicism among the public and deprives voters of their right to freely choose their elected officials.

The right to exercise the franchise in an informed manner that best serves each citizen's interest is essential to the proper functioning of our Republic. The federal election laws exist to protect that right. The law requires that federal candidates make a true and accurate accounting of all donations they have received and all expenses they have made so that the citizens can properly police their own leaders. Mr. Rowland's actions undermined this system and, in 2012, succeeded in depriving Connecticut voters of their right to know what was occurring within the Lisa Wilson-Foley Campaign for Congress.

In carrying out his conspiracy with the Foleys, Rowland not only corrupted the electoral process, he also was paid to manipulate public opinion from his perch as a radio talk show host. Mr. Rowland was the host of Church and State, a prominent news and political commentary radio show on WTIC 1080. WTIC 1080 is an affiliate of CBS, and operates pursuant to a license issued by the Federal Communications Commission. The evidence at trial demonstrated that the defendant used his radio show to promote Lisa Wilson-Foley's candidacy and harshly criticize her principal opponent in exchange for compensation. The defendant never disclosed to his listening public that he was being paid to engage in campaign work on behalf of Lisa Wilson-Foley. At trial, Chris Syrek testified about the benefits this gave the campaign.

> Messaging on campaigns is very important, if not probably the most important thing a campaign can do and control, and to get the media outlets and the press to agree with you and to support your positions on issues is incredibly hard, if not sometimes impossible, for certain candidates. So to know what was going on and the issues that were of relevance and to have those statements echoed on a radio show to an audience such as WTIC provided was incredibly helpful.

Syrek 9.10.2014 Tr. at 194:24. Mr. Rowland had free reign to use the public airwaves to engage in paid campaign work unbeknownst to the FCC or the public. Mr. Rowland used the guise of the free press to execute a political hit-job on Andrew Roraback by stirring up public animosity against Mr. Roraback, urging his audience to call Mr. Roraback and harass him about his position on the death penalty and

then equipping them to do just that by giving out Mr. Roraback's cell phone number on the air.

In sum, Mr. Rowland's actions struck at two central pillars of our democracy: fair and transparent elections and an independent press. The Court's sentence should appropriately reflect the gravity of Mr. Rowland's conduct.

## C.    <u>Specific Deterrence & Protection of the Public</u>

It is difficult to believe that anybody with Mr. Rowland's long, public record of ethical and legal violations and associated penalties would be in need of further deterrence. Yet, given the facts of this case, there is no other conclusion. As Governor, Mr. Rowland was fined over $10,000 by the State Ethics Commission for accepting gifts from subordinates and state contractors.[7] In 2004, Mr. Rowland resigned the Office of Governor in disgrace, following disclosures that he had accepted gifts from state contractors and then repeatedly lied to the public about the circumstances surrounding those gifts.[8] In December 2004, he pleaded guilty to federal corruption and tax offenses, and admitted that he conspired to deprive the people of Connecticut of their right to his honest services by using his authority as Governor to dole out government contracts in exchange for gratuities valued at over

---

[7] In 1997, he was fined $2,000 and ordered to pay an additional $1,919 to charity because he accepted high price tickets from subordinates to six music concerts. In 2003, he was ordered to pay $9,000 because he accepted cut rate or free vacation lodging from state contractors.

[8] On January 7, 2004, Mr. Rowland addressed the State of Connecticut from the Governor's office, and admitted that he lied about the circumstances surrounding his receipt of gifts from state contractors. He asked for forgiveness, stated that knew better than to lie, then stared directly into the camera and said, "I want you all to know that I have never – not once – provided any favors or taken any actions in exchange for the gifts that I have received." Speech of John Rowland, aired on January 7, 2004 (http://www.c-span.org/video/?179836-1/connecticut-governor-address) (last viewed on December 3, 2014). As he later admitted in federal court, this too was a lie.

$100,000. In advance of sentencing in that case, Mr. Rowland obstructed the sentencing process by concealing from the United States Probation Office his single largest asset. At sentencing Mr. Rowland informed the Court that the public humiliation and prosecution had changed him, that it had been "a humbling and meaningful journey towards personal and spiritual growth." In a demonstration of leniency, the district court sentenced Mr. Rowland to 12 months and one day incarceration, resulting in an effective 10-month prison term. Following his release from prison, Mr. Rowland professed on a national television program that he had "fallen into grace," and learned why "really successful, smart people do dumb things . . . the answer is one word 'arrogance' and the sense of entitlement."[9] Within a year of making that statement, Mr. Rowland hatched a plan to perform illegal campaign work for the Greenberg campaign and to obstruct the administration of justice. Then, in 2011 and 2012, Mr. Rowland engaged in a conspiracy to violate federal election laws and to obstruct justice in connection with the Lisa Wilson-Foley for Congress Campaign.

Given this course of conduct, deterring Mr. Rowland and protecting the public from him must be an objective of the Court's sentence. In the Government's view, Mr. Rowland is an individual who simply refuses to "play it straight," because he delights in the illicit, dark side of politics where rules are for suckers, the public good is an afterthought, the game is all that matters and he is the indispensable

---

[9] Interview of John Rowland, *Huckabee*, originally aired December 13, 2008 (available at https://www.youtube.com/watch?v=1lOhuq3_IK0) (last viewed December 3, 2014).

player of that game. The public humiliation of his resignation and the 2004 prosecution did nothing to change Mr. Rowland's outlook, nor did the 10-month prison term imposed by Judge Dorsey. It is this criminal attitude that poses a danger to the public and must be deterred. In short, Mr. Rowland has been a blight on Connecticut politics, and the Court's sentence should ensure that the people of Connecticut are spared further harm.

### D.   General Deterrence & Promoting Respect for the Law

It is also true that Mr. Rowland would not have been in a position to unlawfully manipulate the 2012 congressional race had he not been enabled by others who shared his disdain for the federal elections laws. The Court's sentence must also address these people and all who have the privilege of seeking public office and participating in the electoral process. These individuals must be reminded that the cost of usurping an election by depriving voters of information to which they are entitled is simply too high; that no political victory is worth the risk of a lengthy term in federal prison. After all, it is worth remembering that we don't hold elections in this country for sport, or to line the pockets of the political class. We hold elections in this country so that the American people can make informed decisions about who they trust to represent their interests and aspirations. The federal election laws, imperfect though they may be, remain the single greatest source for transparency and integrity in federal elections. The Court's sentence, therefore, should reflect the importance of these principles by sending a clear

message that people who seek to undermine these principles for their own political or financial gain will pay a steep price in federal court. By imposing a term of incarceration within the guideline range, the Court will also assure the public that their Government is capable of policing and sanctioning conduct that would corrupt their elections and deny them the right to make informed decisions in the voting booth.

### E. The Need to Avoid Unwarranted Sentencing Disparities

The Government respectfully submits that a sentence within the guideline range would be entirely consistent with sentences this Court has imposed in similar cases. In particular, in August 2013, this Court sentenced Robert Braddock, Jr. to 38 months imprisonment. Mr. Braddock was convicted of causing the submission of false statements to the FEC, accepting illegal campaign contributions and conspiracy to cause the submission of false statements to the FEC and to defraud the United States. The facts of that case are familiar to the Court. Mr. Braddock, as finance director of the Chris Donovan for Congress campaign, accepted $27,500 in conduit contributions from Roll-Your-Own smoke shop owners knowing that the contributions were bribe payments to Mr. Donovan. Mr. Braddock faced a guideline range of 41 to 51 months. His range was calculated under the same guideline provisions that the PSR references in this case. Like Mr. Rowland, Mr. Braddock was convicted at trial and did not receive credit for acceptance of responsibility. His guideline range was comprised of a base offense level of 12 (same as in this case), a

4 level enhancement because the value of the illegal campaign contributions exceeded $10,000 but was less than $30,000, a four-level enhancement because the offense involved a public official and a two-level enhancement for abuse of a position of trust. Mr. Braddock had no criminal history, resulting in a guideline range of 41 to 51 months. The Court imposed a non-guideline sentence below the range to account for Mr. Braddock's post-conviction charitable work for an anti-hunger organization.

Here, unlike Mr. Braddock, Mr. Rowland has previously been convicted of federal corruption charges. Further, unlike Mr. Braddock, Mr. Rowland's conduct spanned two elections, and he has now been convicted of two counts of obstruction of justice, in addition to the elections violations. Although Mr. Rowland's guideline range overlaps with Mr. Braddock's range, his range is slightly lower because his offense did not involve a public official and the Government has elected not to pursue an abuse of a position of trust enhancement. In the Government's view, however, the most critical sentencing factors – the nature of Mr. Rowland's conduct, his history and characteristics and the need to deter him and others – all suggest that it would be unwarranted for Mr. Rowland to receive a sentence below 38 months.

# V.    **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence of 40 to 46 months imprisonment is appropriate and necessary in light of the sentencing factors set forth at 18 U.S.C. § 3553(a).

Respectfully submitted,

MICHAEL J. GUSTAFSON
ATTORNEY FOR THE UNITED STATES,
Acting Under Authority Conferred
by 28 U.S.C. § 515

LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27924

CHRISTOPHER M. MATTEI
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27500

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3835

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2014, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_____
CHRISTOPHER M. MATTEI
ASSISTANT UNITED STATES ATTORNEY