UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 3:14cr79 (JBA) |
| v. : | |
| : | |
| JOHN G. ROWLAND : | December 9, 2014 |

**THE GOVERNMENT'S RESPONSE TO
THE DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Connecticut, hereby submits this response to the defendant's memorandum in aid of sentencing. In his memorandum, Mr. Rowland miscalculates the applicable guideline range, and argues for a below-guidelines sentence. His arguments should be rejected.

**I. INTRODUCTION**

After a nearly three-week trial involving evidence of laundered funds and complex questions of intent, it took a jury less than seven hours to convict Mr. Rowland on all charges. Despite this definitive and unanimous verdict, Mr. Rowland continues to dispute the clear fact of his guilt and even the propriety of the criminal prosecution. Ironically, although he refuses to accept the wrongfulness of his conduct, he insists that the prosecution alone is sufficient to punish him and deter future wrongdoing. The defendant's arguments underline his failure to take responsibility for his actions and the inadequacy of a below guidelines sentence. If

criminal prosecution were punishment enough for Mr. Rowland, he would not now be awaiting sentencing again.

## II. THE DEFENSE'S IMPROPER GUIDELINE CALCULATION

### a. APPLICATION OF U.S.S.G. § 2C1.1

Where a defendant is convicted of multiple offenses, the sentencing guidelines require the Court to consider whether the offenses should be grouped under § 3D1.2. Here, the PSR has properly grouped Counts One through Seven under § 3D1.2 because the conduct underlying those counts involve the same victim and was motivated by a common criminal objective. Under § 3D1.3, the Court is then required to determine the offense that carries the highest offense level and apply that offense level to the group. Here, the PSR properly determined that Mr. Rowland's commission of conspiracy to defraud the United States by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of the FEC, in violation of 18 U.S.C. § 371, carried the highest offense level. In particular, the PSR concluded that, by its own terms, § 2C1.1 governs that particular offense. The caption for § 2C1.1 expressly covers "Conspiracy to Defraud by Interference with Governmental Functions." Further, Appendix A to the sentencing guidelines indicates that violations of 18 U.S.C. § 371 fall under § 2C1.1 if the object of that conspiracy is "to defraud by interference with governmental functions." Appendix A – Statutory Index. Similarly, the Commentary to § 1B1.2 directs the sentencing court to "use the Chapter 2 guideline

2

section referenced in the Statutory Index (Appendix A) for the *offense of conviction*. U.S.S.G. 1B1.2, Commentary, Note 1 (emphasis added). There seems to be no dispute that Mr. Rowland was, in fact, convicted of a conspiracy to defraud the United States by interference with governmental functions.

The defendant argues that, notwithstanding the plain language of § 2C1.1, that provision applies solely to a particular type of *Klein* conspiracy, that is, a conspiracy to defraud through "bribery or . . . extortion." Def.'s Mem. in Aid of Sentg. 32. The defendant cites two cases in support of his position, neither of which arises in this Circuit. First, the defendant cites *United States v. Huizar-Velazquez*, 720 F.3d 1189 (9th Cir. 2013) for the proposition that § 2C1.1 applies only in cases involving bribery of or extortion by public officials. In *Huizar-Velazquez*, the defendant was charged in a 55-count Indictment stemming from a scheme to avoid paying import duties on steel wire hangers originating in China. *See Huizar-Velazquez*, 720 F.3d at 1191. In essence, the defendant routed the hangers through Mexico and fraudulently stamped them with a "Made in Mexico" stamp when, in fact, the hangers were manufactured in China. *Id*. The defendant was charged with, among other things, a § 371 conspiracy to defraud the United States by interfering with governmental functions. *Id*. The district court calculated the defendant's base offense level under § 2C1.1, which the defendant challenged on appeal.

3

On appeal, the Ninth Circuit concluded that the district court should have used § 2T1.3, entitled "Evading Import Duties or Restrictions (Smuggling); Receiving or Trafficking in Smuggled Property." *Id*. According to the Ninth Circuit, because the defendant's generic crime was conspiring to evade import duties, the appropriate guideline was the one particularly addressing "evading import duties." *Id*. The Ninth Circuit provided little explanation as to why it was ignoring the precise statutory violation of conviction in favor of its generic characterization of the offense conduct in determining the applicable guideline provision. In making that choice, the Ninth Circuit made the obvious observation that fraud offenses covered by § 2C1.1, "'typically involve an improper use of government influence that harms the operation of government *in a manner similar to bribery offenses.*'" *Id*. at 1191-92 (quoting U.S.S.G. § 2C1.1, Commentary) (emphasis added). Although the Ninth Circuit did not expressly hold that 2C1.1 applies only where the conviction stemmed from a bribery or extortion scheme, its *dicta* suggests that view. To that extent, the Government submits that *Huizar-Velazquez* is incorrect, improperly narrows the scope of § 2C1.1 and is at odds with the plain language of the guideline and its Commentary.

The Ninth Circuit's view is particularly odd given that the Court relied on language expressly allowing for the fact that § 2C1.1 covers non-bribery fraud offenses because such offenses can harm the operation of Government in a manner similar to bribery. *See* U.S.S.G. § 2C1.1, Commentary. This language is

4

particularly important here because there is no question that this conspiracy deliberately sought to undermine the operations of the FEC by (1) preventing the FEC from fulfilling its duty to the voting public and (2) concealing the corrupting influence of Mr. Rowland's and Mr. Foley's excessive campaign contributions. In this manner, the damage wrought by this conspiracy closely resembles the harm caused by a bribery scheme, which also undermines a governmental entity's ability to fulfill its public purpose.

The defendant also cites *United States v. Orsburn*, 525 F.3d 543 (7th Cir. 2008). In that matter, a husband and wife were convicted of mail fraud and tax evasion based on their embezzlement of between $200,000 and $400,000 from Keener Township in Indiana. *See Orsburn*, 525 F.3d at 544. Mr. Orsburn was the Trustee for Keener Township. *Id*. Neither defendant was charged with a section 371 conspiracy to defraud the United States and, given the facts, there was no theory that would support such a charge. *See id.* at 544, 546. The Seventh Circuit, thus, had little difficulty concluding that the district court's use of § 2C1.1 was improper because the offense of conviction was not covered by that guideline provision.[1] *Id*. at 545. Moreover, even if the defendants had been properly charged with theft of the intangible right to one's honest services, under *United States v. McNally*, 483 U.S. 350 (1987), that theory required a bribery component, which was

---

[1] The Seventh Circuit noted that that the indictment made passing reference to 18 U.S.C. § 1346, but concluded that merely referring to section 1346, which does not define a separate offense, did not transform the fraud into a scheme to deprive another of the intangible right to one's honest services. *See Orsburn*, 525 F.3d at 545-46.

5

not present in *Orsburn*. *Id*. at 546. Then, in *dicta*, the Seventh Circuit made the narrow observation that, *with respect to honest services fraud* and in light of *McNally*, § 2C1.1 applies to such frauds only where the fraud involves bribery or closely related conduct. *Id*. That is, *Orsburn* says nothing about whether § 2C1.1 applies to conspiracies to defraud the United States under section 371.[2]

In *United States v. Trent*, 306 Fed. Appx. 482 (11th Cir. Jan. 6, 2009), the issue was squarely presented to the Eleventh Circuit, which concluded that section 2C1.1 does apply to section 371 conspiracies to defraud the United States unrelated to bribery. In *Trent*, the Eleventh Circuit approved the district court's use of § 2C1.1 where the defendant was charged with a conspiracy to defraud the United States by impairing the function of the U.S. Department of Housing and Urban Development ("HUD"), in violation of 18 U.S.C. § 371. *See Trent*, 306 Fed. Appx. at 490. In that case, the defendant was the Executive Director of a municipal housing authority. *Id*. at 484. The defendant submitted false bills and invoices to the housing authority, and authorized payment to herself on those bills and invoices. *Id*. The district court calculated her guideline range under § 2C1.1. *Id*. at 490. On appeal, the defendant challenged the district court's use of § 2C1.1, arguing that the gravamen of her offense really involved a fraud on the municipal housing authority, not the United States. *Id*. The Eleventh Circuit turned aside this argument,

---

[2] The animating concern in *Orsburn* seems to have been that the district court's improper application of § 2C1.1 resulted in a guideline range of 121 to 135 months, which was substantially higher than it would have been if properly calculated under § 2B1.1. Id. at 545 (noting that, under § 2B1.1, the defendants would have had to embezzle over $20 million to be in the 121-135 month range).

holding that the "district court did not err in sentencing Trent under § 2C1.1 because that guideline specifically covered her offense conduct under § 371." *Id.* *See also United States v. Geddings*, 278 Fed. Appx. 281, 287 (4th Cir. 2008) (finding no error where district court applied § 2C1.1 "because the Guidelines statutory index lists § 2C1.1 as the section corresponding to a violation of § 1341" even where conduct is more narrowly described under different guideline provision).

### b. ALTERNATIVE GUIDELINE CALCULATIONS

If section 2C1.1 does not apply, the Court is required to consider which of the remaining offenses of conviction carries the highest offense level. In that event, the defendant contends that § 2J1.2 is the appropriate guideline. *See* Def.'s Mem. in Aid of Sentg. 33. He is incorrect. In the absence of § 2C1.1, the guideline that carries the highest offense level is § 2C1.8, which covers the defendant's convictions for conspiracy to make unlawful campaign contributions (Count Two) and the substantive convictions for making unlawful campaign contributions (Counts Six and Seven). Under § 2C1.8(a), the defendant's base offense level would be 8. Under § 2C1.8(b), six levels would be added because the value of the unlawful contributions exceeded $30,000. Then, two more levels would be added under § 3C1.1 because the defendant obstructed justice in connection with the investigation and prosecution of the offenses of conviction. The resulting total offense level of 16 yields a sentencing range of 24 to 30 months. Under section 2J1.2, the defendant

would have a lower, total offense level of 14, and a sentencing range of 18 to 24 months.[3]

### c. THE APPROPRIATE MEASURE OF LOSS

The defendant argues that, even if § 2C1.1 applies, there is no basis for a loss enhancement under §§ 2C1.1(b)(2) and 2B1.1 because the only measure of loss available under § 2C1.1 is the value of the benefit received in exchange for a bribe payment to a public official. *See* Def.'s Mem. in Aid of Sentg. 33.[4] The defendant is plainly incorrect. Section 2C1.1(b)(2) sets forth several potential measures of loss: (1) the value of any payment; (2) the value of any benefit received; (3) the value of anything obtained by a public official; (4) the loss to the government from the offense. Here, there are actually two potential measures of loss: (1) the value of the unreported payments to Mr. Rowland, the concealment of which defrauded the United States and impeded the FEC, and (2) the loss to the Government. The first measure of loss is simple to quantify, and the Government recommends that the Court find that the aggregate value of the payments to Mr. Rowland, i.e., $35,000, is the appropriate measure of loss. In the alternative, it is undeniable that the conspiracy caused a loss to the United States and the FEC, in terms of transparency, fairness and corruption. That loss is not easily quantified, but the guidelines recognize certain types of loss should be accounted for even where the

---

[3] In this scenario, the defendant would not be eligible for the obstruction of justice enhancement under § 3C1.1 because his sentencing range would be calculated under the guideline provision covering that conduct. *See* U.S.S.G. § 3C1.1, Commentary, Application Note 7.

[4] This argument seems to be based on the same premise as the defendant's principal argument, i.e., that 2C1.1 simply does not apply to non-bribery cases.

8

numerical loss is difficult to determine. *See* U.S.S.G. § 2B1.1, Commentary, Application Note 3(B). The solution in such cases is to use the gain to the defendant as the measure of loss, which in this case is $35,000. *Id*.

Finally, the defendant suggests in a footnote that any loss must be offset by the value of the work Mr. Rowland performed for Apple Rehab. *See* Def.'s Mem. in Aid of Sentg. 34 n.13. In support of the notion that his "work" for Apple Rehab had value, Mr. Rowland cites Mr. Foley's trial testimony. On cross-examination, Mr. Foley did assent to defense counsel's suggestion that Mr. Rowland did real work for Apple Rehab. However, it would be a tortured reading of Mr. Foley's testimony to suggest that any "work" Mr. Rowland performed had actual value to Apple. Indeed, the jury clearly discredited Brian Bedard, who was the only witness to testify that Mr. Rowland's "work" for Apple had actual value. Moreover, Mr. Foley asserted that the only reason he hired Mr. Rowland was to acquire his services for his wife's campaign. Beyond that, however, the guidelines do not support the defendant's view. The defendant suggests that section 2B1.1 permits the Court to credit the fair market value of any services rendered against the loss.[5] U.S.S.G. § 2B1.1, Commentary, Application Note 3(C)(i). The defendant misunderstands the commentary. This guidance addresses situations where the defendant has made restitution to the victim in the form of money or services prior to detection of the offense. That is not the situation here.

---

[5] The defendant mistakenly cites to U.S.S.G. § 2B1.1, Commentary, Application Note 3(C)(i). It appears that he intends to cite to Application Note 3(E)(i)

### III. THE 3553(A) SENTENCING FACTORS FAVOR A SENTENCE OF BETWEEN 37 AND 46 MONTHS

The Government respectfully submits that the appropriate guideline range in this case is 37 to 46 months. However, even if the Court were to conduct an alternative calculation under § 2C1.8 (24 to 30 months) or § 2J1.2 (18 to 24 months), the sentencing factors, as discussed in the Government's Memorandum in Aid of Sentencing and this memorandum, still weigh in favor of a term of imprisonment between 37 and 46 months.

#### a. MR. ROWLAND'S ACTIONS UNDERMINE RESPECT FOR THE LAW

Throughout his memo, John Rowland criticizes the criminal prosecution. He spends the majority of his memo disputing the evidence against him and claiming that his actions were perfectly lawful. He claims that the contract with Greenberg was legal even though three separate witnesses testified to the contrary at trial. Furthermore, Mr. Rowland states that he engaged in real, valuable work for Apple Rehab, even though his own witness could not present a coherent statement about what John Rowland did for the healthcare company. Mr. Rowland complains that he is being treated disparately because other, less culpable co-conspirators were not prosecuted criminally and argues that the conduct he was charged with is normally prosecuted civilly. None of this is persuasive. John Rowland and several others engaged in a criminal scheme involving laundered funds, sham contracts, and an elaborate cover-up. Mr. Rowland is the only participant who has previously been

convicted of corrupting his public office. He is the only participant who has demonstrated to this Court that a prior term of imprisonment was insufficient to deter him from committing crimes. He is the only participant whose criminal conduct spanned two elections. He is the only individual whose participation in the conspiracy was the raison d'etre for the conspiracy itself. And, he is the only charged participant to refuse to accept responsibility for the wrongfulness of his conduct. The sentence he receives should reflect these facts.

The defendant would have the court believe that his crimes are less serious than others because they involve no corruption of elected officials. Def.'s Mem. in Aid of Sentg. 7. The Government does not accept the defendant's premise. Corrupting an elected official while he or she is in office is no worse than electing a public official by corrupting an election in the first place. Even so, the natural end of Mr. Rowland's criminal activity was to elect a public official who he had already corrupted. His actions were intended to elect Lisa Wilson-Foley to Congress through their criminal conspiracy. John Rowland told both Lisa Wilson-Foley and Mark Greenberg that he could get them elected. GX 3 and GX 513. He should receive no benefit because he did not succeed in actually carrying out his criminal scheme.

Mr. Rowland also argues that he should receive a downward variance because there were no financial victims of his crime. Def.'s Mem. in Aid of Sentg. 7. He is correct that the harm here was not primarily financial. The harm here was

the gash that his crime tore through our state's already weakened democratic fabric. This harm is not easily measured in dollars and cents because it is more grievous than that. The Court's sentence should aim to restore the public's flagging faith in the integrity of our electoral process by recognizing that all citizens are victimized by crimes like Mr. Rowland's.

Rowland's argument that this case should have been prosecuted civilly is equally misguided. The FEC or any other civil authority would not have had the resources to investigate and prosecute Mr. Rowland's crimes. Grand jury subpoenas were issued to Apple Rehab and the Wilson-Foley campaign. That evidence was reviewed in the secret setting that only a criminal investigation provides. Search warrants were issued, resulting in critical evidence that would have been outside the reach of civil authorities. The most significant evidence at trial was the product of six different search warrants executed during the course of the investigation.

The subpoena to Apple Rehab returned a selection of relevant documents found on Apple Rehab's servers and Brian Foley's personal computer. However, a subsequent search warrant for Brian Foley's computer itself was the only thing that revealed GX 150, the original version of Rowland's contract with Shelton – a draft that detailed campaign work and contained a non-compete clause that forbid Mr. Rowland from working for any other federal campaign. Similarly, the subpoena to the Wilson-Foley campaign failed to produce any documents indicating that Mr. Rowland had sought out employment on the campaign. Similarly, a search warrant

on the servers containing the campaign emails revealed GX 107 and GX 116 (an unadmitted exhibit in which Tiffany Romero Grossman discussed Rowland's interest in a job with Lisa Wilson-Foley). GX 183, the email in which John Rowland reminds Lisa Wilson-Foley of their cover story regarding his employment, hid in the personal email accounts of Lisa Wilson-Foley and John Rowland until it was uncovered by search warrants. GX 191 and 192, the emails in which Chris Healy and John Rowland discuss "Brian and LWF private enterprises" subsidizing John Rowland's campaign work were only discovered after executing search warrants on Christopher Healy's and John Rowland's email accounts. Likewise, Brian Bedard's protestations that he did not work on the contract between Rowland and Christian Shelton might have been believable to a jury, had a search warrant on Rowland's email account not turned up GX 145.

No civil authority ever would have found this evidence. This should be no surprise. The laundered funds, the sham contract, and the clandestine aspects of this conspiracy all emphasize its criminal nature. John Rowland engaged in a crime, not a civil offense. His failure to comprehend the serious difference between the two highlights his lack of respect for the federal elections laws.

> b. THE DEFENDANT'S UNIQUE HISTORY AND LETTERS OF SUPPORT EMPHASIZE THE IMPORTANCE OF SPECIFIC AND GENERAL DETERRENCE

In his sentencing memo, the defendant relies heavily on 90 letters from friends, family members, and former colleagues. These letters evidence a man with

a wide network of support. They speak of John Rowland's positive traits and tell the story of an individual who has had a host of opportunities. It should be no surprise to the court that someone who had previously served as governor and, even after conviction, become somewhat of a political celebrity would have a number of supporters. There is no doubt that John Rowland was very successful in politics and in the media because of a great facility with people. There is also no doubt that John Rowland has demonstrated admirable qualities in his dealings with family and friends, and the Government does not demean this in any way.

However, Mr. Rowland is being sentenced for his crimes against the public. While Mr. Rowland may be a warm, giving, humble person in his relationships with his family and friends, this is not how he has treated our political system and the public generally. He has treated the public good and democratic institutions in a selfish, disdainful way.[6] He has done so for little financial benefit. Indeed, the sheer number of letters submitted on his behalf demonstrates that Mr. Rowland had personal support, a network of opportunities and every reason to lead a fulfilling, crime-free life. The fact that he committed crimes anyway speaks to a troubling mindset that must be addressed and deterred by the Court's sentence.

The letters also demonstrate that the public is paying attention to what happens to John Rowland. The message that the court sends in sentencing Mr.

---

[6] The testimonials concerning Mr. Rowland's service while Governor strike a false note. First, it is the job of the Governor to serve the public's needs, particularly in times of crisis. Second, the record demonstrates that Mr. Rowland failed to meet that basic job requirement. A leader who has the best interests of Connecticut at heart does not engage in a six-year conspiracy to defraud the very people whose interests he is sworn to represent.

14

Rowland will reverberate with the community writ large. The Government respectfully submits that, in promoting respect for law, the Court should consider whether Mr. Rowland is deserving of yet another "break"; whether all defendants – rich or poor, famous or anonymous, influential or powerless – will be treated equally in federal court; and whether our election laws and the electorate are deserving of the protection that only criminal penalties can give.

    c.    A SETENCE OF 37 TO 46 MONTHS DOES NOT CREATE UNWARRANTED SENTENCING DISPARITIES

First, Mr. Rowland argues that a guidelines sentence is unwarranted because certain of his co-conspirators remain uncharged. *See U.S. v. Fermin,* 277 Fed.Appx. 28, 39 (C.A.2 (N.Y.),2008) ("Juan's reliance on the shorter sentences for codefendants who pled guilty and the non-prosecution of co-conspirators is similarly unavailing. We do not see any inexplicable unwarranted sentencing disparity."); *U.S. v. Scott*, 631 F.3d 401, 405-406 (C.A.7 (Ill.),2011) ("[T]here can be no disparity between the defendant's sentence and the coconspirator's sentence when the latter does not even exist. … [W]e reject the notion that a court may consider the coconspirator's lack of conviction under § 3553(a) because holding otherwise would deprive prosecutors of the opportunity to exercise any meaningful prosecutorial discretion in coconspirator cases.") The uncharged co-conspirators, while instrumental in carrying out the conspiracy, were second-tier players in Mr. Rowland's illegal game with the Foleys. The uncharged co-conspirators each facilitated the conspiracy in some way, but were by no means as responsible or as

15

involved as the Foleys and John Rowland. Employing John Rowland to aid in Lisa Wilson-Foley's campaign was the very object of the conspiracy and the principal participants were Brian Foley, Lisa Wilson-Foley, and the defendant.

Second, Mr. Rowland claims that a guideline sentence would create unwarranted sentencing disparities between him and the Foleys. He says this because the Foleys pled guilty to a misdemeanor, which has a one year maximum sentence, as if he and the Foleys were similarly situated. They are not. Each of the Foleys is a first-time offender. There is no evidence that they have ever been engaged in criminal activity before. While extremely wealthy, neither of the Foleys have ever held positions of political influence. And, in this case, they were only charged with criminal activity in one federal election, and accepted responsibility for that conduct. Mr. Rowland is the former governor. He faced a series of civil citations for unethical conduct while governor. He faced criminal prosecution as governor but then reoffended, engaging in criminal conduct in not one but two congressional campaigns. Any dissimilarities in the sentence here are warranted.

Finally, the defendant cites a number prosecutions of cases involving conduit contributions that did not result in jail sentences. However, the record includes as many such cases that did result in jail sentences. *See U.S. v. Joshua Nassi*, 3:12cr157 (JBA) (28 months incarceration); *U.S. v. Paul Magliocchetti*, 1:10cr286 (TSE) (E.D.V.A.) (27 months incarceration); *U.S. v. Harvey Whittemore*, 3:12cr058 (LRH) (WGC) (D.N.V.) (24 months incarceration); *U.S. v. Michael Giorgio*, 5:13cr420

16

(PAG) (N.D.O.H.) (27 months incarceration); *U.S. v. Benjamin Suarez*, 5:13cr420 (PAG) (N.D.O.H.) (15 months incarceration); *U.S. v. John Junker*, 2:12cr511 (DGC) (D.A.Z.) (8 months incarceration). It is difficult and not always helpful to compare unique cases. But, to suggest that incarceration is simply outside the realm of reasonableness is not credible.

V. **CONCLUSION**

For the foregoing reasons, the Government respectfully opposes the defendant's request for a below-guidelines sentence. A sentence of 37 to 46 months appropriately addresses Mr. Rowland's crimes and his unique history, promotes respect for the law and provides for both specific and general deterrence.

Respectfully submitted,

MICHAEL J. GUSTAFSON
ATTORNEY FOR THE UNITED STATES,
Acting Under Authority Conferred
by 28 U.S.C. § 515

LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27924

CHRISTOPHER M. MATTEI
ASSISTANT UNITED STATES ATTORNEY

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3835

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_____
LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY