UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    *v*.<br><br>JOHN G. ROWLAND | Criminal No. 3:14cr79 (JBA)<br><br>February 25, 2015 |

**RULING ON DEFENDANT'S REQUEST FOR AN EVIDENTIARY HEARING**

Defendant John G. Rowland requests that the Court order discovery and an evidentiary hearing to assess whether the Government failed to comply with its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons that follow, Defendant's request is denied and this case will proceed to sentencing.

**I.    Background**

Following a jury trial, the jury convicted Defendant John G. Rowland on all counts of the Superseding Indictment charging him with conspiracy and two counts each of falsification of records in a federal investigation, causing false statements, and illegal campaign contributions. On January 2, 2015, Mr. Rowland moved [Doc. # 195] to continue his sentencing hearing scheduled for January 7, 2015, contending that the sentencing memorandum of his separately charged coconspirator, Lisa Wilson-Foley revealed that there had been "a potential violation of the Government's disclosure obligations under *Brady*." (Def.'s Mot. at 1.)

Specifically, Mr. Rowland contended that the Government failed to disclose statements made by Brian Foley and Ms. Wilson-Foley during interviews with the Government, which Defendant Rowland contended collectively showed that Ms. Wilson-Foley did not join the charged conspiracy until sometime in 2012—rather than in September 2011 as alleged by the Government—because it was not until that point that she learned that "the payments to Mr. Rowland from Mr. Foley were not all for true value" and instead were partially intended to benefit her campaign. (*Id*. at 1 & n.3

(quoting *United States v. Foley, et al.,* Wilson-Foley's Sent. Mem. (Dec. 29, 2014) [Doc. # 51] at 3).)

The principal import of Defendant's contentions is that if this additional evidence had been disclosed (1) Ms. Wilson-Foley's out-of-court statements from September 2011, which were admitted as statements of a coconspirator in furtherance of the conspiracy pursuant to Fed. R. Evid. 801(d)(2)(E), would not have been admissible; (2) Defendant would have had "fertile cross-examination material for Mr. Foley," because the statements were "entirely consistent with Mr. Rowland's theory of the case at trial: that there was no conspiracy and that any illicit intent was secreted in Mr. Foley's mind;" and (3) Defendant "likely" would have called Ms. Wilson-Foley at a witness at trial. (Def.'s Mot. at 2.) During a January 5, 2015 telephonic conference with counsel, the Court granted Defendant's Motion to Continue Sentencing and directed counsel for Ms. Wilson-Foley, Craig Raabe, to submit an affidavit outlining the basis for the factual statements in Ms. Wilson-Foley's sentencing memorandum. (*See* Endorsement Order [Doc. # 196].)

In his affidavit, Mr. Raabe outlined his discussions with the Government regarding its investigation of Ms. Wilson-Foley. In December 2013, the Government advised Mr. Raabe that it believed Ms. Wilson-Foley was part of a three-party conspiracy with Mr. Rowland and Mr. Foley, but that if Mr. Foley cooperated with the Government, Ms. Wilson-Foley and her family members who were separately being investigated for making "straw donations" to her campaign would "get a pass" and not be charged. (Raabe Aff. ¶¶ 3–4.) During a March 10, 2014 meeting with the Government, Ms. Wilson-Foley stated "that while she believed in September, 2011 that a purpose of Apple Rehab ("Apple") hiring Mr. Rowland was to benefit her campaign and avoid having a formal relationship with him due to publicity concerns, she also believed that Mr. Rowland could provide real and valuable services to Apple based on his experience and contacts." (*Id.* ¶ 7.)

Mr. Raabe reviewed the Memorandum of Interview ("MOI") prepared by Postal Inspector Brian Feeney summarizing the interview (*see* Ex. 4 to Gov't's Opp'n [Doc. # 210]), which, along with Feeney's hand-written notes, was disclosed to Rowland, and contends that the MOI[1] is "not accurate and is not complete" in three respects.[2]  First, the MOI fails to note that Ms. Wilson-Foley discussed with Mr. Foley her decision not to hire Mr. Rowland for a public role in her campaign and that Mr. Foley responded, "I think I could have a job for John" at Apple.[3]  (Raabe Aff. ¶ 8a.)  Second, the MOI does not reflect that during breaks in the interview, the Government pressed Ms. Wilson-Foley to acknowledge that Apple's relationship with Mr. Rowland was a "sham," which she refused to do.  (*Id.* ¶ 8b.)  Third, the MOI states that Ms. Wilson-Foley "might have had a conversation with [Chris] Covucci in which she did mention Mr. Rowland and some reference to FEC filings" but Mr. Raabe contends that Ms. Wilson-Foley "steadfastly denied that she made any reference to FEC filings in her conversation with Mr. Covucci" and any statement to the contrary by Mr. Covucci was "false."[4]  (*Id.* ¶ 8c.)

During and after this meeting, the Government expressed its "disbelief that Ms. Wilson-Foley could have believed reasonably that Mr. Rowland intended to provide real and valuable services to Apple while also working on her campaign" and suggested that it

---

[1] There is no indication that Mr. Raabe reviewed Feeney's hand-written notes.

[2] Mr. Raabe was not present at this meeting and bases his account on information provided to him by co-counsel.  (Raabe Aff. ¶ 7.)

[3] The MOI states: "Mrs. Foley was asked if she discussed her decision with her husband, Brian, and she replied she could not recall."  (MOI at 5.)  It later states: "Mrs. Foley was asked if it was fair to say she had a conversation with Mr. Foley regarding hiring Mr. Rowland and she replied she told her husband she did not think it was a good idea."  (*Id.* at 6.)

[4] The MOI states:  "Mrs. Foley was asked about her conversation with Chris Covucci and her statement to him that it was good to have Mr. Rowland working for her husband and there was no concern with Mr. Rowland and the FEC filings and Mrs. Foley replied that is a lie."  (MOI at 6.)  Two paragraphs later, the MOI states:  "Mrs. Foley explained she might have had a conversation with Mr. Covucci in which she did mention Mr. Rowland and some reference to FEC filings."  (*Id.*)

3

might charge Ms. Wilson-Foley with an offense. (*Id.* ¶ 9.) Mr. Raabe had approximately seven telephone conversations with the Government in which he maintained on behalf of Ms. Wilson-Foley that "*a purpose of the Rowland/Apple relationship was to benefit her campaign*" but that "she also reasonably believed, based on her conversations with her husband between September 2011 and April 2012, that Mr. Rowland was going to and did perform services on a number of issues as a 'consultant' to Apple" and therefore the relationship was not a "sham" but rather had the "dual purpose" of both aiding the campaign and benefiting Apple. (*Id.* ¶¶ 10–11 (emphasis added).)

On March 24, 2014, the Government indicated that based on the discussions to date it was going to charge Ms. Wilson-Foley with a misdemeanor. (*Id.* ¶ 14.) Ms. Wilson-Foley continued to maintain that Mr. Rowland performed legitimate work for Apple but intended to plead guilty because the arrangement was also intended to benefit the campaign and was not reported to the FEC. (*Id.* ¶ 15.) On March 31, 2014, hours before Ms. Wilson-Foley pled guilty, Mr. Raabe emailed the Government a document titled "Plea factual basis" "[f]or . . . discussion" during an upcoming telephone conference between the parties which stated, "I admit the facts in the Information" and that although Mr. Foley "had some work for" Mr. Rowland at Apple, Ms. Wilson-Foley also believed that by hiring Mr. Rowland he "would help my campaign and not switch allegiance to another campaign" and that Ms. Wilson-Foley failed to "report the money that [Mr. Foley] paid to John Rowland."[5] (*Id.* & Ex. 2.)

---

[5] The full text of the document stated:

> I admit the facts in the Information. John Rowland asked to be hired by my campaign for Congress and to take on a larger more official role than he had as a volunteer helper. I didn't believe it was a good idea due to the potential negative publicity. But I was also concerned that he might take the rejection poorly and could stop helping me and perhaps switch allegiance to another campaign.

Later that day Ms. Wilson-Foley pled guilty, initially denying that she came to an "agreement" that Mr. Rowland would be paid by Apple for work on the campaign and describing her offense as a "record keeping violation" for failing to "report money that my husband paid to John Rowland while he was working on my campaign." *See United States v. Foley, et al.*, 14cr65 (JBA), Change of Plea Tr. [Doc. # 23] at 30–31. After consulting with counsel, Ms. Wilson-Foley explained that she knew that when Mr. Foley hired Mr. Rowland to work at Apple, Mr. Rowland's work for the campaign would increase and that she knew that she should have therefore reported some of the money paid to Mr. Rowland as a campaign expenditure. *Id.* at 32–33.

## II.  Discussion

Defendant Rowland contends that the Raabe Affidavit "shows that further discovery and a hearing are necessary to assess the extent of the deficiencies in the Government's disclosures" and asks the Court to "reserve its consideration of the ultimate *Brady* issue until the completion of discovery and briefing of [an anticipated] Rule 33 Motion by Mr. Rowland." (Def.'s Resp. to Raabe Aff. [Doc. # 214] at 1–2, 14.)

A district court has discretion to order post-trial discovery or an evidentiary hearing to explore a potential *Brady* violation but only when a defendant has offered more than mere speculation that a violation may have occurred. *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1189 (11th Cir. 2006) ("We declined to order discovery based upon mere speculation as to whether the material would contain exculpatory evidence because to do so would 'convert *Brady* into a discovery device and impose an

---

> My husband suggested he had some consulting work at his companies at the time.  I then relayed the message to John that the campaign couldn't hire him but if interested, Brian had some work for him.  I believed that when my husband gave John a job, John would help my campaign and not switch allegiance to another campaign.  My campaign did not report the money that my husband paid to John Rowland.
>
> As the candidate, I take full responsibility for the resulting consequences of the above action.

undue burden upon the district court.'"); *see also United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998) (holding on *habeas* review that in "the absence of . . . a nonspeculative basis for inferring that . . . the government had not made available to [the defendant] all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary.").

Pursuant to *Brady* and its progeny, the "prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). *Giglio v. United States,* 405 U.S. 150 (1972) established that "[t]his duty covers not only exculpatory material, but also information that could be used to impeach a key government witness." *Coppa*, 267 F.3d at 135. "*Brady* does not, however, require the prosecution to disclose *all* exculpatory and impeachment material," *id.*, and did not create a "general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Rather, *Brady* requires the prosecution to disclose only evidence that is "material" either to guilt or to punishment "to ensure that a miscarriage of justice does not occur." *United States v. Bagley,* 473 U.S. 667, 675 (1985). Evidence is material in the *Brady* context only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012).

### A.  Ms. Wilson-Foley's Interview with the Government

Defendant's principal contention is that the Raabe Affidavit "described previously-undisclosed statements made by Ms. Wilson-Foley during her interview with the Government as well as inaccuracies in the Government's corresponding

memorandum of interview."[6]  (Def.'s Resp. at 7.)  Notwithstanding the Government's original contention that it "believes that the principal assertions set forth in [the Raabe] Affidavit are inaccurate," it subsequently agreed to accept the facts in the Raabe Affidavit for the purposes of addressing Defendant's request for discovery and an evidentiary hearing, but maintains that the affidavit shows "there has been no *Brady* violation." (Gov't's Opp'n [Doc. # 210] at 2.)  The Government contends that each of Ms. Wilson-Foley's purported statements was otherwise made known to Defendant and that much of the purportedly non-disclosed evidence was not favorable to Defendant and/or was not material.

Defendant claims that the Raabe Affidavit described four previously-undisclosed or inaccurately described statements made by Ms. Wilson-Foley in her interview, but Defendant largely fails to explain how any undisclosed or inaccurately described statements could have been favorable to his defense.  First, Defendant contends that the Government failed to disclose that Ms. Wilson-Foley told the Government that "although *one* purpose of hiring Mr. Rowland was to benefit her campaign and avoid having a formal relationship with him, she also believed he would provide real and valuable services to Apple."  (Def.'s Resp. at 7 (emphasis added).)  Second, and relatedly, Defendant contends the MOI failed to report that during "breaks" in the interview "Ms. Wilson-Foley refused, despite the Government's urging, to characterize the

---

[6] While *Brady* requires that exculpatory witness statements be disclosed even if they are not memorialized in any document, *see United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."), as discussed above, it does not create a constitutional right to broad discovery or the disclosure of non-material evidence, *see Coppa*, 267 F.3d at 135. Defendant identifies a number of purported inaccuracies in the MOI without attempting to explain their materiality in light of the trial record.  Merely contending that a memorandum of interview and an agent's hand-written notes, which purport to provide only a summary rather than a complete account of an interview, have omitted some information is not sufficient to show that a *Brady* violation has occurred.

Apple/Rowland relationship as a sham and during which Ms. Wilson-Foley insisted that she believed it represented a real job." (*Id.*)

Regardless of whether or not the Government failed to disclose these statements, they have not shown to be exculpatory. In fact, the first statement *inculpates* Defendant, because Ms. Wilson-Foley admits that "one purpose" of hiring Mr. Rowland was to benefit her campaign. As the jury was instructed regarding the illegal campaign contribution counts, the Government was not required to prove that the payments to Mr. Rowland "were made, solely for the purpose of influencing a federal election" but rather it was "sufficient under the law if [the payments] were made for, among other purposes, the purpose of influencing any election for federal office."[7] (Jury Instructions [Doc. # 138] at 29.)

Furthermore, the Government disclosed other evidence that showed that Ms. Wilson-Foley claimed that she acted with a dual purpose and that Mr. Rowland's work at Apple was not a complete "sham." "Evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (quoting *United States v. Gonzalez,* 110 F.3d 936, 944 (2d Cir. 1997)). For example, the Government disclosed a voicemail message from Ms. Wilson-Foley's former counsel after the March 2014 meeting in which he stated that Mr. Foley had "kept his wife in the dark" and Ms. Wilson-Foley "really didn't know that this was a deal . . . for Rowland to work on the campaign." (Ex. 2 to Gov't's Opp'n.) Defendant was also provided with recordings of a 2012 television and radio interview in which Ms. Wilson-Foley maintained that Mr.

---

[7] The Government did not dispute that Mr. Rowland provided some work that could have had some value for Apple but contended that these services were "nominal" and intended to create "'cover' or pretext that he was being paid for providing consulting services" to Apple, instead of the campaign. (Superseding Indictment [Doc. # 38] ¶ 34.c.)

8

Rowland performed valuable work for Apple and "did a very good job." (GX295A.01; GX294A.02.) Defendant also received the grand jury testimony of Tiffany Romero Grossman and Mr. Covucci, both of whom testified that when Apple was contemplating hiring Mr. Rowland, Ms. Wilson-Foley told them that there was actual work for him to do at Apple relating to union negotiations. (*See* Grand Jury Testimony of Grossman at 28–29 & Covucci at 15, Exs. 11 & 9 to Gov't's Opp'n.)

Third, Defendant contends that the MOI failed to note that Ms. Wilson-Foley discussed with Mr. Foley her decision not to hire Mr. Rowland for a public role in her campaign and that Mr. Foley responded, "I think I could have a job for John" at Apple. Although Defendant does not explain how this statement is exculpatory, any omission is largely trivial, because the MOI later does indicate that Ms. Wilson-Foley had a conversation about hiring Mr. Rowland for her campaign with Mr. Foley and said "she did not think it was a good idea." (MOI at 6.) And, as discussed above, both Ms. Grossman and Mr. Covucci testified about Ms. Wilson-Foley's statements regarding Defendant's anticipated role at Apple when he was hired.

Fourth, Defendant contends that the MOI failed to reflect that Ms. Wilson-Foley denied making any reference to FEC filings in a conversation with Mr. Covucci and asserted "that any statement otherwise by Mr. Covucci was false." (Def.'s Resp. at 7.) However, the MOI is largely consistent with this assertion. It stated that when Ms. Wilson-Foley was initially asked about her conversation with Mr. Covucci in which she purportedly referenced FEC filings, she replied, "that is a lie." (MOI at 6.) Even if the MOI erroneously stated at another point that Ms. Wilson-Foley "might have had a conversation with Mr. Covucci in which she did mention Mr. Rowland and some reference to FEC filings" (*id.*), this vague description does not overshadow Ms. Wilson-Foley's more adamant response that Mr. Covucci was lying and adequately conveyed to the defense at least the essential fact that Ms. Wilson-Foley disputed Mr. Covucci's account.

9

### B.     Draft Factual Basis for Plea Allocution

Defendant further argues that the undisclosed Wilson-Foley draft plea allocution in which she stated that she believed that if Mr. Foley hired Mr. Rowland, he "would help" the campaign and "not switch allegiance to another campaign" was *Brady* material and should have been disclosed. (Def.'s Resp. at 9.)  Defendant again fails to provide any explanation for why this document was exculpatory.  This document largely inculpates Defendant in that Ms. Wilson-Foley "admit[s] the facts in the Information" and that she believed that when Mr. Foley hired Mr. Rowland at Apple, Defendant "would help" her campaign but she nevertheless failed to report the money Mr. Foley paid to Mr. Rowland.  (Ex. 2 to Raabe Aff.)

Furthermore, to the extent that Ms. Wilson-Foley's somewhat tepid acknowledgement of guilt was exculpatory, Defendant was provided with other evidence in which Ms. Wilson-Foley denied guilt, including as discussed above, the voicemail message from her former counsel  (Ex. 2 to Gov't's Opp'n) and her 2012 television and radio interviews.  (GX295A.01; GX294A.02.)  Most notably, however, Ms. Wilson-Foley made similar statements in her actual plea allocation—which occurred just hours after the draft plea allocution was sent to the Government and a transcript of which was a matter of public record and provided to Defendant by the Government.  At the change of plea hearing, Ms. Wilson-Foley initially denied that she came to an "agreement" that Mr. Rowland would be paid by Apple for work on the campaign and described her offense as a "record keeping violation" for failing to "report money that my husband paid to John Rowland while he was working on my campaign." *Foley, et al.*, Change of Plea Tr. at 30–31.  After consulting with counsel, Ms. Wilson-Foley explained that she knew that when Mr. Foley hired Mr. Rowland to work at Apple, Mr. Rowland's work for the campaign would increase and that she therefore should have reported some of the money paid to Mr. Rowland as a campaign expenditure.  *Id.* at 32–33.

Defendant was aware of this evidence and highlighted it in his pretrial motion opposing the admission of Ms. Wilson-Foley's co-conspirator statements under Fed. R. Evid. 801(d)(2)(E), contending that Ms. Wilson-Foley "engaged in a strained and lengthy colloquy that necessitated a break in the proceeding before reluctantly admitting participation in a conspiracy." (Def.'s Mem. Admiss. Coconspirator Stmts. [Doc. # 84-1] at 3.) Defendant further maintained in that pre-trial motion that the plea allocution was "in essential respects, consistent with her earlier statements" to the Government memorialized in the MOI, both of which demonstrated that Ms. Wilson-Foley "denied entering into any agreement and denied hiring Mr. Rowland for the campaign" and showing that "If there was a conspiracy, it was a conspiracy of one: Brian Foley." (*Id.* at 3–4, 2.)

### C. Did Prejudice Result?

Finally, to demonstrate a *Brady* violation that would require a new trial, Defendant must demonstrate prejudice, i.e., that in light of the trial record as a whole, there is a reasonable probability that the undisclosed evidence would have altered the result or undermined confidence in the fairness of the trial. *Strickler v. Greene*, 527 U.S. 263, 282 (1999) ("[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."); *Mahaffy*, 693 F.3d at 127.

Defendant contends that he has been prejudiced in three ways. First, Defendant maintains that if he "possessed the information contained in the Raabe Affidavit, he would very likely have called Ms. Wilson-Foley as a witness, and her testimony would have been highly favorable to the defense" because it would have been "entirely consistent with Mr. Rowland's theory of the case" that Mr. Foley hired Mr. Rowland for legitimate work at Apple and wanted him to continue helping her campaign as a volunteer. (Def.'s Resp. at 16–18; *see also* Jury Instructions [Doc. # 130] at 38 (Defendant's theory of the case was that "any work performed by him for the Wilson-

11

Foley campaign was in a volunteer capacity").)  However, as discussed above, Defendant has not shown that the purportedly non-disclosed statements were not otherwise made known to him.  *See United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006); *see also Tate v. Wood*, 963 F.2d 20, 25 (2d Cir. 1992) ("The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." (quoting *United States v. LeRoy,* 687 F.2d 610, 619 (2d Cir. 1982) (emphasis omitted)).

Second, Mr. Rowland maintains that the Raabe Affidavit "provides valuable impeachment material for cross-examination of Mr. Foley" because his "apparent efforts to assure his own wife that Mr. Rowland's relationship with Apple was legitimate . . . . would generally buttress Mr. Rowland's defense that any illicit intent was secreted in Mr. Foley's own mind."  (Def.'s Resp. at 18–19.)  As discussed above, there was substantial other evidence that Defendant could have used to pursue this same line of impeachment, including the voicemail from Ms. Wilson-Foley's former counsel from shortly after the March 2014 meeting.  *See United States v. Payne*, 63 F.3d 1200, 1210 ("[A] new trial is generally not required . . . when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.").

Third, Defendant posits that Ms. Wilson-Foley's withheld testimony would have "significantly undercut at least the timing of Ms. Wilson-Foley's entry into the conspiracy" and therefore Ms. Wilson-Foley's out-of-court coconspirator statements offered through Mr. Covucci and Mr. Syrek in September and October 2011 would not have been admissible.  (Def.'s Resp. at 19); *see* Fed. R. Evid. 801(d)(2)(E).  However, Ms. Wilson-Foley's purported statements do not outweigh the other evidence from which the Court concluded by a preponderance of the evidence, *see United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999), that Ms. Wilson-Foley had entered the charged

12

conspiracy at the time these out-of-court statements were made, including the content of the statements themselves, *see Bourjaily v. United States*, 483 U.S. 171, 181 (1987).[8]

The evidence at trial showed that after the Foleys met with Mr. Rowland on September 14, 2011, Ms. Wilson-Foley responded to concerns by Mr. Syrek that hiring Mr. Rowland for the campaign would require disclosures to the FEC by saying, "Well, maybe the campaign doesn't have to pay him." (Syrek Tr., Vol. 1 [Doc. # 162] at 157–58.) Mr. Syrek was so alarmed by his perception that Ms. Wilson-Foley was proposing an illicit arrangement for paying Mr. Rowland for his campaign work that he emailed Ms. Grossman while he was driving, telling her to discuss the situation with Ms. Wilson-Foley immediately. (*Id.* at 158–59.) Shortly thereafter, Ms. Wilson-Foley had two telephone conversations with Mr. Rowland and then Mr. Rowland emailed Mr. Foley, "Brian, had a brief chat with Lisa, I get it, let's you and I meet." (GX109.)

Ms. Wilson-Foley thereafter informed Mr. Covucci that "Mr. Rowland was going to become more involved with the campaign, that he had just signed a contract with Apple . . . and that way they wouldn't have to report it to the FEC." (Covucci Tr. [Doc. # 160] at 220–21.) On September 23, 2011, Mr. Rowland sent Ms. Wilson-Foley an email asking, "Does Chris . . . know that I am 'helping'"? (GX120) with the quotation marks around the word "helping" suggesting that it was a cover for his true role as a paid consultant. In November 2011, Mr. Rowland emailed Ms. Wilson-Foley with a "reminder" that he was "just a volunteer helping you and 'many other Republican candidates;' in case anyone asks" (GX183) with the quotation marks again suggesting

---

[8] The Government offered an alternative theory for the admissibility of Ms. Wilson-Foley's out-of-court statements, contending that they were not assertions of truth and therefore not hearsay under Fed. R. Evid. 801(c), which Defendant did not address. (*See* Syrek Tr. at 153.) Therefore, even if Ms. Wilson-Foley's statements were not admissible under Fed. R. Evid. 801(d)(2)(E), they may have been admissible non-hearsay to show intent. *See United States v. Paone*, 782 F.2d 386, 390–91 (2d Cir. 1986) (noting that even when the requirements of Rule 801(d)(2)(E) are not satisfied coconspirator statements "[f]requently . . . may be admitted" under other hearsay exceptions).

that Mr. Rowland's statements conveyed the coconspirator's cover story rather than the actual arrangement.

### III.    Conclusion

In sum, *Brady* does not require or authorize the far-reaching post-trial discovery that Defendant seeks based on speculation regarding potential violations and Defendant has not identified any basis for the Court to conclude that discovery or a hearing is warranted. Defendant's request for an evidentiary hearing and discovery is denied and this case will now proceed for sentencing on March 18, 2015, at 10:00 a.m.[9]

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 25th day of February, 2015.

---

[9] During a telephonic conference with counsel on the record, defense counsel indicated that although the Court was denying its request for discovery on the purported *Brady* claim, it still intended to file a Rule 33 motion for a new trial based on the existing record. Any motion by Defendant shall be submitted by seven days after this Ruling and the Government's response is due seven days later.