UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN G. ROWLAND | Criminal No. 3:14cr79 (JBA)<br><br>March 16, 2015 |

**RULING ON DEFENDANT'S MOTIONS FOR A NEW TRIAL AND FOR RECONSIDERATION**

Defendant John G. Rowland moves [Doc. ## 233, 235] for a new trial pursuant to Fed. R. Crim. P. 33 and for reconsideration of the Court's Ruling [Doc. # 231], denying his request for discovery and an evidentiary hearing in support of the same. For the reasons that follow, Defendant's motions are denied and this case will proceed to sentencing as scheduled.

**I.      Background**

The relevant facts are set forth in the Court's Ruling on Defendant's Request for an Evidentiary Hearing [Doc. # 231] ("the Ruling") and will not be repeated in their entirety here. Briefly, Mr. Rowland contends that the Government failed to disclose statements made by Brian Foley and Lisa Wilson-Foley during interviews with the Government, which Defendant Rowland contends collectively showed that Ms. Wilson-Foley did not join the charged conspiracy until sometime in 2012—rather than in September 2011 as alleged by the Government—because it was not until that point that she learned that "the payments to Mr. Rowland from Mr. Foley were not all for true value" and instead were partially intended to benefit her campaign. (Def.'s Mot.

Continue Sentencing [Doc. # 195] at 1 & n.3 quoting *United States v. Foley, et al.,* Wilson-Foley's Sent. Mem. (Dec. 29, 2014) [Doc. # 51] at 3).) In support of his request for discovery and an evidentiary hearing to explore whether the Government failed to comply with its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), Defendant relied heavily upon an affidavit prepared by Craig Raabe, counsel for Ms. Wilson-Foley, which disputes aspects of the Government's account of Ms. Wilson-Foley's March 10, 2014 proffer with the Government as documented in the Memorandum of Interview ("MOI") disclosed to the defense. (*See* Raabe Aff. [Doc. # 203]; MOI, Ex. 4 to Gov't's Opp'n [Doc. # 210].)

The Court rejected Defendant's request for discovery, concluding that Defendant had not offered "more than mere speculation that a [*Brady*] violation may have occurred" and that he largely failed to show "how any undisclosed or inaccurately described statements could have been favorable to his defense." (Ruling at 5, 7.) Additionally, the Court concluded that the purportedly undisclosed statements were not "suppressed" because the underlying information was otherwise made available to Defendant. (*Id.* at 11–12.)

## II. Discussion

### A. Motion for a New Trial

Defendant's Motion for a New Trial and his related Motion for Reconsideration largely reprise the arguments that the Court has already considered in declining to

exercise its discretion to order post-trial discovery in support of his *Brady* claim.[1] Defendant now faces a more substantial burden to obtain a new trial on the basis of this same record and additional items of newly submitted evidence. *Compare United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998) (district court has discretion to order an evidentiary hearing where there is "a nonspeculative basis for inferring that . . . the government had not made available to [the defendant] all pertinent material in its possession"), *with United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007) ("A new trial pursuant to Rule 33 based on newly discovered evidence may be granted 'only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal.'" (quoting *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir. 1980))).

Defendant disputes the Court's conclusion that each of Ms. Wilson-Foley's statements from the March 2014 proffer identified in the Raabe Affidavit were either not exculpatory and/or were not suppressed. "Evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take

---

[1] Pursuant to *Brady* and its progeny, the "prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment," *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001), or "could be used to impeach a key government witness," *id.* (citing *Giglio v. United States,* 405 U.S. 150 (1972)). Evidence is material in the *Brady* context only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012).

advantage of that evidence." *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (quoting *United States v. Gonzalez,* 110 F.3d 936, 944 (2d Cir. 1997)).  The Court has already identified numerous items of evidence that conveyed to Defendant the essential facts that would have permitted him to take advantage of the material that he contends was suppressed and would have furthered his cross examination of Mr. Foley and inform his decision whether to call Ms. Wilson-Foley as a trial witness.  (*See* Ruling at 8–12.)

Defendant nevertheless maintains that "[w]itness statements relaying what Wilson-Foley stated before the Government's investigation commenced are no substitute for Wilson-Foley's own account *to the Government* at a time when she was under extreme pressure to conform her account to the Government's preferred version of events."  (Def.'s Mem. Supp. New Trial [Doc. # 234] at 12 (emphasis in original).)  Defendant further contends that he came "very close" to calling Ms. Wilson-Foley as a witness but ultimately did not "in large part, because Mr. Rowland had limited information as to what Ms. Wilson-Foley would say if called as a witness" (Def.'s Response to Raabe Aff. [Doc. # 214] at 3), but had he been provided with the information disclosed in the Raabe affidavit he "likely" would have called her to testify for the defense (Def.'s Mem. Supp. New Trial at 16).

*Brady* is not intended to eliminate the litigation risks associated with calling a witness whose testimony is uncertain.  Ms. Wilson-Foley was available for Defendant to subpoena at trial to elicit the details that he now claims were lacking from the MOI in which Ms. Wilson-Foley purportedly maintained that Mr. Rowland performed some legitimate work for Apple.  Defendant knew from other evidence: (1) after the March 2014 meeting, Ms. Wilson-Foley's former counsel left a voicemail for the Government in

4

which he claimed that Mr. Foley had "kept his wife in the dark" and Ms. Wilson-Foley "really didn't know that this was a deal . . . for Rowland to work on the campaign" (Ex. 2 to Gov't's Mem. Opp'n Evid. Hr'g [Doc. # 210]); (2) in 2012 television and radio interviews Ms. Wilson-Foley maintained that Mr. Rowland performed valuable work for Apple and "did a very good job" (GX295A.01; GX294A.02); (3) Tiffany Romero Grossman and Chris Covucci both testified that when Apple was contemplating hiring Mr. Rowland, Ms. Wilson-Foley told them that there was actual work for him to do at Apple relating to union negotiations (Grand Jury Testimony of Grossman at 28–29 & Covucci at 15, Exs. 11 & 9 to Gov't's Opp'n); and (4) at her change of plea hearing, Ms. Wilson-Foley implied that Mr. Rowland was paid both for legitimate work at Apple and for his role on the campaign, explaining that "[w]hen my husband offered to hire John Rowland I knew that his hiring John Rowland would increase the work that John Rowland would do for my campaign" and that "I should have put *some* of the money that my husband paid to John Rowland towards a record of that for my campaign." *United States v. Foley, et al.*, 14cr65 (JBA), Change of Plea Tr. [Doc. # 23] at 32–33 (emphasis added).

Therefore, from this evidence Defendant had sufficient information available to him to elicit testimony from Ms. Wilson-Foley that she believed that Mr. Rowland provided some legitimate work to Apple. *See United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) (no *Brady* violation where the defendant "clearly was on notice of the facts necessary for him to take advantage of such exculpatory testimony [that witnesses] might conceivably furnish" and if he "had desired to have [their] testimony . . . , the obvious course was to subpoena . . . and call them to the witness stand"); *cf. United States v.*

*Mahaffy*, 693 F.3d 113, 131 n.11 (2d Cir. 2012) (*Brady* violation established where the defendant "did not know that [witness] met with the SEC or that his previous testimony might be exculpatory"). Likewise there is no "general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), and Defendant's preference to receive material in a particular form that he believes would be most advantageous to his case is insufficient to establish a *Brady* violation. The "rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *Tate v. Wood*, 963 F.2d 20, 25 (2d Cir. 1992) (quoting *United States v. LeRoy,* 687 F.2d 610, 619 (2d Cir. 1982) (emphasis omitted)).

Finally, Defendant has not demonstrated prejudice as that phrase is used in the *Brady* context, i.e., that in light of the trial record as a whole, there is a reasonable probability that the undisclosed evidence would have altered the result or undermined confidence in the fairness of the trial. *Strickler v. Greene*, 527 U.S. 263, 282 (1999) ("[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").

The evidence at trial showed that after the Foleys met with Mr. Rowland on September 14, 2011 when he outlined what he could do for the campaign, Ms. Wilson-Foley responded to concerns by Chris Syrek that hiring Mr. Rowland for the campaign would require disclosures to the FEC by saying, "Well, maybe the campaign doesn't have to pay him." (Syrek Tr., Vol. 1 [Doc. # 162] at 157–58.) Mr. Syrek, alarmed by his

6

perception that Ms. Wilson-Foley was proposing an illicit arrangement for paying Mr. Rowland for his campaign work, emailed the campaign manager while he was driving, asking her to discuss the situation with Ms. Wilson-Foley immediately. (*Id.* at 158–59; GX107.) Less than one hour later, Ms. Wilson-Foley had two telephone conversations with Mr. Rowland and then Mr. Rowland emailed Mr. Foley, "Brian, had a brief chat with Lisa, I get it, let's you and I meet." (GX109.)

On September 23, 2011, Mr. Rowland sent Ms. Wilson-Foley an email asking, "Does Chris [Syrek] . . . know that I am 'helping'"? (GX120) with Defendant using quotation marks around the word "helping" from which it could be readily inferred that "helping" was his coded euphemism for his true role as a paid consultant. On October 10, 2011, Ms. Wilson-Foley informed her new campaign manager Chris Covucci on his first day at work that "Mr. Rowland was going to become more involved with the campaign, that he had just signed a contract with Apple . . . and that way they wouldn't have to report it to the FEC, but conveniently there also actually was work for him to do at Apple." (Covucci Tr. [Doc. # 160] at 220–21.)

In November 2011, Mr. Rowland emailed Ms. Wilson-Foley with a "reminder" that he was "just a volunteer helping you and 'many other Republican candidates;' in case anyone asks" (GX183) with the quotation marks used to again refer to the coconspirator's cover story rather than the actual arrangement.

Moreover, after agreeing to the contract with Mr. Foley, Mr. Rowland immediately increased his role on the campaign, reporting to campaign headquarters frequently and assuming responsibility for strategy and operations, as evidenced at trial by a substantial increase in his campaign-related email correspondence. (GX1006–1015.)

7

Prior to signing the consulting agreement, Mr. Rowland's role on the campaign was described by staffers as "minimal" and "not existent." (Grossman Tr. [Doc. # 156] at 122; Syrek Tr. Vol. 1 [Doc. # 162] at 171.) By contrast, the evidence showed that Defendant's work at Apple was only episodic, consistent with Mr. Foley's testimony that such work was only designed to provide a "cover" for Defendant's role on the campaign. (Foley Tr. Vol. II [Doc. # 158] at 65; Collette Tr. [Doc. # 167] at 130–43, Boynton Tr. [Doc. # 166] at 84–85.)

Given the strength of the other trial evidence against Defendant and that he has not shown that any material exculpatory evidence was suppressed, Defendant has not met his burden of showing that there are grounds for a new trial. *Coppa*, 267 F.3d at 141; *United States v. Bagley,* 473 U.S. 667, 675 (1985) (*Brady* is intended "to ensure that a miscarriage of justice does not occur.").

### B.     Motion for Reconsideration

After filing his Motion for a New Trial, Defendant moved for reconsideration of the Ruling denying him an evidentiary hearing, contending that he has obtained new evidence from Attorney Jessica Santos, who previously represented both Foleys before Ms. Wilson-Foley retained separate counsel, which shows that the Government "applied tremendous pressure on [Ms. Wilson-Foley] to conform her story to its own theory, and failed to disclose critical evidence of the behind-the-scenes drama that resulted in her guilty plea." (Def.'s Mem. Supp. Mot. Reconsideration at 6.) In particular, Defendant contends that the Government failed to disclose that during the March 2014 proffer, it advised Ms. Wilson-Foley that it wanted her to corroborate Mr. Foley's account before formalizing an agreement not to prosecute her and did not believe her contentions that

8

she did not know that the arrangement between Defendant and Apple was a "sham." (*Id.* at 2 & Ex. A.) After Ms. Wilson-Foley refused to adopt the Government's view, Ms. Santos contends that the Government threatened to revoke Mr. Foley's cooperation agreement despite believing that he was truthful and refused to interview Ms. Wilson-Foley again, because she had already done "too much damage" with her original proffer statements. (Def.'s Mem. Supp. at 2 & Ex. B.)

Defendant contends that this previously undisclosed information "provides powerful motive evidence that would have been relevant to both Mr. Foley and Ms. Wilson-Foley's testimony" by showing "the tremendous pressure exerted on the Foleys to conform to the Government's theory of the case with Mr. Foley's misdemeanor package deal directly tied to Ms. Wilson-Foley corroborating Mr. Foley's account" and "that Ms. Wilson-Foley stood by her account despite the fact that doing so jeopardized her husband's own plea deal." (*Id.* at 5.)

Defendant does not explain how such "motive evidence" would have been exculpatory. Defendant does not contend that Mr. Foley altered his testimony after the Government challenged the veracity of Ms. Wilson-Foley's statements such that Defendant could have sought to impeach Mr. Foley by challenging his motivation for giving testimony favorable to the Government.[2] Likewise, the "tremendous pressure" placed on Ms. Wilson-Foley by the Government is not claimed by Defendant to have

---

[2] Defendant thoroughly cross-examined Mr. Foley on other evidence that suggested he had a motive to provide the Government with favorable testimony in order to avoid further investigation and potential prosecution of his children and other family members for making straw donations to the Wilson-Foley campaign. (Foley Tr. Vol. III [Doc. # 159] at 137–43.)

caused her to change her account but rather Defendant implies that it would have bolstered her credibility because she "stood by her account." (Def.'s Mem. Supp. at 5.) But as discussed above, evidence of this "account" that Defendant provided value to Apple was otherwise made available to Defendant (as well as to the television-viewing public) and thus was cumulative.

While there was nothing in the trial evidence suggesting that Ms. Wilson-Foley knew the "sham" nature of the actual contract,[3] there was substantial evidence that suggested that Ms. Wilson-Foley knew that Defendant's relationship with Apple was for the practical purpose of getting Defendant committed to only her campaign and should have been reported. (S*ee* Ruling at 12–14.)  Her insistence that Mr. Rowland had provided value to Apple and that thus it did not constitute a sham relationship was never couched in terms that the relationship was merely coincidental to her campaign or its purpose was solely for Apple's benefit.  Given her apparent unwillingness to embrace the characterization of the relationship the way the Government argued and the jury credited, it was hardly surprising that the Government would decline to enter into a cooperation agreement with a witness whose account it did not credit.  It was also unsurprising that neither side risked calling Ms. Wilson-Foley as a witness at trial.  Ultimately, despite whatever pressure was applied to Ms. Wilson-Foley, Defendant was aware that she was

---

[3] The structure of the contract between Apple's outside law firm and Mr. Rowland, rather than between Apple and Mr. Rowland, strongly suggested that it was designed to conceal that Mr. Rowland was being paid by Mr. Foley.  Mr. Rowland submitted invoices for consulting services purportedly provided to the law firm and payments were routed to him from Mr. Foley's unrelated entity, Ridgeview Health Realty, LLC, via the law firm.  (GX4–7.)

not given a cooperation agreement by the Government and that in pleading guilty, she provided an adequate but tepid admission of her participation in the conspiracy. (*See* Def.'s Mem. Admiss. Coconspirator Stmts. [Doc. # 84-1] at 3 (contending that Ms. Wilson-Foley "engaged in a strained and lengthy colloquy that necessitated a break in the proceeding before reluctantly admitting participation in a conspiracy").

Finally, Defendant cites an email that Ms. Santos sent to defense counsel six months after trial in which she represents that during proffers with the Government, Mr. Foley said that "the value of Mr. Rowland's work for Apple was at least $5,000," which was not disclosed in the MOI. (Santos Email to Novak, Ex. C to Def.'s Mem. Supp.)  The Government disputes this account as a factual matter, contending that Mr. Foley never ascribed a dollar value to Mr. Rowland's work and notes that Defendant has not provided any contemporaneous documentation of the statement but only Ms. Santos's recollection. (Gov't's Opp'n [Doc. # 237] at 20–21.)

Even if Mr. Foley in fact ascribed this dollar amount to Mr. Rowland's work at Apple, Defendant does not contend that such a statement constituted *Brady* material as to his criminal liability nor could he, given that Mr. Foley stated in his proffers and at trial that despite whatever value Defendant may have provided to Apple, Mr. Rowland was being paid by Apple for his work on the campaign.[4]  Rather, Defendant contends that Mr.

---

[4] The cross-examination of Mr. Foley established that Mr. Rowland's work had some value to Apple but asking Mr. Foley to ascribe a dollar figure that was anything less than the full $35,000 he paid to Mr. Rowland likely would have been inculpatory, because Mr. Foley's testimony was that he "really hired him for Apple to work on the campaign" and Defendant's work at Apple was just an attempt to "legitimatiz[e]" the arrangement so "it wouldn't be discovered that the real reason was to have him work on the campaign." (Foley Tr. Vol. II at 65.)

11

Foley's description of the value of Mr. Rowland's work at Apple is *Brady* material as to his sentencing exposure, which would not warrant a new trial. (Def.'s Mem. Supp. at 3 n.5.) Mr. Rowland will have the opportunity to make "effective use" of this information at his upcoming sentencing hearing with respect to his view of the applicable advisory sentencing guidelines and thus "the government has not deprived the defendant of due process of law simply because . . . the evidence [was not produced] sooner." *Coppa*, 267 F.3d at 144.

### III.    Conclusion

For the reasons set forth above, Defendant's Motions [Doc. ## 233, 235] for a New Trial and for Reconsideration are DENIED.

IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of March, 2015.