10:03:25   1

2                    UNITED STATES DISTRICT COURT

3                      DISTRICT OF CONNECTICUT

4
      ------------------------------ x
5     UNITED STATES OF AMERICA           :
                                         :Docket NO.
6                                        :3:14CR00079 (JBA)
           -versus-                      :
7                                        :
      JOHN G. ROWLAND                    :March 18, 2015
8                                        :10:00 a.m.
      ------------------------------ x
9

10

11

12                         SENTENCING

13

14

15

16    B E F O R E:   THE HONORABLE JANET BOND ARTERTON

17

18

19

20

21

22

23

24

25

**A P P E A R A N C E S:**

FOR THE GOVERNMENT:   LIAM BRENNAN
                      CHRISTOPHER M. MATTEI
                      Assistant U.S. Attorney's Office
                      157 Church Street, 23rd Floor
                      New Haven, Connecticut  06510
                      Liam.brennan3@usdoj.gov
                      Christopher.mattei@usdoj.gov
                      (203) 821-3835


FOR THE DEFENDANT:    REID H. WEINGARTEN
                      STEPTOE & JOHNSON, LLP
                      1330 Connecticut Ave. NW
                      Washington, DC  20036
                      Rweingarten@steptoe.com
                      (202)429-8082

                      JEFFREY A. NOVACK
                      STEPTOE & JOHNSON, LLP
                      1114 Avenue of the Americas
                      New York, New York  10036
                      Jnovack@steptoe.com
                      (212)378-7519

Court Reporter:       Julia Cashman, LSR
                      141 Church Street
                      New Haven, Connecticut

10:03:30 1    THE COURT:  All right, we are here for the

10:03:32 2    sentencing hearing in United States of America versus

10:03:35 3    John G. Rowland, 14CR79.  May I have appearances,

10:03:40 4    starting with the Government.

10:03:42 5    MR. BRENNAN:  Good morning, your Honor.

10:03:43 6    Liam Brennan and Chris Mattei for the United States,

10:03:47 7    joined at counsel table by Inspector Bernard Feeney

10:03:51 8    THE COURT:  Good morning.  And for Mr.

10:03:53 9    Rowland?

10:03:53 10   MR. WEINGARTEN:  Good morning, your Honor,

10:03:54 11   it's Reid Weingarten.  I have Jeff Novack here with me,

10:03:58 12   Andrew Fish of counsel and Mr. Rowland is here.

10:03:59 13   THE COURT:  Good morning.  Mr. Lopez from

10:04:01 14   the Probation Office is also present.  Good morning.

10:04:04 15   MR. LOPEZ:  Good morning, your Honor.

10:04:08 16   THE COURT:  Mr. Rowland stands before the

10:04:10 17   Court today for sentencing on seven counts of

10:04:17 18   conviction, Count One and Three, Falsification of

10:04:20 19   Records in a Federal Investigation in violation of 18 US

10:04:25 20   Code 1519; Count Two, Conspiracy to Commit an Offense

10:04:33 21   Against or to Defraud the United States, 18 US code 371;

10:04:39 22   Count Four and Five, Causing False Statements in

10:04:44 23   violation of 18 United States Code 1000(1)(a)(2); and

10:04:49 24   Count Six and Seven, Illegal Campaign Violations in

10:04:54 25   violation of 2 United States Code 441(a)(1)(A), 441

10:05:05  1  a(f), and 437 g(d)(1)(A)(ii) and 18 United States Code

10:05:14  2  2.

10:05:15  3          With respect to the factual statements

10:05:20  4  contained in the Presentence Report, and recognizing

10:05:26  5  that the defendant takes issues with the statements of

10:05:35  6  factual underpinnings for liability, are there specific

10:05:43  7  factual statements in the Presentence Investigation

10:05:47  8  Report that there is objection to or, for the purposes

10:05:52  9  of sentencing today, should the Court adopt the factual

10:05:56 10  statements in the Presentence Report?  Mr. Weingarten?

10:05:59 11          MR. WEINGARTEN:  With the Court's

10:06:00 12  permission, Mr. Novack will handle the guideline

10:06:02 13  section.

10:06:03 14          MR. NOVACK:  Your Honor, we just have the

10:06:04 15  same objections we pressed about the liability issues,

10:06:07 16  but nothing else specific at this time.

10:06:09 17          THE COURT:  All right, very well.  Your

10:06:11 18  record is preserved on that.  Mr. Brennan?

10:06:14 19          MR. BRENNAN:  Your Honor, no objections to

10:06:16 20  the factual findings in the PSR.

10:06:17 21          THE COURT:  All right, then, the Court will

10:06:19 22  adopt those factual statements for the purpose of

10:06:23 23  imposing sentence.

10:06:26 24          Now, we start with the Federal Sentencing

10:06:32 25  Guidelines to give the Court the advisory sentencing

| | |
|---|---|
| 10:06:40 | 1 |
| 10:06:48 | 2 |
| 10:06:53 | 3 |
| 10:06:58 | 4 |
| 10:07:04 | 5 |
| 10:07:07 | 6 |
| 10:07:12 | 7 |
| 10:07:15 | 8 |
| 10:07:21 | 9 |
| 10:07:31 | 10 |
| 10:07:40 | 11 |
| 10:07:47 | 12 |
| 10:07:54 | 13 |
| 10:08:02 | 14 |
| 10:08:08 | 15 |
| 10:08:13 | 16 |
| 10:08:21 | 17 |
| 10:08:25 | 18 |
| 10:08:28 | 19 |
| 10:08:34 | 20 |
| 10:08:37 | 21 |
| 10:08:39 | 22 |
| 10:08:44 | 23 |
| 10:08:46 | 24 |
| 10:08:51 | 25 |

range that the Sentencing Commission has applied to the offense, as it is determined to be.  And that is where there has been a great deal of dispute.  The manual that will be used is the November 2014.

The one thing counsel, I believe, agree on is that the counts should be grouped, Count One through Seven, should be grouped in order to determine the offense level.  And that is the procedure used in the Presentence Report.  The Presentence Report utilizes the 2C1.1 (a)(2) conspiracy guideline, level 12, enhanced by six points under 2C1.1 (b)(2), for a greater than thirty thousand dollar benefit received.  The Presentence Report has no other adjustments, and there reaches an offense level of 18, criminal history Category II, with an advisory sentencing range of 30 to 37 months.

The defendant objects to use of 2C1.1 (a)(2).  The Government seeks an obstruction of justice enhancement.  Let me turn that over to counsel to articulate their objections, the basis on what they believe to be the correct advisory guidelines.

Mr. Novack, do you wish to start?

MR. NOVACK:  Yes, your Honor.  To start with, your Honor, we believe the correct advisory guideline offense level is 14.  We agree with the Probation Department's decision not to apply the

10:08:54 1   obstruction enhancement.  Where we disagree with the

10:08:56 2   Probation Department is on two issues.

10:08:58 3           The first is their application of 2C1.1 to

10:09:01 4   Count 6 and 7.  We believe 2C1.8 is the applicable

10:09:05 5   guideline.  The second issue on which we disagree with

10:09:10 6   Probation is the use of over thirty thousand dollars as

10:09:13 7   the loss amount.

10:09:15 8           With respect to the first issue with which

10:09:17 9   we disagree with Probation, the applicable guideline to

10:09:20 10  use, our position, as articulated in the briefing, is

10:09:23 11  that 2C1.1 is limited to bribery related offenses, and

10:09:29 12  2C1.8 captures the conduct at issue here.  That

10:09:33 13  proposition is supported by the main language of the

10:09:37 14  guideline itself in 2C1.1.  It continually refers to the

10:09:42 15  conduct as warranted toward bribery oriented offenses.

10:09:47 16  2C1.8 refers to 2C1.1 for bribery related offenses.

10:09:53 17  It's also supported by case law from two circuits, the

10:09:57 18  Seventh and Ninth Circuit.  And we don't believe there's

10:09:59 19  any contrary case law.  The one case the Government has

10:10:03 20  relied upon actually did involve bribery conduct.  And

10:10:07 21  in that case, the defendant conceded that 2C1.1 was

10:10:11 22  applicable.

10:10:13 23          The last reason, also we've articulated in

10:10:16 24  the briefs, that supports this conclusion, is that it

10:10:21 25  would work an unwarranted result in the sentencing

10:10:24    1    guidelines, in the way they're applied, in that it would

10:10:27    2    take almost any kind of conspiracy oriented offense,

10:10:30    3    including any conduct contribution offense, which is

10:10:32    4    intended to be prosecuted -- excuse me, intended to be

10:10:36    5    used under the guideline for campaign oriented conduct,

10:10:40    6    and turned into a bribery oriented offense.  And the

10:10:43    7    guidelines clearly contemplate that bribery related

10:10:46    8    offenses are to be treated more harshly so it wouldn't

10:10:49    9    work that unwanted result.

10:10:53   10            The second issue, your Honor, in which we

10:10:54   11    disagree with Probation, is the loss amount.  Probation

10:10:59   12    has utilized the loss amount of over thirty thousand

10:11:02   13    dollars based upon payments Mr. Rowland received.  We

10:11:06   14    believe that the payment amount should be thirty

10:11:09   15    thousand dollars or less.  We believe that's supported

10:11:13   16    by the fact that the amount at issue should be offset by

10:11:19   17    the value of the work Mr. Rowland did at Apple.  We

10:11:22   18    think that the offset is warranted by the language

10:11:26   19    within the guideline itself for 2C1.8, which is the

10:11:30   20    applicable guideline.

10:11:31   21            That guideline discusses the value of the

10:11:35   22    illegal transactions at issue.  And in reference to the

10:11:39   23    illegal transaction, it looked to the contributions at

10:11:42   24    issue.  Real work for Apple is necessarily not

10:11:46   25    contribution to any campaign.

10:11:50 1          The second reason beyond the language is the
10:11:52 2     Government's own theory of the case supports this.
10:11:56 3     Their theory has been that from the outset, Mr. Rowland
10:11:59 4     and Mr. Foley contemplated that there would be real work
10:12:02 5     done by Mr. Rowland at Apple.  So in essence, from the
10:12:08 6     outset, the notion that Mr. Rowland performing real work
10:12:13 7     at Apple and getting paid for it was baked into the
10:12:16 8     agreements, and the value of the payments in it.
10:12:18 9          The final reason why this outcome of using
10:12:21 10    an offset is warranted, is the purpose of these
10:12:25 11    guidelines is really driven by using the loss amount to
10:12:29 12    try and assess someone's culpability.  We don't think it
10:12:32 13    makes sense or is fair to utilize a guideline without
10:12:36 14    respect to the value of the real work here.  If you
10:12:39 15    accept the Government's position and take it to its
10:12:41 16    logical conclusion, even if Mr. Rowland was working nine
10:12:45 17    to five at Apple every day, he wouldn't be entitled to
10:12:47 18    offset.  I think that's their theory of the case.
10:12:51 19         Then in terms of the value of the actual
10:12:53 20    offset, we think the Government has acknowledged that
10:12:57 21    there's ample evidence of real work at Apple.  And the
10:13:02 22    Court has instructed us to assume, for purposes of the
10:13:04 23    guidelines, that Mr. Foley himself believes Mr.
10:13:07 24    Rowland's work at Apple is worth five thousand dollars.
10:13:09 25    It's not a significant amount.  Over seven months, it's

10:13:13  1  about seven hundred fifteen dollars a month.  We think

10:13:15  2  there's ample evidence to support using offset of at

10:13:18  3  least five thousand dollars, which would bring us to a

10:13:20  4  lower offense level of 12 for the conduct.

10:13:26  5          The last issue to address for the Court is

10:13:28  6  the Obstruction of Justice enhancement.  The Court

10:13:32  7  doesn't even need to read this issue if it agrees with

10:13:34  8  us on the first two issues, because even if it applied

10:13:38  9  the obstruction enhancement in that context, it would

10:13:42  10 bring the offense level to 14, which is the base offense

10:13:45  11 level for Counts One and Three for Obstruction of

10:13:47  12 Justice.  So the Court does not need to reach the

10:13:49  13 obstruction enhancement issue if it agrees with us on

10:13:52  14 the correct guideline and the loss amount.

10:13:55  15         If you do choose to reach this issue because

10:13:57  16 you disagree on any front, we don't believe obstruction

10:14:00  17 enhancement applies here.  We agree with the Probation

10:14:04  18 Office assessment that the conduct at issue is not over

10:14:07  19 and above the charge conduct, sufficient to warrant the

10:14:11  20 enhancement.  To the extent the Government has sought to

10:14:16  21 apply the enhancement based upon the contracts that are

10:14:20  22 at issue here, they're required to show that it was

10:14:24  23 likely to thwart an investigation, and we don't believe

10:14:27  24 they've shown that here.

10:14:28  25         The Greenberg contract was the very basis of

10:14:30  1   this prosecution.  And the contract with Apple was used

10:14:35  2   to support the Government's theory of the case, based on

10:14:38  3   its structuring.  To the extent that alleged false

10:14:43  4   statements by Mr. Rowland's prior counsel would serve as

10:14:46  5   a basis for obstruction, we don't believe that's

10:14:49  6   warranted here.  The Second Circuit has been clear that

10:14:53  7   you have to show an actual hindrance, an actual impeding

10:14:58  8   of the case.  And that is not shown here.  At the time

10:15:01  9   these were offered, the Government had already

10:15:04  10  concluded, you know, that Mr. Rowland was guilty of the

10:15:07  11  crimes charged, and we don't believe that it impeded the

10:15:10  12  investigation.

10:15:11  13          I know your Honor, in Mr. Foley's

10:15:14  14  sentencing, referenced two cases that came to an

10:15:16  15  opposite conclusion, and with respect to whether or not

10:15:19  16  attempted obstruction was enough in this scenario with

10:15:22  17  these kind of statements conveyed by the Government post

10:15:25  18  investigation; the Girod case and the Patterson case.

10:15:29  19  The Patterson case actually predates the amendments to

10:15:34  20  the guidelines that deal with this specific issue.  And

10:15:38  21  the Patterson case is just simply out of the circuit.

10:15:40  22  And the two cases I would direct your attention to, your

10:15:43  23  Honor, are United States versus Bliss, 430 F.3d 640, and

10:15:51  24  the Khimchiachvili case, which is 372 F.3d 75.  Both

10:15:54  25  those cases are Second Circuit authority that made clear

| | | |
|---|---|---|
| 10:15:58 | 1 | that you have to show an actual impediment to the |
| 10:16:02 | 2 | Government's investigation to apply this enhancement. |
| 10:16:05 | 3 | THE COURT: Thank you. All right, from the |
| 10:16:30 | 4 | Government? |
| 10:16:31 | 5 | MR. BRENNAN: Thank you, your Honor. In |
| 10:16:33 | 6 | terms of objections to the guidelines calculation PSR, |
| 10:16:36 | 7 | the Government's only objection is that an Obstruction |
| 10:16:38 | 8 | of Justice enhancement was not used. And I'll get to |
| 10:16:43 | 9 | that in a moment. I do understand that there's, as you |
| 10:16:47 | 10 | have seen in the papers, a debate over whether 2C1.1 |
| 10:16:50 | 11 | should be used or 2C1.8, or the defense has also argued |
| 10:16:55 | 12 | (2)(J). We're having to largely rest on our papers on |
| 10:16:58 | 13 | that issue. We think there's sufficient case law, |
| 10:17:02 | 14 | particularly United States versus Trent, that 2C1.1 can |
| 10:17:06 | 15 | be used. I think defense counsel possibly misspoke; I |
| 10:17:09 | 16 | don't believe Trent was a bribery case. However, 2C1.1 |
| 10:17:13 | 17 | is not the case -- not the guidelines to start with, the |
| 10:17:19 | 18 | base offense level. We do agree that 2C1.8 is the |
| 10:17:22 | 19 | appropriate alternative guideline to start. And I'm |
| 10:17:28 | 20 | happy to answer any other questions on that. Otherwise, |
| 10:17:30 | 21 | I'll rest on the papers on the issue. |
| 10:17:32 | 22 | THE COURT: Did you not wish to respond to |
| 10:17:34 | 23 | Mr. Novack's analysis of whether or not the evidence at |
| 10:17:39 | 24 | trial in the form of the contracts and the attorney |
| 10:17:42 | 25 | representation on behalf of Mr. Rowland does or does not |

```
10:17:49   1    fit the Obstruction of Justice guideline?
10:17:53   2          MR. BRENNAN:  Absolutely, your Honor, yes.
10:17:55   3    That was the next thing I was going to touch upon.  As
10:18:00   4    your Honor knows from our filings, we do believe that
10:18:05   5    C21.1 for obstruction enhancement applies.  In this
10:18:07   6    instance, we have fabrication of two contracts, the
10:18:11   7    Greenberg contract and the Chris Shelton contract.  The
10:18:16   8    Greenberg contract wasn't just created before the event.
10:18:21   9    It was actually used to try to obstruct this case.  It
10:18:26  10    was sent to the United States Attorney's Office in an
10:18:29  11    effort to shut down this investigation.
10:18:32  12          I think your Honor actually said it best at
10:18:35  13    Brian Foley's sentencing, that the sham contract was an
10:18:39  14    obstructive vehicle.  Here, we have two sham contracts
10:18:42  15    that were obstructive vehicles.  Not just in
10:18:47  16    anticipation of an investigation, but actually used, in
10:18:51  17    Mr. Rowland's instance, to try and shut down the
10:18:55  18    investigation.  The obstruction enhancement does apply
10:19:01  19    when it's actually just an attempted obstruction.  I
10:19:05  20    think your Honor also found this in Mr. Foley's
10:19:08  21    sentencing, on page 16 of the transcript, and a number
10:19:14  22    of courts have concluded that the Government isn't
10:19:16  23    required to prove actual prejudice resulted from the
10:19:20  24    defendants's false statements.  And here, the
10:19:21  25    defendants's false statements are in these contracts,
```

and are actually the way in which the Mark Greenberg
contract was sent to the US Attorneys's Office.

So there's no bar on the guidelines to
applying obstruction in this instance.  I think the
conduct clearly shows it should be applied in this
instance.  They were both obstructive vehicles made in
anticipation of an investigation.  Your Honor has saw
Mr. Rowland himself say, in Government Exhibit 158, that
this was to provide cover, that's where he says "use JJR
Associates to give us more cover."  And the only natural
item that's cover from an investigation -- and actually
in this instance, not only was it in anticipation of an
investigation, it was -- the Greenberg contract was used
to shut down, to try to shut down, our investigation
into Mr. Rowland.

Furthermore, actually Mr. Rowland also
attempted to use the Apple contract to shut down the FEC
investigation.  He suggested to Ben Croto to send the
Apple contract to the FEC.  I believe that was
Government Exhibit 291 or 292.  So not only is there an
attempt, there's actual -- and not only is there attempt
in anticipation, which in itself is enough under the
guidelines, there's actual use here.

Your Honor, I'd be happy to speak about the
guideline provision that we think, in terms of loss

10:20:49 1  under 2B1.1, we think it should be thirty thousand and

10:20:53 2  above, if your Honor would like to hear.

10:20:55 3            THE COURT:  I would.

10:20:56 4            MR. BRENNAN:  Okay.  Your Honor, I do

10:20:57 5  believe the defense's whole argument on why it should be

10:21:01 6  under thirty thousand dollars is that Mr. Rowland has

10:21:04 7  provided some services to Apple.  And particularly,

10:21:07 8  they're saying that -- they haven't said it today, but

10:21:10 9  that this recommendation of Tom Ritter was worth at

10:21:13 10  least five thousand dollars.  Your Honor, in your

10:21:16 11  Honor's last ruling, found that Mr. Foley's testimony

10:21:19 12  was such that the work that Mr. Rowland provided was

10:21:22 13  only designed to provide, quote, unquote, cover for the

10:21:27 14  defendant's role on a campaign.  That's page eight.  And

10:21:30 15  again, at page 11, your Honor I think astutely points

10:21:35 16  out that Mr. Foley stated at trial that despite whatever

10:21:40 17  value the defendant may have provided to Apple, Mr.

10:21:43 18  Rowland was being paid for his work on the campaign.

10:21:47 19            The payments here were not for the

10:21:49 20  recommendation of Tom Ritter.  They were not for

10:21:52 21  anything else.  They were for the work on the campaign.

10:21:55 22  The payments total thirty-five thousand dollars.  That

10:21:58 23  is the appropriate measure under 2B1.1 loss statement

10:22:02 24  analysis.

10:22:03 25            THE COURT:  All right.

10:22:04   1         MR. BRENNAN: Thank you, your Honor.

10:22:05   2         THE COURT: Anything further from you, Mr.

10:22:10   3  Novack?

10:22:10   4         MR. NOVACK: Your Honor, we would just say,

10:22:11   5  again, with respect to the thirty thousand dollar issue,

10:22:19   6  like I articulated earlier, even if it was part of the

10:22:23   7  design as, quote, cover, Mr. Foley admitted there was

10:22:28   8  real value to this work, and that should be accounted

10:22:32   9  for in the guidelines.

10:22:46  10         THE COURT: All right, then, the Court has

10:22:49  11  considered the briefing of counsel on this. And on

10:22:56  12  these issues have been issues that had considerable

10:23:06  13  reflection by both sides and have been very well

10:23:12  14  articulated, notwithstanding the fact that have come to

10:23:17  15  different conclusions.

10:23:24  16         In determining the applicable sentencing

10:23:27  17  guideline calculation here, the parties don't disagree

10:23:34  18  that they were properly grouped, as we use that phrase,

10:23:39  19  because they all involve substantially the same harm.

10:23:44  20  And then, once that's been determined, the applicable

10:23:48  21  offense guideline is the one that results in the highest

10:23:52  22  offense level of the count in the group. But that

10:23:58  23  requires determining what is the applicable offense

10:24:05  24  guideline, as to which there is considerable dispute,

10:24:12  25  and the answer is not totally clear whether it should be

that which applies to the -- under what counsel refer in shorthand, 2C1.1 or 2C1.8.

The defense argues that the Government's preferred guideline of 2C1.1 only applies to offenses involving bribery or extortion of a public official. The Government believes that the conspiracy conviction of count two puts it under 2C1.1.

The Court concludes that the defendant's version is more persuasive, that 2C1.1 applies only to the bribery and similar offenses. And thus will apply 2C1.8 for violations of the Federal Election Campaign Act.

The Government's view and Probation's view that 2C1.1 is applicable to the conviction under 371 because the conduct was conspiracy to defraud by interference with governmental functions. However, Section 371, the conviction under 371, is not covered by a specific offense guideline. And thus, the Court has looked further for the guidelines section that apply to the defendant's conspiracy conviction and other convictions, applying the guideline that is "most appropriate for the offense conduct charged in the count of which the defendant was convicted;" see 1B1.2 comment note one.

While the guidelines don't explicitly say

that 2C1.1 applies only to conspiracies that involve bribery of public officials, the structure and the language and the commentary suggest such a limitation. The background to that section explains that "It applies to a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to participate in a fraud or to influence such individual's official actions, or to a public official who solicits or accepts such a bribe." The commentary further explains that the section applies to, on a services fraud, not at issue here, and "conspiracy to defraud by interference with governmental functions," because "fraud offenses typically involve an improper use of government influence that harms the operation of government in a manner similar to bribery offenses."

          The Government has explained in its briefing that this conspiracy is similar to a bribery scheme because it undermined governmental entity's ability to fulfill its public purpose. But the Court views this scheme as not involving "improper use of government influence" that's associated with bribery and similar schemes, but rather, that the defendant sought to undermine the FEC enforcement of the campaign finance laws without corrupting the FEC itself.

          There are two cases that confirm the

10:29:15 1 viewpoint that the higher base offense level under 2C1.1

10:29:24 2 reflects the Sentencing Commission's determination that

10:29:29 3 corruption of public officials by bribery merits harsher

10:29:36 4 punishment than other frauds. And that is the

10:29:42 5 Huizar-Velazquez case from the Ninth Circuit, and

10:29:43 6 similarly from the Seventh Circuit, in US versus

10:29:53 7 Orsburn, the limitation on application of 2C1.1 are

10:29:58 8 persuasively, in this Court's view, discussed. Orsburn

10:30:05 9 says although 2C1.1 is among the guideline provisions

10:30:15 10 applicable to mail fraud convictions, the list of

10:30:19 11 offenses in 2C1.1 was "best understood in light of its

10:30:25 12 companion's bribery, extortion and interference with

10:30:28 13 governmental function," which shows that it is designed

10:30:34 14 "to include many kinds of bribery, but that fraud does

10:30:39 15 not include bribery -- that fraud that does not include

10:30:45 16 bribery or closely related offense, is outside the scope

10:30:48 17 of 2C1.1."

10:30:53 18　　　　　So based on the text and the structure and

10:30:57 19 the sentencing guidelines commentary to 2C1.1, as well

10:31:03 20 as the Ninth and the Seventh Circuit holdings, which I

10:31:08 21 find persuasive, I conclude that 2C1.1 does not apply to

10:31:14 22 this defendant's offense conduct. The offense guideline

10:31:24 23 that results in the highest offense level that is

10:31:28 24 applicable is, in the Court's view, 2C1.8 for violation

10:31:34 25 of the Federal Election Campaign Act, which results in

10:31:39 1    an offense level of 16 if the base offense level is

10:31:51 2    eight, if six points are added under 2C1.8(b) on the

10:32:02 3    loss table in 2B1.1, and if two points are added under

10:32:07 4    2C1.1 for Obstruction of Justice.  And those two latter

10:32:13 5    enhancements are also in dispute.

10:32:18 6            The Court has concluded that the obstruction

10:32:22 7    enhancement applies.  It applies "if the defendant

10:32:29 8    willfully obstructed or impeded, or attempted to

10:32:31 9    obstruct or impede, the administration of justice with

10:32:33 10   respect to the investigation, prosecution or" -- not

10:32:39 11   applicable here -- "sentencing of the instant offense of

10:32:42 12   conviction, and the obstructive conduct related to (A)

10:32:46 13   the defendant's offense of conviction and any

10:32:49 14   related" -- excuse me, "any relevant conduct or (B)

10:32:52 15   closely related offense." And "The application notes

10:33:00 16   indicate that among the conduct to which this

10:33:03 17   enhancement applies is producing or attempting to

10:33:05 18   produce a false, altered or counterfeit document or

10:33:10 19   record during an official investigation or judicial

10:33:14 20   proceeding."  That's note 4(C) in the commentary to

10:33:21 21   3C1.1.

10:33:25 22           Both sides have set forth their views.  I

10:33:27 23   have asked them to assume for the purposes of this

10:33:30 24   sentencing that Mr. Foley believed Mr. Rowland's work

10:33:44 25   for Apple is valued at about five thousand dollars.  As

10:33:59 1  the Government has articulated again here today, because

10:34:04 2  Mr. Rowland created two false contracts through which he

10:34:07 3  proposed to be paid for the Greenberg campaign in

10:34:11 4  2009-2010, and for which he was actually paid for the

10:34:16 5  Wilson-Foley campaign in 2011-2012, and in April 2013

10:34:22 6  presented the Greenberg contract to demonstrate that his

10:34:28 7  proposal to Greenberg was unrelated to the campaign, and

10:34:33 8  structured his contract for the Wilson-Foley campaign as

10:34:37 9  between JJR Associates and the law offices of Christian

10:34:43 10  Shelton, to provide cover and conceal his work for the

10:34:48 11  campaign, that this enhancement should apply.

10:34:54 12        While the creation of a false consulting

10:34:58 13  agreement wasn't necessarily a part of the offense, but

10:35:03 14  it does represent the sort of additional conduct,

10:35:06 15  creation of false conduct -- of document to conceal that

10:35:12 16  conduct, which underlay the conviction, as well as the

10:35:16 17  submission of a similar contract to the government to

10:35:21 18  throw off its investigation, I believe the enhancement

10:35:26 19  squarely applies.  And I will add two points under

10:35:31 20  2C1.8.

10:35:32 21        And then the value of the illegal

10:35:34 22  transaction, which is also in dispute, in which the

10:35:42 23  defendant characterizes the value of the illegal

10:35:45 24  transaction and only the portion of Mr. Rowland's salary

10:35:51 25  that qualifies, as an expenditure by the Wilson-Foley

campaign under the Election Act, and thus the value of the defendant's legitimate work for Apple should be deducted from the thirty-five thousand dollars in payments for offset, as Mr. Novack explains.

At trial, there was no dispute that Mr. Rowland's work had some value to Apple. But Mr. Foley testified that he "really hired him for Apple to work on the campaign," and that his actual work at Apple was just an attempt to provide "cover" and "legitimize the arrangement so it wouldn't be discovered that the real reason was to have him work on the campaign." So for the purposes of determining the value of the illegal transactions, the sentencing guidelines define illegal transaction as including "any contribution, donation, solicitation or expenditure of money or anything of value, or any other conduct prohibited by the Federal Election Campaign Act of 1971. And indeed, the jury was instructed that any payment made in exchange for a person's work or support of the campaign is a contribution to the candidate.

In the Court's view, the trial evidence showed that all of the thirty-five thousand dollars that Mr. Foley paid Mr. Rowland was made in exchange for Mr. Rowland's work on the campaign. Even if his work at Apple was indeed worth at least five thousand dollars to

10:37:52  1   the company, that value was really a byproduct of the

10:38:02  2   attempted coverup of the true nature of the campaign

10:38:05  3   contribution.  So any value that Mr. Rowland's work may

10:38:12  4   have provided to Apple, shouldn't be subtracted from the

10:38:17  5   guidelines.  The illegal transaction is in excess of

10:38:23  6   thirty thousand dollars, so the six levels will be

10:38:28  7   added.

10:38:28  8          In briefing, there was some disagreement

10:38:36  9   about whether the payments, fifteen thousand in 2011,

10:38:43  10  twenty thousand in 2012, should be aggregated.  The

10:38:50  11  Court believes that the unlawful campaign contributions

10:38:53  12  of Six and Seven, now having been grouped for sentencing

10:38:58  13  purposes, it's appropriate and proper to aggregate.

10:39:06  14         So in summary, the base offense level that

10:39:11  15  the Court will apply will be the Federal Election

10:39:15  16  Campaign Act violation 2C1.8, with a base offense level

10:39:21  17  of eight; a six level enhancement for payment exceeding

10:39:26  18  thirty thousand dollars; and a two level enhancement for

10:39:30  19  obstruction of justice, resulting in a total offense

10:39:33  20  level of 16.  Mr. Rowland has a criminal history

10:39:38  21  Category II.  And this results in an advisory sentencing

10:39:44  22  guideline range of 24 to 30 months and a fine range of

10:39:49  23  five to fifty thousand dollars.

10:38:50  24         All right, then, the advisory applicable

10:38:55  25  guideline having been determined, let us move onto the

| | | |
|---|---|---|
| 10:39:01 | 1 | considerations under 3553(a) that would inform where a |
| 10:39:15 | 2 | fair sentence should lie under the circumstances of this |
| 10:39:20 | 3 | case and for this defendant. |
| 10:39:21 | 4 | MR. BRENNAN: Your Honor, may I ask a |
| 10:39:23 | 5 | question before we move on? |
| 10:39:24 | 6 | THE COURT: Yes. |
| 10:39:24 | 7 | MR. BRENNAN: Just wanted to clarify. I |
| 10:39:27 | 8 | believe -- I believe JJR Associates was not actually |
| 10:39:30 | 9 | used in the end as a counterparty on the contract. |
| 10:39:34 | 10 | THE COURT: On the Shelton contract. |
| 10:39:36 | 11 | MR. BRENNAN: It was suggested, but it |
| 10:39:37 | 12 | wasn't actually used. I don't believe that changes your |
| 10:39:39 | 13 | Honor's analysis, but I wanted to clarify. |
| 10:39:41 | 14 | THE COURT: It doesn't. Thank you for |
| 10:39:43 | 15 | clarifying. As I recall now, it was in one earlier |
| 10:39:45 | 16 | draft. |
| 10:39:46 | 17 | MR. BRENNAN: I believe it was in -- it was |
| 10:39:48 | 18 | suggested in -- I think your Honor might be right, that |
| 10:39:52 | 19 | it was written in handwriting in one earlier draft, |
| 10:39:55 | 20 | never actually used, and it was suggested in Government |
| 10:39:57 | 21 | Exhibit 158, I believe. |
| 10:39:59 | 22 | THE COURT: Right, okay, thank you for |
| 10:40:01 | 23 | clarifying that. All right. So shall we then proceed |
| 10:40:04 | 24 | to the factors the Court should take into account in |
| 10:40:11 | 25 | imposing an individualized sentence for the defendant? |

10:40:14  1   Mr. Weingarten or Mr. Novack?

10:40:20  2           MR. WEINGARTEN:  Thank you, your Honor.  The

10:40:21  3   way we would like to proceed is there are five members

10:40:24  4   of the community who would like to address the Court

10:40:26  5   briefly.  So I'd call them to the --

10:40:29  6           THE COURT:  Okay.

10:40:29  7           MR. WEINGARTEN:  -- podium.

10:40:30  8           THE COURT:  And for everyone who has

10:40:33  9   written, I assure you, I have read your letter.

10:40:47  10          THE COURT:  Good morning.

10:40:48  11          MS. CARABETTA:  Good morning.

10:40:49  12          THE COURT:  Will you give us your full name,

10:40:50  13  please?

10:40:51  14          MS. CARABETTA:  Sarah Elizabeth Carabetta.

10:40:53  15          THE COURT:  Good morning.

10:40:54  16          MS. CARABETTA:  Good morning, your Honor,

10:40:55  17  and thank you for the opportunity to speak in front of

10:40:58  18  the Court this morning.

10:41:00  19          I have the privilege of being the executive

10:41:02  20  director of a local Waterbury-based nonprofit,

10:41:08  21  nondenominational organization called Acts 4 Ministry.

10:41:10  22  We're a collaborative group of a volunteer Board of

10:41:14  23  Directors, staff members, and a multitude of volunteers

10:41:17  24  who desire to share God's love by meeting the physical

10:41:22  25  comforting needs of others.  We achieve this daily on

10:41:25  1    many levels, by the collection and distribution of

10:41:28  2    reusable clothing, furniture and house goods within the

10:41:31  3    greater Waterbury community.

10:41:34  4            Outside of our interactions at Acts 4

10:41:36  5    Ministry, I have known Mr. Rowland in a multiple

10:41:40  6    community capacity over ten years.  I was first

10:41:45  7    introduced to Mr. Rowland as I was doing clerical

10:41:48  8    activities for the tri-campus office of the University

10:41:52  9    of Connecticut at the Rowland Center in Waterbury.  And

10:41:57  10   at the time, Mr. Rowland was governor.  And I'd just

10:42:01  11   like to account for the Court the consistency in Mr.

10:42:06  12   Rowland's character.

10:42:07  13           When I met Mr. Rowland, when he was

10:42:09  14   governor, he had a wonderful opportunity of making

10:42:14  15   everyone in the room feel just as important as he was in

10:42:17  16   the room.  He came directly up to me, introduced

10:42:21  17   himself, and made conversation that was important at the

10:42:24  18   time.  We all know that different positions within

10:42:27  19   different companies can make one feel not as relevant in

10:42:31  20   a conversation.  And that was very important at the

10:42:34  21   time.  It showed me where his character lied.

10:42:39  22           And as the years progressed, your Honor, I

10:42:42  23   got a chance to work with Mr. Rowland over a variety of

10:42:46  24   different capacities, through our local chamber,

10:42:49  25   nonprofit organizations, and most importantly, the

10:42:52 1   privilege to get to know his family.  Mr. Rowland is a

10:42:56 2   man of faith and has always kept family first, and stood

10:42:59 3   on strong Biblical principles.  Never once have I

10:43:03 4   witnessed him disrespect another human being, or take

10:43:06 5   advantage of them.

10:43:09 6           Now how this ties into Acts 4 Ministry, Mr.

10:43:12 7   Rowland has consistently served with our organization

10:43:15 8   since March 2013, and as a member of our Board of

10:43:19 9   Directors from March to October of 2014.  During that

10:43:23 10  time, he provided strong governance, diplomacy,

10:43:27 11  consensus building to our board in the matters of

10:43:30 12  strategic planning, and overall growth.  Mr. Rowland

10:43:34 13  spearheaded the ministry's first fundraising event,

10:43:37 14  which helped grow our organization.  It's a wonderful

10:43:41 15  organization to be able to build someone's self dignity,

10:43:45 16  love and respect as they build their life from a life

10:43:50 17  devastating circumstance.

10:43:51 18          And I must share also with the Court, your

10:43:53 19  Honor, that it's safe to say that the board at large

10:43:56 20  shares the same sentiment as I.  Mr. Rowland has also

10:43:59 21  consistently volunteered to pick up and deliver

10:44:02 22  furnishings to area residents who have experienced these

10:44:08 23  life devastating events.  He's stepped in when we've

10:44:12 24  received probably the worst winter we've had in the past

10:44:15 25  few years, shoveled off snow off of our 15-foot box

10:44:21 1  truck, made a clear path so that elderly volunteers can

10:44:23 2  come and have the joy of serving other people.  These

10:44:27 3  things don't go unrecognized.  They weren't asked of

10:44:30 4  him.  He took the initiative to step in, and has

10:44:33 5  consistently done that for us.

10:44:36 6          And your Honor, as I account one specific

10:44:40 7  activity that happened in our building was we were all

10:44:44 8  gathering together for a meeting, and I happened to look

10:44:47 9  down our building, it's a long corridor, and Mr. Rowland

10:44:50 10 had come in early and saw that we had a variety of

10:44:54 11 different community service volunteers that come in from

10:44:57 12 halfway houses.  And they left a trail of a mess in our

10:45:00 13 building.  And Mr. Rowland took the time to pull out a

10:45:05 14 broom and a dustpan, got on the floor and cleaned our

10:45:08 15 floor.  Not -- no one asked him.  No one gave him that

10:45:13 16 directive.  He took the time to care and he took the

10:45:17 17 time to serve.

10:45:19 18          And as stated through the furnishings that

10:45:21 19 get delivered, he shows respect to the most vulnerable

10:45:27 20 in our community.  Those that are needing most from us

10:45:30 21 at a time that they're so vulnerable.  And he steps in

10:45:34 22 and provides them respect and dignity.  And I think

10:45:37 23 that's really important to the citizens of our

10:45:39 24 community, is that they're able to experience that

10:45:42 25 dignity and self-respect again.

| | | |
|---|---|---|
| 10:45:47 | 1 | And as another important thing that Mr. |
| 10:45:50 | 2 | Rowland has done, he's taken the time to clean our |
| 10:45:53 | 3 | warehouse.  We receive over five thousand pieces of |
| 10:45:57 | 4 | furniture to our building, and have about twelve hundred |
| 10:46:00 | 5 | square feet in our warehouse.  And Mr. Rowland has taken |
| 10:46:04 | 6 | the time to organize it, collect different church |
| 10:46:07 | 7 | members within our communities, a variety of churches |
| 10:46:10 | 8 | that we represent, along with community service members |
| 10:46:15 | 9 | that need to do community service.  And he's organized |
| 10:46:18 | 10 | furniture, he's helped collect it, polish it, repair it. |
| 10:46:24 | 11 | I can't tell you enough how much that means.  It may be |
| 10:46:27 | 12 | something so small and so trivial, but when you take the |
| 10:46:31 | 13 | time to show someone that you care, it matters so much. |
| 10:46:35 | 14 | And during this time with our organization, I have again |
| 10:46:39 | 15 | witnessed Mr. Rowland being compassionate, empathetic, |
| 10:46:43 | 16 | and providing wisdom to those he encounters. |
| 10:46:46 | 17 | One of our most recent community service |
| 10:46:49 | 18 | volunteers, we nicknamed him Monte, through his last |
| 10:46:53 | 19 | name.  And this gentleman came in and had experienced |
| 10:46:56 | 20 | some life devastating events.  And Mr. Rowland took him |
| 10:47:00 | 21 | under his wing, took him out on delivering furniture, |
| 10:47:04 | 22 | picking up furniture from donors and area residents. |
| 10:47:08 | 23 | Helped coach him in ways to build your resume, how to |
| 10:47:13 | 24 | speak on a job interview.  And I'm proud to say that |
| 10:47:16 | 25 | this man got his first job after some life devastating |

10:47:20  1  circumstances.  That went a long way.  Now this

10:47:23  2  gentleman comes back and says "Thank you to Act 4

10:47:26  3  Ministry, and thank you to Mr. Rowland, I now have a

10:47:30  4  job."

10:47:32  5          In the fall of 2013, I brought up serving

10:47:37  6  the most vulnerable with respect.  Mr. Rowland and I had

10:47:41  7  been in conversation about different ways that we could

10:47:44  8  reach out being nondenominational with groups in our

10:47:48  9  community.  Mr. Rowland has spearheaded our once a month

10:47:51  10  serve days, where we have upwards of 50 volunteers that

10:47:55  11  take the entire day, on their weekend, to serve other

10:47:59  12  people.  And we serve anywhere between 12 to 13 homes,

10:48:03  13  which is just on average of 200 pieces of furniture, all

10:48:07  14  thanks to Mr. Rowland, his coordination, his keen

10:48:10  15  attention to detail.  That has meant so much to us.

10:48:14  16          Your Honor, I believe in character not being

10:48:18  17  designed by what you show others, or the perception that

10:48:21  18  you have of an individual.  It's driven by what we do

10:48:24  19  when no one is looking.  And many of the activities that

10:48:27  20  I brought forth to you today have been when no one was

10:48:30  21  looking.  That others happen to glance over and see in

10:48:37  22  the midst of Mr. Rowland doing at our building.  With

10:48:41  23  over four thousand people that walk through our doors,

10:48:45  24  not one person has felt less than in the presence of Mr.

10:48:50  25  Rowland.  That's character.  That's dignity.  And that's

10:48:54  1    self-respect that we're instilling back into those folks

10:48:58  2    that have received so much hurt and so much pain in

10:49:01  3    their lives.

10:49:04  4            And I'd like to conclude with a quote from

10:49:06  5    one of my dear -- one that I respect most, a coach.  And

10:49:14  6    we know with coaches, such as any mentor that we have in

10:49:18  7    our lives, has the ability to morph and to change and to

10:49:22  8    help us, and to edify us.  It states "Be more concerned

10:49:27  9    with your character than your reputation.  Because your

10:49:30  10   character is what you really are, while your reputation

10:49:33  11   is merely what others think you are".  That's quoted

10:49:36  12   from John Woodin.  And as I read the quote from Mr.

10:49:42  13   Woodin, I was preparing for today, your Honor, all I can

10:49:45  14   think of was Mr. Rowland.  And his character precedes

10:49:50  15   any reputation that he may have or perception that he

10:49:54  16   may have.  I have seen it, I have witnessed it, I felt

10:49:58  17   it.  As someone representing the faith community today,

10:50:03  18   as someone serving others in our community, what better

10:50:06  19   way to know that someone once governor, and now he is

10:50:11  20   today, has always, always, treated this person, this

10:50:17  21   individual, with dignity, self-respect and love.  And

10:50:22  22   that has enabled me to pay it forward to the over four

10:50:27  23   thousand people that I serve on an annual basis.  I

10:50:31  24   can't tell you how much that means.  Thank you for the

10:50:34  25   opportunity.

10:50:35   1          THE COURT:  Thank you very much.  Mr.

10:50:35   2    Weingarten?

10:51:04   3          Good morning.

10:51:04   4          MR. MAROTTI:  Good morning, your Honor.  My

10:51:06   5    name is Bill Marotti.  I'm the senior pastor of New Life

10:51:09   6    Church in Wallingford, Connecticut.  And thank you for

10:51:12   7    the opportunity to speak before the Court today.

10:51:15   8          During the past 12 years, I have had both

10:51:20   9    the pleasure and privilege of knowing John Rowland both

10:51:23  10    as a friend, and as his pastor.  And I have gotten to

10:51:28  11    know John in a way that few people ever do.  When close

10:51:33  12    friends are also pastor and parishioner, one gets a deep

10:51:38  13    look into a man's soul and character.  We've been

10:51:42  14    through some very good times together, and we've been

10:51:45  15    through some very difficult times together.  But as a

10:51:48  16    result, there's several things I'm persuaded of today.

10:51:50  17          One is that John Rowland is not the bad,

10:51:54  18    deceptive or manipulative person some have tried to

10:51:59  19    portray him to be.  Rather, I know John to be a loving,

10:52:04  20    caring husband and father, as well as a loyal and

10:52:09  21    generous friend.  I have had a bird's eye seat when

10:52:16  22    seeing John deal with overwhelming stress.  And all the

10:52:21  23    while comforting and supporting his wife Patricia.  I

10:52:26  24    will always remember the day that Patty lost her son,

10:52:31  25    John's stepson.  And I can still vividly see John

10:52:36 1  providing strong and loving support and tender comfort

10:52:42 2  to his grieving wife.  Nothing mattered more at that

10:52:46 3  point than John caring for his spouse.

10:52:50 4          Over the years, I, too, have seen firsthand

10:52:52 5  John's love for service.  I have seen John work with

10:52:57 6  former inmates who desperately need a second chance.

10:53:02 7  And in particular, I'm reminded about Curtis, who was a

10:53:05 8  career criminal, never knowing his father, spent all of

10:53:09 9  his life bouncing in and out of first juvenile, and then

10:53:14 10 adult correction facilities.  Curtis came to John.  He

10:53:17 11 was desperate, he was suicidal.  John spent a lot of

10:53:22 12 time with him, helping him with clothing, personal

10:53:26 13 hygiene, and developing a simple resume that landed

10:53:30 14 Curtis a job at a local church.  And it was the first

10:53:34 15 job in Curtis' entire adult life.

10:53:38 16         While John was still governor, a homeless

10:53:42 17 man guilty of nothing except being in the wrong place at

10:53:45 18 the wrong time, was set afire by some heartless youths.

10:53:51 19 John wanted to go see the man and I went with him.  The

10:53:55 20 man was in critical condition.  He was unconscious.  We

10:53:59 21 entered the Burn Unit, went into his room, and we prayed

10:54:03 22 over him.  And then we took turns trying to say

10:54:08 23 encouraging things in hopes that even in his comatose

10:54:13 24 state, he would hear something that would be encouraging

10:54:17 25 and a source of hope.  And I remember how taken aback I

10:54:20  1    was that John spoke to him more like a fellow governor

10:54:24  2    than a penniless homeless person, treating him with

10:54:28  3    great compassion.

10:54:30  4            I remember while John was still governor,

10:54:33  5    sharing with me the early days following the attacks on

10:54:37  6    9/11.  And how he felt such a tremendous sense of burden

10:54:42  7    to personally call each of the 152 Connecticut families

10:54:47  8    that suffered loss on that horrific day.  I could sense

10:54:51  9    the heart wrenching emotion he shared with me, having

10:54:55  10   called over and over again, to share both his

10:54:59  11   condolences, and our State's condolences.  And since

10:55:03  12   that day, I have encountered several of those families,

10:55:07  13   who still will say how important the call from their

10:55:11  14   governor was during their time of need.

10:55:16  15           I also have personal knowledge of families

10:55:19  16   whose loved ones were also to be incarcerated.  And how

10:55:22  17   John came alongside of them and coached and counseled

10:55:26  18   those families.  I'm aware of many hours that John has

10:55:31  19   spent in Youth Challenge, working with teens and young

10:55:35  20   adults who struggle terribly with drug and alcohol

10:55:38  21   dependency.  I have been present at church services

10:55:42  22   where John has both helped administer the ordinance of

10:55:46  23   communion, and personally baptized new believers in the

10:55:49  24   faith.

10:55:51  25           When our facility had become too small

several years ago, we began holding services at the

Oakdale music theater as a remote location.  We asked

John to serve as a host for those weekly gatherings.

The first service we would do was Easter of 2010.  And

that morning, John was busy hustling around chairs,

setting up communion trays.  But during the service, as

I was teaching, a young girl became ill and vomited

right where she was sitting.  It was quite a scene,

watching John scamper around to find towels, eventually

ending up on his hands and knees, cleaning up the mess,

only after reassuring the little embarrassed girl that

everything was all right.  It seemed like there was no

job beneath John.

As a generous friend, when a local radio

concern wanted him to start a talk show, John gave me a

chance to be a part of the program at financial cost to

him.  I began a radio broadcast career I never knew I

had.  Countless times during our partnership on the air,

John would allow, John would encourage, he would urge me

to do interviews of national celebrities, when he could

have just as easily taken those interviews for himself.

John has also been a mentor to many a

would-be novice politician.  He spoken at countless

fundraising events pro bono.  And he's been a mentor in

many other ways as well.  I will never forget the time

10:57:34 1  John and I were traveling, and we were literally

10:57:36 2  boarding a plane, when he received a call from one of

10:57:40 3  his daughters who had just minutes earlier been involved

10:57:43 4  in a car accident.  And having been the father of a

10:57:46 5  young teen-age daughter myself at the time, I remember

10:57:49 6  how mentored I felt being able to listen to John gently

10:57:54 7  guide her through that time, reassuring her over and

10:57:59 8  over again that the most important thing was that she

10:58:02 9  was okay, and the car could be fixed or replaced.

10:58:05 10             I remember numerous visits to scenic

10:58:10 11  Loretto, Pennsylvania, coming as John's pastor, hoping

10:58:15 12  that I would be an encouragement to him in his difficult

10:58:19 13  time, only to come away from each visit realizing he had

10:58:22 14  encouraged me instead, putting his family and their

10:58:25 15  concerns always first, never his own.  And in all the

10:58:32 16  time I have known John Rowland, I have not one time, not

10:58:36 17  one recollection, of him ever blaming someone else for

10:58:40 18  situations that he had been involved in.  But rather

10:58:45 19  always taking responsibility for whatever part or fault

10:58:49 20  may have been his.

10:58:52 21             Your Honor, John Rowland is not a bad man.

10:58:56 22  He is not a deceptive or manipulative person, as some

10:59:01 23  have tried to portray him.  Your Honor, that is a hollow

10:59:08 24  pretense and it is patently false.  I have witnessed

10:59:12 25  John Rowland over the years be a loving, caring husband

10:59:17  1    and father, and a loyal and generous friend.  And with

10:59:23  2    all due respect your Honor, I don't believe John Rowland

10:59:26  3    belongs in prison.  I firmly believe John Rowland

10:59:30  4    belongs here in society, where he can earn a living, pay

10:59:35  5    taxes, care and love for his family, and invest time as

10:59:41  6    he has all his life in caring for others who are less

10:59:46  7    fortunate and in need of a second chance.  And so I

10:59:51  8    beseech thee, your Honor, when you're making your final

10:59:55  9    decision, please be merciful to a man whom I believe is

11:00:02  10   a casualty of circumstances.  Thank you very much.

11:00:05  11           THE COURT:  Thank you very much.  Mr.

11:00:05  12   Weingarten?

11:00:29  13           Good morning.

11:00:30  14           MR. BERGENN:  Thank you, your Honor.  My name

11:00:33  15   is Jim Bergenn, and I am not an expected witness.  I was

11:00:37  16   not asked to be here by Mr. Rowland or by his attorneys.

11:00:43  17   But over the last decade, I came upon some information

11:00:47  18   that I thought this Court would appreciate knowing

11:00:50  19   before it concludes its sentencing decision.

11:00:53  20           Last week, I just finished editing a chapter

11:00:56  21   that I was assigned for the next Connecticut criminal

11:00:59  22   law book.  It comes out this year.  Coincidentally, it

11:01:02  23   was on sentencing.  And it made me feel a duty to report

11:01:07  24   very briefly to your Honor information that I learned,

11:01:09  25   so I called to see if it would be welcome.  I now feel,

having just heard what I heard, perhaps I'm more surplusage than I might have anticipated. Wouldn't be the first time that's occurred to me. But the wise among us have always known that character is best revealed by a person's decisions and actions when no one is looking. And when a Court can have access to this intimate information, the Court is better equipped to fulfill its function, which of course is to respond to the events of the case, but it's also to appreciate the whole of the person before it. Because the Court's concern, as it must be with matters beyond the limited admissible evidence that very capable advocates, whose skills I greatly respect, choose to present at a trial to satisfy the elements of charged offenses.

And over my 36 years of observation, the District Court of Connecticut has been ennobled by judges such as yourself who have taken extraordinary pains to consider sentences, and often making decisions not expected by others who are not burdened by what the Court considers. So my relevant personal observations about Rowland came after decades of work before this court, first as one of its clerks, and assist public defender, on the CJA panel for over 30 years. I never expected to stand here, not as an attorney, but just feeling a duty to the Court.

| | | |
|---|---|---|
| 11:02:56 | 1 | And I'm a dyed-in-the-wool Democrat, my |
| 11:02:59 | 2 | whole life.  Never voted for, much less represented Mr. |
| 11:03:03 | 3 | Rowland.  But many years ago, I took a risk and asked if |
| 11:03:08 | 4 | Rowland would be willing to talk to a client of mine who |
| 11:03:10 | 5 | had paid dearly for his mistake, leaving his family and |
| 11:03:14 | 6 | job to serve time.  And I was never a fan of his |
| 11:03:19 | 7 | politics.  I appreciated the good things he did for |
| 11:03:22 | 8 | cities and towns, and UConn.  But I noticed he did this |
| 11:03:26 | 9 | by working with people whose opinions differed from his, |
| 11:03:30 | 10 | so I took the chance.  He owed me nothing. |
| 11:03:37 | 11 | John Rowland's response was immediate.  It |
| 11:03:40 | 12 | was wholehearted, it was intimate and it was humble. |
| 11:03:43 | 13 | And most important, it was completely invisible to |
| 11:03:47 | 14 | everyone except to that client and the suffering family. |
| 11:03:51 | 15 | To this moment, no one knew the many private hours he |
| 11:03:54 | 16 | spent with complete strangers, only because someone he |
| 11:03:58 | 17 | didn't owe a thing to asked.  He saw that he could help |
| 11:04:04 | 18 | that person and that family.  And I knew that Rowland |
| 11:04:07 | 19 | himself had suffered, his family, quite a lot.  He was |
| 11:04:12 | 20 | someone who we Democrats recognize had considerable |
| 11:04:16 | 21 | skills connecting with people.  And he lost out on a |
| 11:04:20 | 22 | career that had no bounds.  He didn't complain.  More |
| 11:04:26 | 23 | importantly, he used his own suffering to work hard as |
| 11:04:29 | 24 | he could to relieve the suffering of others, of people |
| 11:04:33 | 25 | who he didn't even know.  He only knew that he could |

11:04:36  1   help.  And so for that reason alone, he did it.

11:04:40  2           I listened to this client thank me for

11:04:42  3   connecting him and his family with John Rowland.  My

11:04:48  4   intuition was rewarded.  The only ones who knew were my

11:04:52  5   clients and me.  No fool me, I did it again, and again.

11:04:57  6   And every time I called, John, without any hesitation,

11:05:01  7   he would take my call as his calling.  He knew he had a

11:05:06  8   gift of caring for others who were totally unrelated to

11:05:10  9   him, who could do him no favors at all, but he could see

11:05:13  10  he could help.

11:05:16  11          When I sketched out these words last night,

11:05:19  12  I sent an e-mail this morning to some of those clients.

11:05:23  13  I can't remember all the clients that he did this for,

11:05:25  14  but I got e-mails back this morning from three, and just

11:05:31  15  little inserts from what they expressed to me, as more

11:05:35  16  factual than my secondhand.  The first, "The governor

11:05:40  17  met us at a quiet place and his three hours of real life

11:05:45  18  he'd been there orientation to both of us served

11:05:47  19  immeasurably.  Most impactful was his message to leave

11:05:50  20  my anger behind.  Our business associates" -- excuse me,

11:05:55  21  "The governor advised us to focus on ourselves, our

11:05:59  22  family and friends, and gave me insight what to expect

11:06:03  23  while incarcerated, and his advice and wisdom was well

11:06:06  24  taken.  Governor Rowland did not have to take the time

11:06:09  25  you asked him to do with us.  He did so unselfishly and

11:06:12  1  there was no 'What am I doing here with these people' in

11:06:15  2  him.  And when we parted that night, I told him I could

11:06:19  3  not thank him enough.  He replied 'My pleasure.'  Then

11:06:21  4  he said 'Just take the time to do the same thing for

11:06:24  5  someone else some day.'"

11:06:27  6          The second, these are just from this

11:06:30  7  morning, "John and I spoke at length when I returned

11:06:32  8  from Devon about how to move forward with life after

11:06:35  9  prison.  He was very helpful to me in getting a change

11:06:38  10 of perspective and attitude as I reentered society.  We

11:06:41  11 spoke for several hours over dinner.  There's more, but

11:06:45  12 it would take me forever to type an appropriate

11:06:48  13 response."

11:06:49  14          And finally the third, "He and I met before

11:06:52  15 I reported to Devon.  We had never met before, but he

11:06:55  16 was gracious enough to meet with me to provide me

11:06:58  17 guidance about what I could expect and encouragement to

11:07:02  18 let me know that not only would I endure, but also that

11:07:05  19 I would be a kinder, more humble person, and a better

11:07:09  20 man as a result of that endurance."

11:07:13  21          So I hope the Court appreciates that I have

11:07:19  22 never had anybody else with this combination of gifts.

11:07:23  23 Because John can humbly and intimately connect with each

11:07:28  24 of these unique clients.  And many others who have been

11:07:32  25 clients of mine have offered to help others, but none of

11:07:36  1  them have the humility and grace to actually connect to

11:07:39  2  people.  And John did it for free.  Others have tried to

11:07:43  3  do it to make a few bucks.  And he did it quietly.  He

11:07:47  4  moved in and out of service of this people as if it was

11:07:50  5  a job he loved.  And that's because it was a job he

11:07:55  6  loved.  And to my observations, he simply loves to serve

11:07:59  7  people.  Irrespective of the fact that he has to provide

11:08:02  8  for a family, it motivates John as much as it motivates

11:08:06  9  the rest of us.  He has an outside desire to help

11:08:10  10  people.

11:08:10  11       And when I talked with my partner Ross

11:08:13  12  Garber, he mentioned that John did the same thing for

11:08:15  13  clients of his.  And his office is right next door to

11:08:18  14  mine, Ross'.  And I'm sure I told him at one point what

11:08:22  15  John did for somebody.  But neither Ross nor Rowland

11:08:25  16  told me that he did the same quiet, humble service for

11:08:29  17  Ross' clients until I mentioned it to Ross.  And then I

11:08:32  18  really felt a little stupid.  But that's why I'm here

11:08:37  19  today.  I was surprised, just yesterday, to get the

11:08:41  20  details from Ross.  And the fact that I'm surprised

11:08:45  21  tells us something else.  That Rowland is different

11:08:50  22  enough that even once you know him, you sort of can't

11:08:53  23  believe the character.  That that character is revealed,

11:08:57  24  and it's revealed by virtuous acts when no one is

11:09:01  25  looking.  And that unalterably is his true character.

11:09:05 1    Thank you, your Honor.

11:09:05 2            THE COURT:  Thank you, Mr. Bergenn.  Mr.

11:09:05 3    Weingarten?

11:09:24 4            MISS ROWLAND:  Good morning.

11:09:25 5            THE COURT:  Good morning.

11:09:27 6            MISS ROWLAND:  Your Honor, I want to first

11:09:28 7    thank you for giving me the opportunity --

11:09:30 8            THE COURT:  You need to put your full name

11:09:32 9    on the record.

11:09:35 10           MISS ROWLAND:  Julianne Rowland.  Your

11:09:36 11   Honor, I want to first thank you for giving me the

11:09:38 12   opportunity to speak on behalf of my family.  In

11:09:43 13   particular, on behalf of my siblings.  My name is

11:09:46 14   Julianne and I'm the youngest of John Rowland's

11:09:49 15   children.  My sister Kirsten got married at the

11:09:51 16   beginning of this year and works in New York.  My

11:09:53 17   brother RJ is a military veteran who served in Iraq and

11:09:57 18   lives in Denver.  And my stepbrother Scott is getting

11:10:00 19   married one month from today, and is living and working

11:10:03 20   in Boston.  While they're out working in different parts

11:10:06 21   of the country right now, I appreciate being here in

11:10:09 22   this courtroom to talk about John Rowland, the father,

11:10:11 23   and perhaps give you some insight into who he really is.

11:10:16 24           Now for me, I'm used to doing much of my

11:10:19 25   public speaking in front of 17 first-graders who are not

11:10:22   1   paying much attention at all, so this is certainly a

11:10:24   2   change of pace.  And apart from the academics, many of

11:10:28   3   my conversations with them include how to be a good

11:10:32   4   person, how to make good choices, how to say you're

11:10:36   5   sorry, and how to dust yourself off after making

11:10:38   6   inevitable mistakes.  There is no doubt that I'm able to

11:10:42   7   facilitate these conversations because of the influence

11:10:44   8   that my dad has had on my life.

11:10:47   9          Since I can remember, my father has done

11:10:49   10   everything he possibly can to make sure my family and I

11:10:52   11   have been taken care of.  He is a hard worker, an

11:10:57   12   amazing father, and truly a good person.  My dad has

11:11:01   13   been through many adversities in his life that he has

11:11:04   14   grown from.  And I can confidently say that he is an

11:11:08   15   inspiration to me and other people who know him.  As his

11:11:11   16   daughter, I have supported him through these difficult

11:11:14   17   times, not because he is my dad, but because he is the

11:11:17   18   most genuine, caring and loving person that I know.

11:11:21   19          While he was in office and I was in

11:11:23   20   elementary school, he made time to drive down from

11:11:26   21   Hartford to Middlebury to eat lunch with me at school

11:11:29   22   every Friday.  Although I still wonder if it had

11:11:32   23   anything to do with the cafeteria pizza.  He came to my

11:11:36   24   library class to read us stories, which is where he was

11:11:39   25   inspired to start the Governor's Reading Program.  He

11:11:42　1　chaperoned field trips, hosted pasta parties, and

11:11:48　2　grilled 75 cheeseburgers at my Sweet 16 birthday.

11:11:50　3　Throughout middle school and high school, he barely

11:11:52　4　missed a field hockey game or a tennis match.  And he

11:11:55　5　always remembered to bring my favorite sports drink in

11:11:58　6　spite of his busy schedule.  He was at the DMV while I

11:12:02　7　took my driver's test, and he moved me into every

11:12:05　8　college dorm I lived in.  He supported me through

11:12:07　9　graduate school and celebrated with me when I got my

11:12:09　10　dream job and I moved to the city.  He has been there

11:12:12　11　for the big moments, and for all of the little days in

11:12:15　12　between.

11:12:17　13　　　　My father is someone who is always willing

11:12:19　14　to help others, to give advice to people, including my

11:12:23　15　friends, about their futures.  He has written

11:12:26　16　recommendations for my friends, mentored them through

11:12:29　17　their course loads, picked them up from the airport, and

11:12:32　18　even helped them figure out the right car to buy when

11:12:35　19　their parents couldn't.  We talk on the phone every day.

11:12:39　20　Excuse me.  And I call him when I have a flat tire, need

11:12:42　21　advice with my job or have even gone on a bad date.  He

11:12:46　22　is my backbone and sounding board.

11:12:50　23　　　　There's so many memories that I have of my

11:12:52　24　dad that I will be forever grateful for because I know

11:12:54　25　that he has made me the person that I am today.

11:12:57 1 Regardless of how busy he has been, he's always made

11:13:00 2 time for our family. And he has done everything he can

11:13:03 3 to provide for us. And above all, he has gone out of

11:13:06 4 his way to make sure that we, his children, have turned

11:13:09 5 into good people, ones who help serve others, and ones

11:13:14 6 who have faith in humanity. I am proud to be his

11:13:17 7 daughter, and I am proud to call him my dad because of

11:13:21 8 the amazing person that he is to everyone he meets.

11:13:24 9 As I look forward to the next phases of my

11:13:26 10 young adulthood, continuing my career, meeting the

11:13:30 11 person I may some day marry, and even having children, I

11:13:35 12 know that it is absolutely essential for my dad to be

11:13:38 13 present, and to continue to be a part of my life.

11:13:42 14 Excuse me. I would be eternally grateful for your

11:13:45 15 consideration as you decide on his future, and the

11:13:48 16 future of our family. And I am very much grateful for

11:13:51 17 you listening to me today. Thank you.

11:13:53 18 THE COURT: Thank you.

11:14:07 19 MRS. ROWLAND: Good morning, your Honor.

11:14:08 20 THE COURT: Mrs. Rowland.

11:14:09 21 MRS. ROWLAND: My name is Patricia Rowland.

11:14:11 22 Thank you for giving me the opportunity to speak to you

11:14:13 23 this morning. I know we spent a lot of hours in this

11:14:16 24 courtroom together, but I have never been able to speak

11:14:18 25 to you personally. I know that you have read many

11:14:21  1  letters from our friends, our family, and others,

11:14:23  2  including myself, in regards to John and his many -- and

11:14:28  3  his many personal and professional accomplishments.

11:14:31  4  You've heard many things said about him today, as well

11:14:34  5  as during his trial.  But of all these people, I have

11:14:38  6  known John far longer and more personally than any

11:14:41  7  other.  And I want to again share what I know to be the

11:14:44  8  truth about this man.

11:14:45  9          I have known John for nearly 40 years.  We

11:14:49  10  met in high school at the age of 17.  And the qualities

11:14:52  11  that attracted to me then, are the same ones he

11:14:56  12  possesses today.  He is a loyal and kind friend, and he

11:15:00  13  treats people equally and is respectful to everyone.  He

11:15:04  14  is a responsible, mature and loving son, father, and

11:15:09  15  husband.  He is a natural leader who freely gives his

11:15:13  16  time and talents to other, with no thought to

11:15:16  17  reciprocity.  He also makes people laugh and puts them

11:15:20  18  at ease.  He is gregarious and fun loving, which is why

11:15:24  19  he has many friends and people generally want to be

11:15:27  20  around him.  Those who really know John recognize all

11:15:31  21  these qualities in him.

11:15:34  22          Both John and I have made volunteerism a

11:15:37  23  part of our lives since our high school years.  We

11:15:39  24  learned about service to others from our parents'

11:15:41  25  example, and we brought that commitment to our years in

11:15:44  1  public service and beyond.  But I must say that John

11:15:48  2  goes far beyond what I am willing to do.  And I have

11:15:51  3  rarely seen him refuse a task or say no to an ask for

11:15:55  4  help in the last 20 years of our married life.  He has

11:15:58  5  never shied away from a request for help, whether it be

11:16:01  6  from his church, his friends, the addicted, the

11:16:06  7  homeless, the jobless, and yes, even the occasional

11:16:09  8  candidate.  Anyone in need of assistance or advice.

11:16:13  9            For example, he volunteered once a week for

11:16:16  10  over three years for Youth Challenge in Hartford, a drug

11:16:19  11  and alcohol rehab, training the men there to prepare for

11:16:22  12  the job market once they completed their time there in

11:16:26  13  rehab.  He has assisted numerous men who have found

11:16:29  14  themselves homeless and jobless, helping to find them

11:16:32  15  meaningful work and living arrangements.  We have both

11:16:36  16  picked up used furniture and provisions to help them

11:16:39  17  begin their lives again.  John has helped several church

11:16:43  18  ministries, as you heard today, with tasks ranging from

11:16:46  19  financial consulting, to helping with ministries such as

11:16:49  20  Acts 4 in Waterbury, picking up and delivering furniture

11:16:53  21  to those in need.  There are hundreds more individuals

11:16:57  22  and organizations that he has given his time to, and

11:17:00  23  never once have I ever known him to expect any kind of

11:17:03  24  compensation.

11:17:05  25            To us, this is an integral part of what it

11:17:08  1   means to lead a Christian life.  We live our faith and
11:17:12  2   treat others as we would like to have them treat us.  We
11:17:15  3   are not perfect by any means.  No one is.  We just try
11:17:19  4   to live a life of love, of God, each other, and our
11:17:23  5   fellow man.  This is how we were raised, and how we try
11:17:27  6   to conduct ourselves in our daily lives.
11:17:31  7         We both have aging parents living in close
11:17:34  8   proximity to us.  It is the primary reason we choose to
11:17:37  9   stay in Connecticut, so that we can be of comfort and
11:17:39  10  help to them.  John's mother is nearly blind and
11:17:43  11  housebound.  My mother has a heart condition and my
11:17:46  12  father is confined to a wheelchair.  We are both
11:17:49  13  essential to their care and well being at this stage of
11:17:52  14  their lives and into the future.  Needless to say, this
11:17:55  15  has been a worrisome experience for them.  Not only do
11:17:58  16  they worry about our future, but their own care as well.
11:18:02  17        As Julianne said, John has always been and
11:18:07  18  continues to be a loving and supportive father to not
11:18:09  19  only his children, but his stepsons as well.  They love
11:18:14  20  him and they are as devoted to him as he is to them.  As
11:18:19  21  Pastor Will mentioned, we have endured the greatest loss
11:18:23  22  imaginable, in the loss of my beautiful son at age 23,
11:18:26  23  just six years ago.  It is a loss that tears at every
11:18:30  24  member of our family, and leaves a void in all of our
11:18:33  25  lives.  For myself, it is a heartbreak that I can never

11:18:37 1 fully recover from, but I thank God that we are blessed

11:18:41 2 with loving and resilient children, parents, family and

11:18:44 3 friends, and above all, the strength of faith.

11:18:49 4 My stepdaughter Kirsten was married two

11:18:52 5 months ago and my son Scott is to be married one month

11:18:55 6 from today. Our four children are adults now with lives

11:18:58 7 moving forward in positive directions. And John is

11:19:01 8 undeniably one of the most important catalysts for their

11:19:05 9 past, present and their future.

11:19:08 10 Your Honor, I consider myself fortunate to

11:19:12 11 be married to a wonderful, funny, loving and giving man.

11:19:16 12 He has worked hard over the past ten years, serving our

11:19:20 13 community and those less fortunate, rebuilding our life,

11:19:23 14 taking care of our children, and undertaking a second

11:19:27 15 career by building a popular radio show and a successful

11:19:31 16 consulting business. We were happy and content with a

11:19:35 17 quiet life. But over the last two years, we have lost

11:19:39 18 our savings, John has lost all he has worked for in the

11:19:43 19 job he valued, and this process has taken an emotional

11:19:47 20 toll on our entire family. My hope is that you believe

11:19:51 21 that this has been enough. Thank you for giving me the

11:19:55 22 chance to talk today about John Rowland. And I ask for

11:20:00 23 fairness and compassion in your sentencing. Thank you.

11:20:02 24 THE COURT: Thank you. Mr. Weingarten?

11:20:10 25 MR. WEINGARTEN: Your Honor, I'd like to

11:20:11  1   address the Court, if I may.

11:20:13  2              THE COURT:  Pardon me?

11:20:13  3              MR. WEINGARTEN:  I'd like to address the

11:20:14  4   Court, if I may.

11:20:15  5              THE COURT:  Please.

11:20:16  6              MR. WEINGARTEN:  Your Honor, I'd like to

11:20:23  7   start by observing the obvious.  I'm guessing this is

11:20:27  8   going to be the last time I have the privilege of

11:20:30  9   appearing here before you.  I'd just like to thank you,

11:20:33 10   your staff, everybody in the courthouse.  From day one,

11:20:36 11   we've been treated with respect, kindness, compassion,

11:20:39 12   dignity.  I see some new faces, but, you know, everybody

11:20:42 13   that we dealt with in this case has been terrific.  And

11:20:45 14   I just want to thank you for that, in behalf of me, my

11:20:48 15   team, and my client.

11:20:52 16              THE COURT:  Thank you.

11:20:53 17              MR. WEINGARTEN:  I'm in the point in my

11:20:55 18   career when I do a lot of looking back.  And I think

11:20:58 19   when the book is written, this case is going to be more

11:21:00 20   than a footnote for many reasons.  And I can -- you have

11:21:05 21   to read the book to get them all, but the one I'd like

11:21:07 22   to talk about a little today is I have been surprised

11:21:11 23   over and over again in this case.  And I've been doing

11:21:16 24   this for so long, both as a prosecutor, and as a defense

11:21:19 25   attorney, I'd thought I'd seen it all; but it turns out,

11:21:22  1   had not seen it all.  And I'd like to take a couple of

11:21:25  2   minutes to tell you about some of those surprises.  And

11:21:27  3   I do it because, not to whine, not to complain, and not

11:21:31  4   to attack.  But rather, to give some perspective on how

11:21:34  5   I see this case, and how I think it should be resolved

11:21:37  6   today by this Court.

11:21:40  7           I'd like to begin by how I met John.  We

11:21:44  8   actually had a conversation in John's first case.  And

11:21:48  9   for a variety of reasons, I obviously didn't represent

11:21:50  10  him.  He came back to me the second time around and

11:21:53  11  described the allegations.  I listened, and I checked --

11:21:57  12  I've had the privilege of working in Connecticut on

11:22:00  13  other cases, so I have friends amongst the older

11:22:04  14  statesmen of the defense bar.  And I got a sense of the

11:22:06  15  allegations.  And to me, in the vernacular, the issue at

11:22:10  16  hand was there was a woman who ran for Congress, did not

11:22:14  17  win, and there's an allegation that she misreported her

11:22:18  18  FEC filings.  And he may have been involved indirectly

11:22:22  19  because some of the payments in controversy were made to

11:22:25  20  him, as opposed to her reporting them as campaign

11:22:28  21  contributions.

11:22:28  22          In my life as a lawyer, that's FEC stuff.  I

11:22:33  23  mean, I was a prosecutor for 15 years and the majority

11:22:37  24  of the time, I was in the public integrity section

11:22:41  25  prosecuting public officials.  I am very, very familiar

11:22:44 1    with this terrain.  The majority of my life as defense

11:22:47 2    attorney was in Washington, DC. I represented countless

11:22:50 3    members of Congress.  I am familiar with this terrain.

11:22:52 4          So I said to myself, and to my client, I'm

11:22:55 5    guessing we can resolve this one peacefully. I'm

11:22:57 6    guessing we can get the Government in a place where

11:23:00 7    they're satisfied that their law enforcement

11:23:03 8    opportunities and responsibilities were fulfilled, and

11:23:05 9    you can live with it.  And it turns out, of course, I

11:23:08 10   was wrong.

11:23:08 11         And the first big surprise I got was the

11:23:11 12   indictment.  You know, I know this.  I'm familiar with

11:23:15 13   the statutes.  And I think the indictment I viewed was

11:23:21 14   one of the most overcharged indictments I have ever seen

11:23:24 15   in my life.  And I have drafted plenty and I have read

11:23:27 16   plenty.  And it starts with 1519.  1519 comes out of

11:23:33 17   Sarbanes-Oxley.  1519 was to respond to Enron.  1519,

11:23:37 18   with all due respect, was not to respond to the

11:23:40 19   allegations in this case.  And of course, we're

11:23:44 20   heartened by the Yates case that just came out from the

11:23:46 21   Supreme Court, where they talk extensively about 1519.

11:23:50 22   A we're hopeful and optimistic that our view of 1519 is

11:23:54 23   going to ultimately prevail.

11:23:56 24         And then we get to trial, and you know

11:23:58 25   there's a lot to say about the trial.  Obviously, we all

11:24:01  1    lived through it.  I just want to point out one or two

11:24:03  2    things that happened that caused me some surprise.  Mark

11:24:06  3    Greenberg, obviously an important witness in the trial.

11:24:10  4    And we learned through normal investigation that this

11:24:14  5    Tea Party guy named Wilcox was paid by his dog charity

11:24:20  6    at least 86 thousand dollars one year, and probably

11:24:24  7    another 50 or so another year.  And we also know through

11:24:27  8    simple research, that he aggressively and

11:24:32  9    enthusiastically sponsored Greenberg at an event hosted

11:24:36  10   or run by Dick Morris, the famous consultant.

11:24:39  11           So we say to ourselves, what is the story

11:24:42  12   here.  Greenberg puts him on the Simon payroll, and in

11:24:47  13   return, it seems to us, he gets political support.  He

11:24:51  14   gets the blessing of the Tea Party, which is the heart

11:24:54  15   and soul of the Greenberg effort.  Our immediate

11:24:59  16   reaction is well, any 1519 here?  Is Wilcox going to be

11:25:05  17   charged?  Is Greenberg going to be charged?  The bottom

11:25:08  18   line here is I don't know that the Government knew about

11:25:11  19   the payments to Wilcox.  I don't know that they've

11:25:15  20   investigated Wilcox subsequent to this, or Greenberg.

11:25:19  21   And maybe they'll come up here after I'm done and

11:25:22  22   they'll say, you know, he did real work at the Simon

11:25:25  23   Foundation, he walked all the dogs, he cleaned up the

11:25:28  24   kennels, whatever, he earned the money.

11:25:29  25           It seems to us that what actually happened

11:25:31 1  here is that Wilcox actually engaged in the conduct that

11:25:34 2  they believed my client wanted to engage in, and didn't.

11:25:38 3  And I think the only reason that the Wilcox thing was of

11:25:41 4  no interest, is Wilcox is not named John Rowland.  That

11:25:45 5  was my impression and my belief to this moment.

11:25:50 6           Now, we talk about the Foley part of the

11:25:54 7  trial.  And just small pieces.  I know for my own

11:25:57 8  experience, the conduit campaign contributions for the

11:26:02 9  last 20 years or so have been treated as felonies by the

11:26:05 10  Feds.  That's how they are viewed.  We also know, from

11:26:08 11  the evidence in this case, that the Foleys are

11:26:10 12  essentially serial conduit campaign contribution

11:26:14 13  violators.  And we know, obviously from this case, all

11:26:19 14  was completely and almost immediately forgiven.  No

11:26:25 15  charges, no interest, nothing whatsoever.  How can that

11:26:32 16  be?  Well, the only conclusion you can come to is none

11:26:35 17  of those campaign conduit contributions, illegal

11:26:38 18  felonies all, involved John Rowland.

11:26:41 19           Then Foley is on the witness stand, and I

11:26:43 20  didn't know that this was going to turn out this way.

11:26:46 21  And it turns out the mother-in-law conduit campaign

11:26:50 22  contribution was Foley to his wife.  Just before I

11:26:53 23  elicited that he gave his wife's campaign a half million

11:26:56 24  bucks, he testified that he knew specifically that there

11:27:00 25  were limits on how much he could contribute to his wife.

11:27:03 1 But again, all forgiven, no interest on the part of the

11:27:08 2 Feds to prosecute Foley for one of the largest conduit

11:27:12 3 campaign contributions I've ever known about.

11:27:14 4 Think about this. Let's say hypothetically,

11:27:16 5 that half a million campaign contribution was triggered

11:27:20 6 by or at least John knew about it. How do we think

11:27:25 7 these prosecutors would have responded. Would they have

11:27:29 8 responded the same way? "No brainer, no problem, we'll

11:27:31 9 pass on this." I think not.

11:27:34 10 And let's just talk briefly about this

11:27:37 11 lawyer. Obviously, at the center of this case was the

11:27:40 12 contract between the Foleys and Mr. Rowland, drafted by

11:27:49 13 a lawyer. As far as I know, he's a practicing lawyer in

11:27:53 14 the State of Connecticut. He was an unindicted

11:27:57 15 co-conspirator. He carries a bar card, he practices

11:28:00 16 law, he appears in court. I assume. I don't know this

11:28:02 17 guy, I couldn't pick him out of a lineup. But I know he

11:28:05 18 hasn't been charged. He drafted the conract. He was

11:28:08 19 the one who put the words down on paper. I mean, had

11:28:11 20 they gone to the Connecticut Bar and said, you know,

11:28:13 21 there's a guy in the bar that -- at a minimum? The last

11:28:17 22 I heard, he still works for Foley. So how can we have

11:28:21 23 the conspiracy of the century, how can we have the crime

11:28:24 24 of the century, where the author of the contract most at

11:28:28 25 issue, is a lawyer who's been untouched by the process.

| | | |
|---|---|---|
| 11:28:32 | 1 | There's a hypothetical that sums all this |
| 11:28:35 | 2 | up.  What if, hypothetically, the Foleys had a nephew at |
| 11:28:39 | 3 | Yale.  A Political Science major, who's a junior, and |
| 11:28:44 | 4 | Auntie Lisa is running for Congress, and he says "What I |
| 11:28:48 | 5 | would love to do is take a semester off and work for my |
| 11:28:53 | 6 | aunt on policy issues."  It turns out, he's brilliant. |
| 11:28:57 | 7 | Turns out he doesn't have much money.  So Uncle Brian |
| 11:29:01 | 8 | gives him a no-show job at one of the facilities, he |
| 11:29:05 | 9 | shows up every week to get his paycheck, but he's in the |
| 11:29:07 | 10 | campaign headquarters, he's working 24/7, and he's great |
| 11:29:10 | 11 | at it.  And every policy decision Lisa articulates comes |
| 11:29:15 | 12 | from his pen.  And it turns out it's found out that he |
| 11:29:21 | 13 | is working 24/7, responsible for all her policy |
| 11:29:25 | 14 | decisions, and he's a no-show at Apple. |
| 11:29:29 | 15 | Judge, in my experience, there's not one |
| 11:29:32 | 16 | prosecutor in America who would be interested in |
| 11:29:35 | 17 | prosecuting this case.  And certainly -- and I include |
| 11:29:39 | 18 | the gentlemen right behind me.  This, at most, would be |
| 11:29:45 | 19 | an FEC case, the potential for the impact on the |
| 11:29:47 | 20 | campaign would be ten times what John Rowland did for |
| 11:29:50 | 21 | Lisa Foley, and the difference between my hypothetical |
| 11:29:54 | 22 | and what happened in this courtroom with the charges |
| 11:29:56 | 23 | here is John Rowland was involved. |
| 11:30:02 | 24 | Let's talk briefly about what happened after |
| 11:30:04 | 25 | the trial.  Obviously, briefs were submitted by both |

11:30:10  1  sides.  And what surprised me here, what surprised me

11:30:13  2  was the purple prose in the Government's brief.  What

11:30:17  3  are the threats to society now.  Well, there's ISIS,

11:30:20  4  there's Putin invading more of the Ukraine, there's the

11:30:25  5  Iran is getting nukes, and there's the blight of

11:30:28  6  Connecticut politics, John Rowland.  I mean, I thought

11:30:31  7  the language was wildly over the top.  It was the

11:30:34  8  language that you hear on cable TV or campaign people

11:30:38  9  running for election.  It shouldn't be the language

11:30:41  10  about John Rowland threatening the pillars of Democracy

11:30:45  11  and being the blight of Connecticut, seemed to me then,

11:30:50  12  and seem to me now, wildly over the top and shouldn't be

11:30:55  13  the language federal prosecutors use when filing such

11:30:59  14  briefs.

11:30:59  15          And I want to talk very, very briefly about

11:31:02  16  the issues relating to the Brady allegations.  And this

11:31:06  17  is not to relitigate.  I understand the Court has ruled.

11:31:10  18  To make one or two points.  One is what we've learned.

11:31:13  19  And what we've learned is obviously, Lisa Foley

11:31:17  20  initially, the candidate, the woman who was responsible

11:31:21  21  for her filings, was going to get a complete pass.  It

11:31:25  22  was her campaign records at issue.  The ones she was

11:31:30  23  responsible for.  And she was going to get a complete

11:31:33  24  pass.  And it only broke down when she wouldn't say that

11:31:39  25  the relationship with Rowland was a sham of an issue.

11:31:44 1 In other words, had she loaded it up with inculpatory

11:31:47 2 stuff, they would have been fine giving her a complete

11:31:50 3 pass. But instead, it was her view that initially, she

11:31:54 4 thought the relationship was completely legitimate.

11:31:57 5 From our vantage point, the problem with

11:32:00 6 that for the Government was it blew up their theory

11:32:03 7 where they wanted to start the conspiracy with "I get

11:32:06 8 it." If Lisa is not going to support that, their whole

11:32:11 9 prosecutor theory has to be redone. And when she

11:32:15 10 wouldn't, the punishment she received was that she

11:32:18 11 wasn't getting her pass. Instead, she was getting

11:32:20 12 prosecuted. The point to this, she was a pawn. She was

11:32:25 13 a pawn entirely, it seems to us, in the desire to

11:32:30 14 successfully prosecute John Rowland.

11:32:34 15 The point to all this, Judge, is that all

11:32:39 16 these surprises I have just talked about lead in the

11:32:43 17 same direction to us. There is a serious imbalance

11:32:48 18 between the actual in fact conduct in this case, and how

11:32:53 19 it is prosecuted. And I'm not sure why there was the

11:32:57 20 imbalance. And what's difficult for me here, and I have

11:33:00 21 said this publicly and privately, I like, admire and

11:33:05 22 respect the prosecutors in this case. I think they're

11:33:09 23 brilliant, I think they're aggressive. I think they

11:33:10 24 have wonderful futures ahead. But I think they

11:33:15 25 distorted the reality of this case in many of the

```
11:33:17   1   decisions they made.

11:33:18   2            And there have been endless discussions

11:33:20   3   about this amongst the defense bar in Connecticut.  And

11:33:25   4   to a person, there a belief that there's a near

11:33:29   5   obsession in federal law enforcement to get John

11:33:34   6   Rowland.  Some think it's because the sentence the first

11:33:37   7   time around wasn't enough.  Some people think he's too

11:33:41   8   noisy and too aggressive politically on his radio show.

11:33:44   9   And I guess some think he's just the evil incarnate.

11:33:48  10   But I would submit, those people do not know the real

11:33:53  11   John Rowland.  And what matters, of course, and the only

11:33:57  12   thing that matters, is what happens today.  And what I'm

11:34:00  13   asking the Court to do, in imposing sentence, is to

11:34:05  14   right the balance, undue the imbalance.  And to get you

11:34:09  15   there, I know I need to focus some on him, and to that

11:34:15  16   subject, I will now turn.

11:34:16  17            Obviously, a fair assessment of what he did

11:34:24  18   in normal everyday terms is essential here.  And I'm not

11:34:29  19   going to repeat the points made at trial.  I'm sure

11:34:33  20   they're before the Court.  I'm not going to make a

11:34:35  21   closing argument.  I did that already.  It wasn't

11:34:37  22   successful.  But in truth, many of the points I made, I

11:34:41  23   think are relevant and persuasive.  To me, he made

11:34:47  24   mistakes.  To me, he should have been more careful.  He

11:34:51  25   is a lightning rod, he is controversial, and he was
```

| | |
|---|---|
| 11:34:56 | 1 |
| 11:35:00 | 2 |
| 11:35:03 | 3 |
| 11:35:05 | 4 |
| 11:35:08 | 5 |
| 11:35:12 | 6 |
| 11:35:17 | 7 |
| 11:35:22 | 8 |
| 11:35:25 | 9 |
| 11:35:32 | 10 |
| 11:35:35 | 11 |
| 11:35:38 | 12 |
| 11:35:41 | 13 |
| 11:35:45 | 14 |
| 11:35:48 | 15 |
| 11:35:51 | 16 |
| 11:35:55 | 17 |
| 11:35:58 | 18 |
| 11:36:02 | 19 |
| 11:36:06 | 20 |
| 11:36:11 | 21 |
| 11:36:18 | 22 |
| 11:36:21 | 23 |
| 11:36:26 | 24 |
| 11:36:29 | 25 |

certainly careless at times.  But I said to the jury,
and I'll go to my grave believing the evidence supported
the conclusion that there was a belief within and a
belief abroad that you could work for a private entity
and earn money, as long as it was real work, and
volunteer to your heart's content.  And the idea that
this was all about deceiving the FEC just runs right
into the obvious fact that what he was proposing with
Greenberg and what he did with Foley was open and
notorious.  He wanted to run Greenberg's campaign.  That
was the conversation.  You can't go two steps outside
with Rowland without him being seen.  So the idea that
this was going to be under cover of darkness, and he was
going to get anyone elected to anything without anyone
knowing about it, is simply silly.  It's preposterous in
our view.  And with Foley obviously showing up, it
became known that he was working for Lisa Foley.  And
you recall at the outset, his proposal was to openly and
notoriously run her campaign for a normal wage.  That is
not a person endeavoring to hide his role from the FEC.

          But enough about the facts.  What I really
want to focus on, and what I really think is the issue,
is who is this guy.  And I'm certain of one thing of
having had the privilege of appearing before you, I know
you read every word of every letter.  And it doesn't --

11:36:32 1    I'm not going to burden the Court or the record with my
11:36:35 2    analysis or my repetition.  But, two things just leap
11:36:39 3    out of those letters, and reiterated by people who have
11:36:44 4    appeared before you today, that sort of two things that
11:36:47 5    make this go round, or many make this guy go round.  One
11:36:51 6    is service.  And he has spent such a significant part of
11:36:55 7    his life in public service.  And, you know, the
11:36:58 8    Government takes the position, I guess, and other
11:37:01 9    prosecutors do, "Well, that was his job, he's supposed
11:37:03 10   to be a good governor."  His accomplishments were
11:37:10 11   legion.  His work with the cities.  Not what you would
11:37:13 12   expect from a Republican governor, quite frankly.  His
11:37:16 13   work in Hartford and his urban renewal efforts in
11:37:19 14   Waterbury, were significant, they were serious, and they
11:37:22 15   were successful.  His work at UConn, his love for UConn,
11:37:25 16   cannot be denied.  Real stuff.  And how many people
11:37:28 17   amongst us, how many people amongst his critics, have
11:37:32 18   accomplished as much as he has done in public service.
11:37:34 19   I bet not many.
11:37:35 20           And number two, of course, is the private
11:37:38 21   stuff.  I mean, you've heard from people far more
11:37:43 22   eloquent than I am.  But it is -- you can measure a man
11:37:46 23   by what he does when no one is looking.  You can measure
11:37:49 24   a man by what he does when the cameras are not on, he's
11:37:53 25   not running for office, and he's just being a person in

11:37:56  1    private.  And his private gratuitous acts of kindness

11:37:59  2    and generosity, you can't count them.  And how many

11:38:05  3    amongst us, and how many amongst his critics, can make

11:38:08  4    the same claim.

11:38:09  5         And of course, John, the family guy.  He's

11:38:12  6    not been born with a silver spoon in his mouth.  He's

11:38:16  7    not had an easy road.  But through it all, number one,

11:38:21  8    numero uno, is his love for his family.  That's really

11:38:24  9    who he is.  And that comes through in the letters.

11:38:29  10        So what's the right balance.  Where should

11:38:32  11   we end up here.  And you know, a traditional way of

11:38:36  12   looking is how others similarly situated have been

11:38:38  13   treated.  And that's valid, and I think sentencing

11:38:42  14   judges always do that.  I think we should start with

11:38:44  15   this case.  You know, six charged conspirators.  You

11:38:50  16   know, John eats seven felonies when they do their

11:38:53  17   charging decisions.  The Foleys, you know, misdemeanor,

11:38:57  18   pass, misdemeanor, misdemeanor.  Okay.  By any fair

11:39:03  19   evaluation of the evidence, he initiated the

11:39:06  20   relationship with the Foleys by saying "I want to run

11:39:09  21   your campaign" openly and notoriously.  It was their

11:39:12  22   idea, it was their contract, they were the movers in

11:39:16  23   formulating the relationship.  Obviously, it could be

11:39:19  24   argued, and was, that he went along with it.  But let's

11:39:23  25   talk about relative culpability.  And then the three

11:39:26  1   others, including a practicing member of the bar, the

11:39:30  2   person who drafted the contract, a complete pass.

11:39:34  3        Now, both sides have made reference to other

11:39:38  4   public corruption cases.  Us, identified cases where

11:39:42  5   there have been probationary sentences or home

11:39:45  6   detention.  The Government identificing cases where the

11:39:49  7   the sentences were far more severe.  I would simply

11:39:53  8   point out I believe the dividing line is consistent with

11:39:55  9   how the Court ruled on the guidelines issue.  When the

11:39:59  10  levers of government are violated, or at risk of being

11:40:02  11  violated, bribery, extortion, when bills are bought,

11:40:05  12  when contracts are corruptly let, that's serious

11:40:09  13  business.  But in the campaign finance arena, where

11:40:15  14  they're not threats to government entities or government

11:40:20  15  processes, different story for purposes of sentencing.

11:40:24  16        I would just like to make reference to a

11:40:26  17  case I just handled.  I actually flew from Richmond to

11:40:31  18  here for our trial.  It was the Governor McDonnell case.

11:40:35  19  I represented the person who made the payments to

11:40:38  20  Governor McDonnell.  And that was a time period of

11:40:43  21  almost two years where the allegations by the Government

11:40:46  22  were that the governor, the sitting governor of the

11:40:50  23  state, became a cheerleader, using government levers,

11:40:55  24  for my client's product.  And there was extensive

11:40:59  25  evidence to support that and he was convicted.  And the

prosecutors asked for double digit sentence, at least

ten years. And the judge, who, no softy by any stretch

of the imagination, gave McDonnell two years. So in my

sense, and I knew the case intimately, that was an

appropriate sentence. And of course, in my view, and

the allegations supported it, the guidelines calculation

support it, conduct far more severe, far more severe,

than anything that was even alleged in this case.

Now the Government is going to stand up and

say "But you know, John is a two-time loser. He's had

this prior offense." Well, when we look at the

guidelines, the prior offense alteration in the

sentence, where we are now, I believe is three months.

So whatever John deserves for his relationship with

Foley, and I guess with Greenberg, you add three months

to it, pursuant to the guideline calculation. And then

in terms of sort of a Judeo-Christian sense of justice,

when they talk about John being a two-time loser, they

passed on I believe at least eight felonies for Foley,

when they were laid down conduit campaign contributions

cases. And so, I mean, how do they get around that one,

when they talk about someone being a two-time loser.

Again, what we're asking for is for the

Court now to restore balance, to put this case back to

where it should be. And I stand before you as a person

11:42:42 1 who's done this for a very long time. I think of myself

11:42:45 2 as an officer of the court. I'm not a close personal

11:42:48 3 friend of Rowland, I'm not a supporter of Rowland. I

11:42:50 4 didn't know him before his legal difficulties. But what

11:42:53 5 I do know in my experience, the conduct charged and the

11:42:56 6 evidence proven in this court, giving every benefit to

11:43:01 7 the Government, is squarely aiding and abetting a losing

11:43:08 8 candidate not properly report on her FEC filings. That

11:43:14 9 is FEC civil, maybe misdemeanor territory. That should

11:43:20 10 not be the trigger to a sentence that puts him away for

11:43:25 11 a long time.

11:43:31 12 What is crystal clear is he is as done as a

11:43:35 13 person can be done politically. There will never be a

11:43:39 14 time when this blight on Connecticut politics will be

11:43:42 15 heard from again, even if he wanted to be. There is no

11:43:44 16 doubt that his family desperately needs him, and he

11:43:48 17 needs them. His record of achievement, both publicly

11:43:52 18 and privately, I would say very few have attained.

11:44:00 19 Judge, I'd end this way. I don't think the

11:44:04 20 Goddess of Justice before whom all we -- all of us

11:44:07 21 kneel, would weep if you sent him home with a home

11:44:12 22 detention, or a Foley-like sentence. I think the

11:44:16 23 Goddess of Justice would weep, with all due respect, if

11:44:19 24 this imbalance is not corrected. Thank you so much for

11:44:22 25 listening to me.

| | | |
|---|---|---|
| 11:44:23 | 1 | THE COURT: Thank you. I'll hear from the |
| 11:44:31 | 2 | Government, and then Mr. Rowland, if you wish to be |
| 11:44:33 | 3 | heard, I'll hear from you. Mr. Brennan? |
| 11:44:36 | 4 | MR. BRENNAN: Thank you, your Honor. Before |
| 11:44:46 | 5 | I begin, I'd just like to briefly comment on Mr. |
| 11:44:50 | 6 | Weingarten's remarks. I would comment substantively |
| 11:44:52 | 7 | somewhat in what I say. But I think what we just heard |
| 11:44:58 | 8 | strikes the wrong tone today at a sentencing. Mr. |
| 11:45:03 | 9 | Weingarten tells your Honor that he believes that this |
| 11:45:05 | 10 | case was overcharged. I think it's pretty evident that |
| 11:45:07 | 11 | the jury didn't think so and then returned verdict |
| 11:45:11 | 12 | pretty quickly. The Government is completely satisfied |
| 11:45:13 | 13 | with the reasons -- well, satisfied in the context of |
| 11:45:16 | 14 | this case with the recent Supreme Court ruling on 1519, |
| 11:45:19 | 15 | and I believe it will be upheld in regards to this case. |
| 11:45:22 | 16 | But what we heard is a whole lot of rhetoric that has |
| 11:45:29 | 17 | nothing to do with the 3553(a) factors which your Honor |
| 11:45:32 | 18 | should take into account in sentencing. No contrition |
| 11:45:36 | 19 | whatsoever. What this case comes down to, to some |
| 11:45:40 | 20 | extent, your Honor, is what your Honor thinks about this |
| 11:45:43 | 21 | conduct. The defense thinks that it is trivial. We do |
| 11:45:47 | 22 | not. Before I talk about Mr. Rowland's factors, I do |
| 11:45:52 | 23 | want to comment on some -- on statements that they made |
| 11:45:56 | 24 | in their sentencing submissions to you and some of the |
| 11:45:59 | 25 | statements today. |

11:46:00  1          Now the defense has repeatedly said that Mr.

11:46:03  2   Rowland still has much to give.  And I want to be clear

11:46:06  3   on whatever we say today, that that is my personal

11:46:10  4   sincere hope, and that is the position of our office, is

11:46:13  5   that we hope that he does.  And we hope that in the

11:46:15  6   future he does give back to society and continue to give

11:46:19  7   back.  In reading the submissions today, I personally

11:46:21  8   was particularly touched by the testimonials of people

11:46:25  9   like Curtis, who was referenced this morning, or Mr.

11:46:29 10   Bergenn's clients, that he gave advice to.  Like any

11:46:33 11   human being, Mr. Rowland is human, he is flawed, he is

11:46:37 12   complicated.  It is clear that he has a family who loves

11:46:42 13   him.  That he has support from many people.  And that

11:46:46 14   he's a man of many gifts, many blessings, and great

11:46:51 15   talent.  But he also has a debt to pay to society.

11:46:57 16          Mr. Weingarten is correct that there is an

11:46:59 17   imbalance in the assessment of what went on here.  But

11:47:03 18   the imbalance is not what he thinks that it is.  There

11:47:07 19   is a raging debate today at the bar over the guidelines.

11:47:12 20   This debate is proper, it should be had, it should be

11:47:14 21   continually had.  There's a particular debate about the

11:47:17 22   loss table.  But your Honor, in this instance -- and we

11:47:20 23   fully understand why your Honor is starting with

11:47:22 24   2C1.8 -- in this instance, the guidelines understate the

11:47:27 25   harm in this case.

11:47:30  1          Mr. Rowland's activities were not like other

11:47:34  2    illegal contribution cases.  In some of those cases, the

11:47:38  3    politicians involved don't even know about the

11:47:41  4    contributions.  In other instances, there are

11:47:46  5    contributions that are illicitly made, but the rest of

11:47:49  6    the campaign operates in the open.  In this instance

11:47:53  7    here, there was a shadow campaign.  There was a shadow

11:47:57  8    activity going on.  There was an operative who was

11:48:01  9    leveraging his influence, not just with party delegates,

11:48:04  10   but through the public airwaves.  This was a full-blown

11:48:09  11   conspiracy.  There were laundered funds, the

11:48:14  12   legitimization of payments through nominal services, and

11:48:17  13   an obstruction that isn't captured by the obstruction

11:48:21  14   enhancement here because it was obstruction that

11:48:24  15   occurred over two different campaigns in multiple

11:48:27  16   phases.  There was the Greenberg phase, creating the

11:48:29  17   contract there.  The Lisa Wilson-Foley phase, creating

11:48:33  18   the contract there.  And then the post campaign phase of

11:48:36  19   sending it to our office.  And there was telling Lisa

11:48:40  20   Wilson-Foley's campaign to send the Apple contract to

11:48:43  21   the FEC.

11:48:44  22          And let us not be deceived.  This was not

11:48:48  23   about getting extra money to a favorite candidate.  The

11:48:52  24   natural end of this activity was to elect to the House

11:48:56  25   of Representatives a corrupt public official.  And it

11:49:02  1   was about much more than thirty-five thousand dollars.

11:49:06  2   The comparatively paltry sum does not capture the

11:49:10  3   systemic threat that these type of activities entail.

11:49:14  4   Moreover, we all know that this only ended because the

11:49:18  5   conspirators got caught.  All the conspirators in this

11:49:21  6   instance intended to keep on going.

11:49:26  7             In our submission to you, your Honor, we

11:49:28  8   started discussing the seriousness of the crime by

11:49:32  9   discussing Mr. Rowland's statement to the state Ethics

11:49:35  10  Commission because he spoke eloquently about the public

11:49:39  11  trust there.  But not only did he violate the public

11:49:44  12  trust in his own political career, he conspired here

11:49:47  13  with Lisa Wilson-Foley in a joint venture to flaunt the

11:49:52  14  public's right to self government.  And he tried to

11:49:55  15  tempt Mark Greenberg down the same dark path.  This is

11:50:01  16  inexcusable.

11:50:03  17            I think, when I'm thinking about this, I

11:50:06  18  think Justice Brandeis put it best when he says

11:50:09  19  "Sunlight is the best disinfectant."  And in our system,

11:50:12  20  we have two safeguards to ensure that sunlight.  One is

11:50:15  21  the reporting requirements that have to occur.  The

11:50:18  22  second is the free and public independent press.  In

11:50:22  23  this case, Mr. Rowland corrupted both of them.  He

11:50:26  24  caused lies to be filed with the FEC, and he posed as a

11:50:30  25  member of the independent media, and tore down Lisa

11:50:33  1   Wilson-Foley's opponent.  And his actions doing so were

11:50:37  2   bought and paid for by the Foleys.

11:50:41  3            John Rowland, Lisa Wilson-Foley, Brian

11:50:44  4   Foley, wanted to throw a dark shroud over their

11:50:47  5   activities to deprive the everyday citizens of their

11:50:50  6   right to police the political class.  And when Mr.

11:50:55  7   Rowland was speaking at the state Ethics Commission, he

11:50:58  8   said the public needs to know that offenders are

11:51:00  9   punished under our system of government.  And yet, the

11:51:06  10  defense argues here that this should have been resolved

11:51:09  11  civilly.  This argument is simply disingenuous, your

11:51:14  12  Honor.  There is no way that that could have been done.

11:51:17  13  It simply wasn't possible.

11:51:20  14            At Brian Foley's sentencing, we took pains

11:51:23  15  to say that he was instrumental, but to specifically not

11:51:26  16  say that he was necessary to bring this case.  Because

11:51:29  17  the only thing that was necessary to bring this case was

11:51:32  18  criminal prosecutorial authority.  Specifically, the

11:51:36  19  ability to execute search warrants.  The vast majority

11:51:40  20  of the exhibits were the product of search warrants that

11:51:43  21  would have been outside the reach of any civil action.

11:51:47  22  Government Exhibit 158, where he says he wants to

11:51:50  23  provide cover, Mr. Rowland, search warrant on his

11:51:52  24  account.  Where he says to Lisa Wilson-Foley, he's

11:51:55  25  reminding her that he's just a volunteer, search warrant

11:52:00  1   on her e-mail account.  Exhibits 191 and 192, where they
11:52:04  2   talk about Brian Foley subsidizing his work, also search
11:52:08  3   warrant.  This is the key evidence.  These are the
11:52:11  4   moments in real time when the conspirators are engaged
11:52:14  5   in their illegal activity and the evidence that reveals
11:52:17  6   their crime.  And their conduct was criminal to the
11:52:20  7   court.
11:52:25  8          Mr. Rowland's arguments are emblematic of
11:52:29  9   his inability or unwillingness today to take
11:52:31  10  responsibility for being engaged in a crime.  And this
11:52:39  11  brings us to his history and characteristics, and the
11:52:41  12  sentencing disparities that they may entail.  The Second
11:52:47  13  Circuit has stressed the importance of individualized
11:52:50  14  sentencing.  And Mr. Rowland's unique history here
11:52:54  15  warrants disparities.  Your Honor, I think about the
11:52:58  16  case of Mr. Braddock, who was a young man with no
11:53:02  17  criminal history, who got a sentence of 38 months.  In
11:53:07  18  this case, the other individuals in this case, no one
11:53:12  19  else has a felony record.  No one else was a former
11:53:15  20  governor.  You know, Mr. Weingarten talked about Mr.
11:53:21  21  Rowland's years of public service.  But during his last
11:53:25  22  conviction, he was convicted of a six-year conspiracy
11:53:29  23  during that public service.  No one else in this case
11:53:33  24  was a paid member of the press, clandestinely promoting
11:53:37  25  a campaign through the public airwaves.  And no one else

11:53:41  1  made a public mockery of the reprimands and punishments

11:53:44  2  he had received.  The state Ethics fines, the criminal

11:53:47  3  prosecution, the lying to Probation last time after the

11:53:50  4  guilty plea.  No one else, none of the other defendants

11:53:55  5  in this case, your Honor, has engaged in activity across

11:53:58  6  two different congressional campaigns.

11:54:04  7         You know, I think it's no coincidence that

11:54:07  8  there were two contracts.  It's no coincidence that John

11:54:10  9  Rowland wanted to be on the Board of Directors of the

11:54:12  10  Simon Foundation, and that Brian Biggard sat there and

11:54:16  11  told us all that he thought John Rowland was going to be

11:54:19  12  a Board of Director at Apple Rehab.  And it's no

11:54:22  13  coincidence that Mark Greenberg and Lisa Wilson-Foley

11:54:25  14  were independently wealthy targets for Mr. Rowland to

11:54:28  15  hit up and bilk.

11:54:31  16         You know, a lot of people today, a lot of

11:54:34  17  the letters said that character is what we do when no

11:54:37  18  one is looking.  That's actually a phrase that Mr.

11:54:41  19  Rowland himself liked to use when he was governor.  And

11:54:45  20  it is true.  I mean, Mr. Rowland did many things when

11:54:48  21  people weren't looking that were good.  But also, when

11:54:51  22  no one was looking, Rowland was engaged in criminal

11:54:54  23  activity.  And one wonders if he was engaged in that

11:54:58  24  criminal activity at the same time that he's counseling

11:55:01  25  Mr. Bergenn's clients on their own criminal exposure.

11:55:05  1          His plea for another chance in this case

11:55:09  2  rings hollow.  You know, I think today, in this country,

11:55:13  3  there are plenty of people who struggle to get one fair

11:55:17  4  chance in life.  But John Rowland has had a first, a

11:55:23  5  second, a third, and a fourth chance.  He had post

11:55:27  6  conviction success at home and at work.  He was a

11:55:32  7  wealthy man, earning more than most Americans can dream

11:55:36  8  of, and he still did this.  His prior sentence of a year

11:55:42  9  and a day was not enough to persuade him to get on the

11:55:45  10  straight and narrow.  I think the guidelines here, the

11:55:48  11  range is 24 to 30.  We're of the opinion of something in

11:55:52  12  the range of 30 and above would be appropriate for Mr.

11:55:56  13  Rowland.  We hope that a sentence in that range would

11:56:04  14  motivate him to turn away from the dark endeavors, to

11:56:07  15  let go of the cheating and scheming, and to in the

11:56:11  16  future truly come out reformed so that he can give back

11:56:14  17  to society, without cheating it any longer.  Thank you,

11:56:19  18  your Honor.

11:56:19  19          THE COURT:  All right, thank you.

11:56:22  20          Mr. Weingarten, will there be any further

11:56:25  21  from you?

11:56:25  22          MR. WEINGARTEN:  No, your Honor, thank you

11:56:27  23  very much.

11:56:27  24          THE COURT:  Mr. Rowland, do you wish to

11:56:29  25  heard?

11:56:29  1          MR. ROWLAND:  No, your Honor.

11:56:30  2          THE COURT:  All right.  Ladies and

11:56:31  3  gentlemen, we'll take a brief recess.

11:56:33  4          MR. BRENNAN:  One thing, your Honor, I

11:56:35  5  believe your Honor might have asked Mr. Rowland if he

11:56:37  6  had read and discussed the PSR --

11:56:40  7          THE COURT:  You're right, I did not.

11:56:41  8          MR. BRENNAN:  Can we just get that on the

11:56:44  9  record?

11:56:44 10          THE COURT:  I made that assumption.  I will

11:56:46 11  not make that assumption.

11:56:48 12          Mr. Rowland, did you read the Presentence

11:56:50 13  Report that was prepared by Ms. Hunt?

11:56:53 14          MR. ROWLAND: Yes, your Honor.

11:56:53 15          THE COURT:  And did you understand it?

11:56:54 16          MR. ROWLAND:  Yes, your Honor.

11:56:55 17          THE COURT:  And did you have the opportunity

11:56:57 18  that you wanted to give input to the contents of that,

11:57:01 19  either to Probation or through your attorney?

11:57:04 20          MR. ROWLAND: Yes, your Honor.

11:57:05 21          THE COURT:  And is there any reason why

11:57:06 22  sentence should not be imposed on you today?

11:57:09 23          MR. ROWLAND:  No, your Honor.

11:57:09 24          THE COURT:  Very well, thank you.  All

11:57:12 25  right, we'll stand in recess briefly.

```
11:57:12   1              (R E C E S S)
12:20:31   2              THE COURT:  Please be seated, ladies and
12:20:32   3   gentlemen.
12:20:52   4              I think it's important to remember what a
12:20:57   5   sentencing isn't about.  It isn't about whether Mr.
12:21:02   6   Rowland was a good or a bad governor, because at the
12:21:06   7   time of the criminal offenses for which he was found
12:21:11   8   guilty by the jury, Mr. Rowland was not a public office
12:21:15   9   holder, he was not a public employee.  The sentencing is
12:21:21  10   also not about whether Mr. Rowland's sentence last time
12:21:26  11   he was convicted was appropriate or not.  Under the
12:21:33  12   sentencing guidelines which have an advisory role, the
12:21:42  13   sentencing range reflects the past conviction, and
12:21:46  14   that's the only extent to which the amount of a prior
12:21:51  15   sentence in number form is relevant.  And this case is
12:22:02  16   not about public corruption, or bribery.  It's about a
12:22:08  17   criminal conspiracy to violate the Federal Election
12:22:13  18   Campaign Account, which requires public disclosure of
12:22:21  19   campaign expenditures, campaign receipts, and limits
12:22:28  20   campaign contributions.  And it's about the
12:22:35  21   falsifications that were found to have been the purpose
12:22:39  22   of throwing off governmental investigations into those
12:22:48  23   potential violations.  And if it is about character and
12:23:03  24   what people do when nobody is looking, then that's why
12:23:07  25   we look at the seriousness of the criminal offenses.
```

12:23:18 1          The offenses here are certainly not trivial,

12:23:24 2     they are not civil, and they are not careless.  The

12:23:32 3     criminal conduct at issue spans two election cycles.

12:23:41 4     Obviously, as Mr. Weingarten says, this was not the

12:23:44 5     crime of the century.  But it was criminal.  It was

12:23:48 6     crimes.  It's about violations of the federal law that

12:24:02 7     campaigns for federal office have to fully and

12:24:05 8     accurately report that campaign contribution limits be

12:24:13 9     complied with.  And that's the law and every federal

12:24:18 10    campaign has to comply so that the public can see what's

12:24:24 11    going on, or else.  And the specter of criminal

12:24:31 12    prosecution is intended to have that self enforcement

12:24:39 13    effect.

12:24:45 14         Now, the Court has received many letters in

12:24:48 15    the course of this prosecution and in anticipation of

12:24:57 16    sentence.  And one of them read, "I don't believe that

12:25:02 17    anyone was honestly hurt in this latest conviction."

12:25:09 18    The Court recognizes that this is a different kind of

12:25:13 19    crime from street crime or financial fraud.  But I

12:25:26 20    disagree that nobody was hurt.  Because this enforcement

12:25:39 21    of this -- these statutes, compliance with these

12:25:46 22    statutes, is how you achieve a free and open campaign

12:25:50 23    process.

12:25:53 24         There were two other letters that reflected

12:26:01 25    recognition of this importance and who gets hurt by Mr.

Rowland's crime.  One person said "The election process
must have integrity for voters to believe in democracy."
Another letter writer said "We need to have transparency
and honesty in our election process; otherwise, the
process doesn't work for any of us."  And what is
striking and disturbing is Mr. Rowland's total contempt
for those laws which was made abundantly evident in the
trial, including his shameless use of his radio talk
show to advantage one candidate, his co-defendant Lisa
Wilson-Foley, and disadvantage her lead opponent.  So in
the Court's view, the crimes found to have been
committed by the jury are most serious in that
perspective.

Now, we have heard most eloquently today,
and expressed in letters of similar eloquence, about the
character of Mr. Rowland.  Mr. Rowland is 57.  He has
had an advantaged life, certainly compared to a fair
number of people who are before the Court.  He's well
educated, well-heeled.  He certainly has a supportive
family and a significant group of loyal friends and
people whose lives he's touched.  He has no medical or
emotional conditions that play into explaining or
understanding his conduct found by the jury.  He has had
a long political history, which has given him the savvy
and the influence and the connections that he has

12:28:44 1 marshalled to his successful political consulting work.

12:28:52 2 And he certainly was recognized to have made a comeback

12:28:59 3 from his political and public disgrace with his first

12:29:05 4 conviction.  His record of service, kindness to

12:29:14 5 strangers, and empathy for those who suffer is

12:29:23 6 undisputed.

12:29:27 7 However, there are very few people who come

12:29:30 8 before the Court who are only bad, who are nothing but

12:29:39 9 evil.  And that's what makes sentencing difficult.

12:29:44 10 Because good people do bad things.  And the reality is

12:29:51 11 that that's why they're before the Court.  The Court has

12:29:59 12 to consider what is a sentence that would provide

12:30:05 13 deterrence in the future to the defendant's criminal

12:30:10 14 conduct and to others similarly situated who might be

12:30:16 15 tempted to do what they want and not what the law

12:30:21 16 requires in the political campaign sphere.

12:30:27 17 Obviously, Mr. Rowland's prior incarceration

12:30:32 18 did not bring about the result which was believed would

12:30:40 19 result at his first sentencing.  That is, he would never

12:30:44 20 be seen in federal court again.  It is really not clear

12:30:54 21 in the picture put forward today of Mr. Rowland of what

12:31:02 22 his motivation was to be involved in this sort of

12:31:10 23 activity.  Perhaps it's lust for influence.  But it

12:31:19 24 nonetheless cannot be tolerated.  And the public

12:31:27 25 protection aspect is deterrence from undermining the

12:31:34 1  federal election laws by him and anybody else.  So the

12:31:48 2  Court is tasked with imposing a sentence that reflects

12:31:53 3  the seriousness of the events, promoting respect for

12:32:00 4  that law, and coming out with something that is called

12:32:06 5  just punishment.

12:32:11 6          Mr. Rowland, would you kindly stand.

12:32:15 7          Having considered the advisory sentencing

12:32:18 8  guideline range, having considered the factors under

12:32:23 9  3553(a), it is the sentence of the Court that you be

12:32:26 10 remanded to the Attorney General of the United States or

12:32:32 11 its designee for a period of 30 months on Count One and

12:32:35 12 Two through Five, concurrently.  As to Count Six and

12:32:40 13 Seven, the sentence imposed is twelve months, to be run

12:32:45 14 concurrently with each other, and concurrently with

12:32:49 15 Count One and Two, Three, Five, for a total effective

12:32:54 16 sentence of 30 months.

12:33:01 17         Balancing the good with the seriousness

12:33:06 18 leads the Court to the conclusion that it will not

12:33:08 19 depart upward, as the Government urges, that this

12:33:13 20 sentence satisfies the goals of the sentencing act.

12:33:21 21         Three years of supervised release are

12:33:23 22 imposed on Count One, Two through Five, concurrently,

12:33:29 23 and one year of supervised release for Count Six and

12:33:35 24 Seven, the misdemeanors.  There are special conditions.

12:33:41 25 You shall not acquire any new credit cards or open new

12:33:46  1    lines of credit or incur charges over five hundred

12:33:50  2    dollars on existing credit cards without prior Probation

12:33:54  3    permission until the criminal fine is paid.  The Court

12:34:01  4    imposes a fine of thirty-five thousand dollars, payable

12:34:06  5    at a monthly rate of a minimum of two hundred fifty

12:34:09  6    dollars a month, adjusted based on Mr. Rowland's ability

12:34:15  7    to pay as determined by the Probation Office and

12:34:19  8    approved by the Court.  Mr. Rowland will be required as

12:34:27  9    a special condition to provide the Probation Office with

12:34:32 10    access to all requested financial information, and he

12:34:37 11    may not possess any firearm or other dangerous weapon.

12:34:42 12            Restitution is not applicable.  A special

12:34:46 13    assessment of five hundred fifty dollars is imposed for

12:34:54 14    the offenses, felonies and misdemeanors under 18 United

12:35:00 15    States Code 3013.

12:35:02 16            There are mandatory conditions of supervised

12:35:05 17    release.  The defendant shall not commit another

12:35:08 18    federal, state or local offense.  The defendant shall

12:35:12 19    not unlawfully possess a controlled substance.  It's

12:35:16 20    never been an issue with Mr. Rowland; all testing is

12:35:19 21    waived.  As to the fine that was imposed, if it was not

12:35:28 22    paid prior to his release, he is required as a mandatory

12:35:33 23    condition of supervised release to adhere to the

12:35:36 24    installment schedule.  And he shall cooperate with the

12:35:41 25    collection of a DNA sample to be taken by the Bureau of

12:35:45 1  Prisons or by the Probation Office.

12:35:53 2          Obviously, voluntary surrender is

12:35:56 3  appropriate.  I'll speak with you about the date that

12:35:59 4  you are requesting in just a moment, but I want to give

12:36:15 5  you notice of your right to appeal.  Any notice of

12:36:17 6  appeal must be filed within 14 days of the entry of

12:36:22 7  judgment in this case.  If you cannot afford the cost of

12:36:25 8  the appeal, you may proceed in forma pauperis and at

12:36:31 9  your request, the clerk will prepare and file that

12:36:33 10 notice of appeal for you.  If you cannot afford counsel

12:36:37 11 for your appeal, the court will appoint counsel for you

12:36:40 12 at no cost to you.

12:36:44 13         Mr. Weingarten, with respect to

12:36:47 14 recommendations that you wish the Court to make to the

12:36:50 15 Bureau of Prisons, and with respect to a surrender date

12:36:54 16 that you are requesting, may I hear you?  I know there

12:36:59 17 is a stepson's wedding in a month, and I'm happy to

12:37:02 18 accommodate that.

12:37:03 19         MR. WEINGARTEN:  Three points, your Honor.

12:37:04 20 If you would be kind enough to recommend Otisville, that

12:37:08 21 would be our request, number one.  Number two, Mr.

12:37:10 22 Rowland has retained Andy Fish, who's in court today,

12:37:15 23 from the law firm of Locke Lord.  He will be the

12:37:17 24 appellate counsel; we are going to pursue appeal.  We

12:37:20 25 respectfully request bond pending appeal.  And then, I'm

12:37:24  1    not sure which issue you want to deal with first, but to

12:37:26  2    the extent we do need a date, assuming we are going to

12:37:31  3    seek bond pending appeal, we would like 90 days.

12:37:51  4             THE COURT:  So you are proposing voluntary

12:37:54  5    surrender June 16?  Does the Government take a position?

12:38:02  6             MR. BRENNAN:  Your Honor, we definitely

12:38:04  7    believe that Mr. Rowland should be allowed out to go to

12:38:07  8    the wedding.  We do believe that the general surrender

12:38:11  9    date is around six weeks.  We think it should be

12:38:14  10   appropriate that Mr. Rowland be treated as any other

12:38:17  11   defendant in this courtroom, and six weeks would be more

12:38:19  12   appropriate.  That is our same opinion on bond pending

12:38:23  13   appeal, that he should be treated equally as any other

12:38:26  14   defendant.

12:38:26  15            THE COURT:  All right.  Many defendants here

12:38:30  16   get as much accommodation as the Court can provide in a

12:38:32  17   voluntary surrender date.  There is nothing special

12:38:36  18   about 90 days, even though it is longer.  It allows him

12:38:40  19   to get his affairs in order, get his role at the wedding

12:38:45  20   completed.  And I'll direct that you report by noon on

12:38:53  21   Tuesday, June 16th, to the US Marshal for this district,

12:38:57  22   or to the facility designated.  I will recommend that

12:39:03  23   that facility be Otisville.  And I will continue bond

12:39:10  24   until the surrender date.  That will give you plenty of

12:39:13  25   time to move for bond pending appeal, if that is in fact

| | | |
|---|---|---|
| 12:39:20 | 1 | what you intend to seek.  The appeal, in any event, will |
| 12:39:29 | 2 | be interesting.  So we'll have that schedule in place. |
| 12:39:34 | 3 | Anything else?  Anything from the Government? |
| 12:39:38 | 4 | MR. BRENNAN:  No, your Honor. |
| 12:39:39 | 5 | THE COURT:  Anything I have not been clear |
| 12:39:41 | 6 | about?  Anything that I have omitted or that needs to be |
| 12:39:45 | 7 | addressed or clarified? |
| 12:39:52 | 8 | MR. BRENNAN:  No, your Honor. |
| 12:39:54 | 9 | THE COURT:  Probation? |
| 12:39:55 | 10 | MR. LOPEZ:  No, your Honor, thank you. |
| 12:39:56 | 11 | THE COURT:  All right, I'd like to |
| 12:39:58 | 12 | compliment counsel on both sides for their excellent, if |
| 12:40:02 | 13 | not exhaustive work on this case, notwithstanding their |
| 12:40:08 | 14 | extremely different views about the case.  And I |
| 12:40:12 | 15 | appreciate all the cooperation that they provided to the |
| 12:40:17 | 16 | Court.  Thank you, we stand in recess. |
| | 17 | ******************** |
| | 18 | COURT REPORTER'S TRANSCRIPT CERTIFICATE |
| | 19 | I hereby certify that the within and foregoing is a true |
| | 20 | and correct transcript taken from the proceedings in the |
| | 21 | above-entitled matter. |
| | 22 | /s/ Julia Cashman |
| | 23 | Official Court Reporter |
| | 24 | 5/18/2015 |
| | 25 | |