```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3   * * * * * * * * * * *  *  *    *
                                    *
 4   UNITED STATES OF AMERICA,    * Case No14cr79(JBA)
                                    *
 5               Government,        *
                                    *
 6         vs.                      *
                                    * New Haven, CT
 7   JOHN G. ROWLAND,               * September 2, 2014
                                    *
 8               Defendant.         *
                                    *
 9   * * * * * * * * * * * *  *   *

10           TRANSCRIPT OF PRETRIAL CONFERENCE

11   BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12
     APPEARANCES:
13   FOR THE GOVERNMENT:      LIAM BRENNAN, ESQ.
                              U.S. Attorney's Office
14                            157 Church Street
                              New Haven, CT 06510
15
                              CHRISTOPHER M. MATTEI, ESQ.
16                            U.S. Attorney's Office
                              450 Main Street
17                            Hartford, Ct 06103

18
     FOR THE DEFENDANT:       REID WEINGARTEN, ESQ
19                            WILLIAM DRAKE, ESQ.
                              MICHELLE LEVIN, ESQ.
20                            Steptoe & Johnson
                              1330 Connecticut Avenue NW
21                            Washington, DC 20036

22
     Court Reporter:          Sharon Montini, RMR, FCRR
23                            141 Church Street
                              New Haven, CT 06510
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1                        APPEARANCES CONTINUED:

2


3    FOR THE DEFENDANT:            PETER BILLINGS, ESQ.
                                   941 Grand Avenue
4                                  New Haven, CT 06511

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THE COURT:  Good afternoon, counsel.
Please be seated.

All right, we are here to hear you on
several of the motions that have been recently
filed.  I'd like to see counsel at sidebar on the
order and way we will proceed.

A number of the members of the press
have asked if they can have their laptops for note
taking during trial.  A letter will be coming out
setting the requirements for that.  That is for
trial, and that's the only proceeding for which the
Court is waiving the rule.

May I see counsel, however, at sidebar?
Let's get counsel -- let's get appearances for the
record.

MR. BRENNAN:  Good afternoon, your
Honor.  Liam Brennan for the United States.  I'm
joined at counsel table by Attorney Christopher
Mattei and Postal Inspector Bernard Feeney.

THE COURT:  And for defendant?

MR. WEINGARTEN:  Good afternoon, your
Honor.  Reid Weingarten, Michelle Levin, Will Drake.
And my client, John Rowland, is here as well.

THE COURT:  All right.  I would like to
get organized at sidebar.

1           (Sidebar conference)

2           (Sealed)

3           THE COURT:  Let's take up the

4    attorney -- the motion with respect to Brian Foley

5    and the Santos office attorney-client

6    communications.

7           Both the government and Mr. Foley have

8    moved to preclude evidence of communications between

9    Mr. Foley and Mr. and Ms. Santos on the basis of

10   attorney-client privilege.  The defendant contends

11   the crime-fraud exception to attorney-client

12   privilege is applicable and waives the privilege.

13          So let's start with that motion.  Is Mr.

14   Santos here?  Is Ms. --

15          MS. SANTOS:  Ms. Santos is, your Honor.

16          THE COURT:  The defendant in his motion

17   contends that the seven exhibits that are in

18   contention don't require that the defendant meet the

19   burden of showing that the exception applies.  I

20   don't find any authority to support that, but let

21   me, before I hear from the defendant, and I gather

22   we're just focused on these seven documents, see

23   what in addition Ms. Santos wishes to add to any of

24   the specific documents that are at issue here.

25          MS. SANTOS:  Well, for the most part,

1  your Honor, we did lay out our position obviously in

2  our papers, and we disagree that the crime-fraud

3  exception applies.

4          THE COURT:  But if doing that

5  generically is a little bit --

6          MS. SANTOS:  Difficult.

7          THE COURT:  -- difficult for the Court

8  to apply to the seven different documents at the

9  same time -- I recognize that the substance of those

10  documents is, of course, exactly the subject of your

11  concern and of the privilege.  So why don't you do

12  the best you can.  If you need to be heard at --

13  again at sidebar, I think we can do that without --

14          MS. SANTOS:  Well, your Honor, as I

15  indicated in the papers, except for -- well, perhaps

16  except for two of the communications, one of which

17  is obviously authored by me and the other was really

18  forwarding materials on, the vast majority of the

19  content of the e-mails is from Mr. Foley to us

20  providing us with information so that we can give

21  him legal advice relative to the investigation.

22          THE COURT:  Now, with respect to that

23  contention, the defendant says that that became a

24  vehicle for feeding false information to the

25  government in an attempt to perpetuate the alleged

1    conspiracy to defraud.  Is there anything about that

2    legal proposition as opposed to the facts that you

3    would disagree with?  Would that fall, in your view,

4    under the fraud crime exception?

5              MS. SANTOS:  If it were the case, that

6    the information in the e-mails was --

7              THE COURT:  Was false.

8              MS. SANTOS:  -- was false.  I disagree

9    with the proposition that all of the content in the

10   e-mails is false.

11             THE COURT:  But that's factual.

12             ATTORNEY SANTOS:  Correct.

13             THE COURT:  So if the information in the

14   e-mails, which contextually we can't really tell,

15   but you are saying that it is in response to

16   inquiries and questions from the government for more

17   information -- is that correct?

18             MS. SANTOS:  The government was not

19   requesting information from us, your Honor.  We were

20   volunteering information in an effort to defend Mr.

21   Foley's position.

22             THE COURT:  Now, you recall that one of

23   the e-mails talks about -- I'm looking at

24   Exhibit 261.  It refers to the government's -- it

25   refers to a motion and the government's response to

1  the motion?

2          MS. SANTOS:  Yes, your Honor.

3          THE COURT:  What is it talking about?

4          MS. SANTOS:  I believe that was a motion

5  to quash the grand jury subpoena.  So to some

6  extent, although I can't frankly recall the precise

7  context in which this communication was sent, there

8  may have been issues raised in the government's

9  response to our motion to quash that Mr. Foley was

10  responding to.

11          THE COURT:  So, for instance, if you

12  look at proposed Exhibit 262, it is a recitation of

13  facts.

14          MS. SANTOS:  Yes, your Honor.

15          THE COURT:  It does not give a context.

16          MS. SANTOS:  Correct.

17          THE COURT:  Except in the third to the

18  last line that references that this information has

19  applicability to the government's anticipated theory

20  of liability of Mr. Foley.

21          MS. SANTOS:  Correct.

22          THE COURT:  So if the statements that he

23  makes are false, then, from what I think you told

24  me, the fact that they are being made to be given to

25  the government would fall under the crime-fraud

exception and they would be discoverable or they
would -- the privilege would not protect them from
disclosure.

MS. SANTOS: I think that that's a -- I
think that's a fair assessment of the situation.

THE COURT: Okay.

ATTORNEY SANTOS: But again --

THE COURT: So let me go back and look
at 249, which appears to be transmittal of a public
pleading. Are you claiming privilege -- why are you
claiming privilege as to that?

MS. SANTOS: Well, it's not a public
pleading. Just to correct the Court, the FEC
response is not public in itself until the FEC makes
a decision. However --

THE COURT: But that's not subject to
attorney-client privilege.

MS. SANTOS: The attachment itself would
not be, no, your Honor.

THE COURT: So the thing that starts
"page 1 of 6" is not claimed as subject to the
attorney-client privilege.

MS. SANTOS: Correct.

THE COURT: And then the previous two
pages are reflective of transmittal of that response

1    to a complaint filed with the FEC.  Why does that

2    contain privileged material?

3            MS. SANTOS:  Well, I certainly did not

4    want to waive Mr. Foley's privilege relative to his

5    representation by Patton Boggs.  To the extent that

6    that has a privileged communication between he and

7    another lawyer that he had sent to us -- although --

8    well, like I said, I didn't want to waive any of Mr.

9    Foley's privilege, attorney-client privilege with

10   Patton Boggs attorneys.  But to the extent -- the

11   communication itself doesn't provide, I suppose,

12   legal advice, but it was a confidential

13   communication between Attorney McGinley and Mr.

14   Foley.

15           THE COURT:  As to 251, if the evidence

16   demonstrates that the financial arrangements with

17   Attorney Shelton were different -- were not as

18   represented, would you agree that 251 is -- that the

19   defendant has met his burden of showing the

20   exception given that the financial arrangements in

21   this case get to the heart of the government's

22   charges?

23           MS. SANTOS:  As far as my understanding

24   of the financial arrangements, your Honor, the

25   evidence would not show that to be the case.

1          THE COURT:  That may be and that may

2     require waiting to hear at trial what the financial

3     arrangements are.  If Mr. Foley were to testify

4     conversely or in contradiction of that last phrase

5     after the word "escrow account," would you agree

6     that then this is disclosable?

7          MS. SANTOS:  That last phrase I would

8     agree would be disclosable.

9          THE COURT:  And then I take it that you

10    are not claiming privilege on the telephone records

11    that are appended.

12          MS. SANTOS:  Correct, your Honor.

13          THE COURT:  So for 249, the FEC response

14    is not protected.  As to 251 the telephone records

15    are not claimed.  Apart from the legal opinion given

16    by Patton & Boggs, and particularly with respect to

17    the last paragraph, does that fall under the same

18    analysis with respect to whether the trial evidence,

19    particularly Mr. Foley's testimony, turns out to be

20    in opposition?

21          MS. SANTOS:  Are we back into the

22    response?

23          THE COURT:  No, I'm at 259.  We actually

24    are moving on.

25          MS. SANTOS:  Okay.  And you are on

1   Exhibit 259?

2           THE COURT:  Yes.  And without regard to

3   the first paragraph that contains the opinion of

4   Patton & Boggs about the law.  I'm referring to the

5   second paragraph.

6           MS. SANTOS:  Which is -- my

7   understanding is entirely accurate.

8           THE COURT:  But if it is not, you would

9   agree that it may be subject -- that it is subject

10  to the exception?

11          MS. SANTOS:  If the evidence shows that

12  those statements are false, then I would agree.  But

13  based upon my understanding, that's not what the

14  evidence would show.

15          THE COURT:  And so 261, which is a

16  rendition of how Mr. Foley conducts business at

17  Apple with respect to -- by way of explanation of

18  the number of e-mails or written reports, that also

19  would be subject simply to his testimony at trial or

20  other testimony or evidence that would -- could

21  indicate that to be false.  And if it is false, it

22  would fall under the fraud crime exception under

23  your theory of how that exception works?

24          MS. SANTOS:  I would agree with you,

25  your Honor, that if there's something found by the

evidence to be false in this communication, yes.

THE COURT:  I guess 262 falls under that same analysis.  But you then attach an e-mail chain from Mr. Foley to Mr. Bedard, Tracy Persico.  None of those are attorneys for whom privilege is claimed.  Isn't that right?

ATTORNEY SANTOS:  Correct, the attachments are not privileged.

THE COURT:  And then 263 is a draft of your proposed letter to the government.

MS. SANTOS:  Correct.

THE COURT:  I take it you don't claim that the letter -- was the letter itself sent?

MS. SANTOS:  A version of the letter was sent.  I would have to compare -- actually, no, certainly not this version because there is a blank in the chart, but a version.

THE COURT:  My copy doesn't have a blank in the chart.

MS. SANTOS:  On the second page.

THE COURT:  Oh, for December 5th.

MS. SANTOS:  Correct.  Something very similar to this letter was eventually sent to the government, but this is, in fact, a draft.

THE COURT:  And 264 describes Mr.

Foley's meetings with Mr. Rowland.  What is the
title of the person, other person identified in that
memo -- in that e-mail?

MS. SANTOS:  That is a good question.

THE COURT:  Okay.

MS. SANTOS:  I don't know the answer to
that.  He's a consultant for the campaign, your
Honor.

THE COURT:  And do I read this
correctly, that he's discussing meeting with Mr.
Rowland separately and with the consultant for the
campaign et al jointly?  Is that how that should be
read?

MS. SANTOS:  I believe so, your Honor.

THE COURT:  All right.  So we have some
things that have been winnowed down as not being
claimed, other things that may need to await a
demonstration of falsity by the defendant.

Mr. Weingarten, what would you like
to -- how would you approach these exhibits?  First
of all, on 249, are you claiming those -- are you
intending to use those transmittals?

MR. WEINGARTEN:  Judge, could I spend
two minutes just laying the foundation for this?  I
think it would be helpful.

1          THE COURT:  Certainly.

2          MR. WEINGARTEN:  So we get our discovery

3   and we get these e-mails.  We get the Jessica Santos

4   e-mails with Foley.  We assume waiver and/or we

5   assume the government exercised crime fraud.  Why do

6   we think that?  We think that because these e-mails,

7   which are extremely exculpatory, flowed into

8   letters, at least six letters, that were submitted

9   to the prosecutors by Mr. Foley through the Santos

10  firm.

11         THE COURT:  Now, are those letters

12  letters that the Court should examine?

13         MR. WEINGARTEN:  They are exhibits and

14  the Court -- I don't think they are being objected

15  to, and I think what the Court -- for sure, and we

16  can do it by close of business, we can show you the

17  nexus between the content in the e-mails and the

18  letters that were subsequently sent to the

19  government.  There is a direct link.

20         THE COURT:  Do you have a list of those

21  exhibits now?  Because I do now have your exhibits.

22         MR. WEINGARTEN:  Yes, sure.  And here is

23  the punch line.  We read the grand jury of Mr. Foley

24  and Mr. Foley says that the letters to the

25  government were false, they were part of a coverup.

We obviously don't believe that the Santos firm was

knowing in the commission of this fraud.  I don't

believe that at all.  We believe they were the

unwitting recipients, according to Foley, of this

false information.

The ironic play here, Judge, is we

believe the e-mails, done when the Foleys were

defending their conduct, were legitimate.  We think,

pursuant to the deal Foley got, he did a flip and

the letters that were submitted are now false.  But

under any estimation of the law a -- the privilege

has been vitiated.  The crime-fraud exception has

been met.  Foley admits to it.

THE COURT:  So we need to pinpoint.

When you say that the letters submitted were false,

you are referring to the letters submitted on behalf

of Mr. Foley by his counsel?

MR. WEINGARTEN:  Yes, the Santos firm.

THE COURT:  They wouldn't be privileged

anyhow, would they?

MR. WEINGARTEN:  Of course not.

THE COURT:  So why are -- why is that

not what you are up to, is showing those to --

MR. WEINGARTEN:  We fully intend to, and

in some respects the e-mails are better because in

1    our view the e-mails are communications from the

2    witness himself, the witness who is going to be in

3    that chair, that will be completely inconsistent

4    with what he's going to testify about at trial this

5    week or next week.  I mean, it's pure impeachment.

6              THE COURT:  And so your

7    cross-examination includes those letters on his

8    behalf and --

9              MR. WEINGARTEN:  And these e-mails.

10             THE COURT:  Wait a minute, just one at a

11   time.  And the expectation that he will say the

12   content of those letters are false.

13             MR. WEINGARTEN:  Yes.  He said it in the

14   grand jury.

15             THE COURT:  And why -- other than these

16   e-mails precluding his backing away and saying my

17   lawyers were mistaken, what is added by these

18   e-mails other than the contrast between their

19   exculpatory purpose for him, Mr. Foley, and what is

20   anticipated to be his trial testimony?

21             MR. WEINGARTEN:  I think Foley is going

22   to be a tough witness.  I think he's going to say,

23   and he suggested this in a memo of interview, that

24   he didn't have responsibility for one or two of the

25   letters, it came from other sources.  Now I want

what he said to his lawyers.

THE COURT:  And why is it that we're not waiting for trial to see if that is, in fact, his backing away from what his lawyers wrote?

MR. WEINGARTEN:  Because, Judge, I mean the privilege is the privilege.  The privilege is vitiated by Foley's own words.  Foley says I used my lawyers to perpetrate a fraud on these prosecutors.  That's what he is essentially saying in the grand jury.  The e-mails follow directly into the fraud.  The fraud was perpetrated based upon the information he provided to his lawyers through those e-mails.

MR. BRENNAN:  Your Honor, if I may, at some point I would like to get an opportunity to just explain the --

THE COURT:  You will.

MR. BRENNAN:  Thank you, your Honor.

MR. WEINGARTEN:  It seems hard to believe --

THE COURT:  So that's the big picture. I understand it.

MR. WEINGARTEN:  Yes.

THE COURT:  Can we move to the individual communications, which vary in their substance.

1        MR. WEINGARTEN:  Sure.

2        THE COURT:  And I had started out by

3   seeing whether we were going to be using the -- you

4   wished to be using the transmittal e-mails of 249.

5        MR. WEINGARTEN:  So what this represents

6   is of all the e-mails, all the Jessica Santos

7   e-mails that were turned over by the government, we

8   winnowed down the list to what we anticipated using.

9   So what they're challenging would be the stuff that

10  we put on our witness list.

11       THE COURT:  And there is no longer any

12  claim that the response to the FEC complaint is

13  privileged.

14       MR. WEINGARTEN:  All we wanted there is

15  the complaint -- I mean the filing, not the e-mail.

16       THE COURT:  All right.  So it's agreed

17  that that's not subject to privilege.

18       MR. WEINGARTEN:  Right.

19       THE COURT:  Let's move on then to 251,

20  which you anticipate Mr. Foley's own testimony will

21  show that not to be true.

22       MR. WEINGARTEN:  Mr. Foley is going to

23  say the whole relationship with Apple is a sham,

24  that Rowland did no work, it was all a joke, it was

25  all a pretext.  We love this document.  This

document contradicts that.  We believe this document

is true, and it's coming right from him.

THE COURT:  Okay.  And then with respect

to 259 and what appears to be legal advice from

Paton & Boggs, are you claiming that?

MR. WEINGARTEN:  Yes, we think that is

really important.

THE COURT:  If it is an accurate

statement of the law, however, how does it fall

under the crime-fraud exception?

MR. WEINGARTEN:  Because he's going to

testify that the whole thing was a cover, everything

he did with Rowland was --

THE COURT:  That's not my question,

though.  If it turns out that the advice contained

in the first paragraph is, in fact, accurate, why is

it subject to the crime fraud -- it is advice given

by counsel to the client.  Why is it subject to the

crime-fraud exception?

MR. WEINGARTEN:  Because part of his

cooperation is going to be that all the letters that

he sent to the government were false, that he

perpetrated a fraud on the government.  I can't

remember the exact -- what he exactly said to the

government about Paton & Boggs, but if he in fact --

1    and we think this document reflects that he received

2    advice from a respected law firm in Washington that

3    says this guy can work for you and volunteer for

4    your wife.  That's going to be utterly inconsistent

5    with what he's going to say on the stand and

6    inconsistent -- and I'm sure that's what Hubie

7    Santos said to the government when he was

8    representing Foley.  And Foley is now going to say

9    that's not what happened.

10            THE COURT:  And 261 falls then into your

11   argument that --

12            MR. WEINGARTEN:  I think 261 is

13   directly -- I remember almost verbatim pieces of 261

14   that found their way into the letter, and I'm

15   anticipating Foley is going to say the letters were

16   just a cover, a fraud, an obstruction.  Also he's

17   going to say there was no meaningful -- he said it

18   in the grand jury and I expect he's going to say it

19   in court, there was no meaningful communication, no

20   substantive meaningful communications between

21   Rowland and Foley.  This puts the lie to that.

22            THE COURT:  Okay.  Now, where do I find

23   the grand jury transcript you are referring to?

24            MR. WEINGARTEN:  I can give you the

25   whole transcript or I can give you a little piece of

1   it that contains the --

2           THE COURT:  Maybe we should have all of

3   Mr. Foley's.  Okay, thank you.  And then 262 is the

4   same.

5           MR. WEINGARTEN:  262, the point there is

6   Foley will testify that, you know, the payments made

7   to Rowland he wouldn't have made had it been a real

8   deal.  This is substance where he is reporting about

9   how he deals with consultants in a way parallel to

10  how he dealt with Mr. Rowland.

11          THE COURT:  So what you say is even if

12  the substance is true, the purpose is fraudulent.

13          MR. WEINGARTEN:  No, I mean it's -- I

14  totally understand this is an odd situation.  We're

15  saying these e-mails are true.  And I understand how

16  it turns the world upside down.  I totally agree, I

17  get it.

18          THE COURT:  That's a phrase we'll get to

19  in another motion.

20          MR. WEINGARTEN:  Yes.  It's simply this,

21  Judge.  I don't think the Santos firm can walk into

22  court and say we were the unwitting dupes of our

23  client's fraud, that's what our client has said to

24  the government, and the fraud was based upon our

25  letters to the prosecutors.  The letters to the

1   prosecutors were based upon the information we

2   received from our client in these e-mails and now we

3   want the sanctity of the privilege to get these

4   e-mails back.  That can't be the law.

5           THE COURT:  263 is a draft.

6           MR. WEINGARTEN:  263 is huge.  263 --

7           THE COURT:  It's a draft from Attorney

8   Santos -- no -- yes, to Mr. Foley, and she says

9   there is a final that actually was sent.  Isn't that

10  what should be your exhibit?

11          MR. WEINGARTEN:  We want that to be our

12  exhibit, but we're anticipating the real possibility

13  that he's going to try to walk away from this stuff,

14  and this is -- this puts him -- this puts the

15  document in his hands.

16          THE COURT:  If, as you say, the world

17  has turned upside down, I'm curious why you say he's

18  going to walk away from it.

19          All right.  Anything that you want to

20  add to your argument?

21          MR. WEINGARTEN:  I don't think so, your

22  Honor.  I mean, this is pure impeachment.  It's

23  extremely important to the defense.  It's highly

24  exculpatory.  He's going to testify inconsistent

25  with the e-mails that came right out of his computer

and we should be able to cross him on that.

THE COURT:  All right, let's hear from the government.

Mr. Brennan.

MR. BRENNAN:  Good afternoon, your Honor.  Thank you.  Your Honor, what I wanted to raise, what I asked to be heard about when Mr. Weingarten was speaking, was actually the grand jury transcript.  I was going -- because I think Mr. Weingarten is not accurately representing what --

THE COURT:  That's why I want to take a look.  Not that I doubt Mr. Weingarten's representation, but we just have to look at everything.

MR. BRENNAN:  Your Honor, I just had it up.  It's on page 114.  If your Honor has it there.  Does your Honor have a copy?

THE COURT:  I do.

MR. BRENNAN:  At the beginning -- at the end of 113 we ask:  "And you retained counsel in connection with that, right?"

He says:  "Yes."

And then we ask:  "That's Hubert Santos and his associate Jessica Santos?"

And he says:  "Yes."

1          "And you were aware that during the time

2     period that this matter was under investigation,

3     Attorney Santos was communicating with the U.S.

4     Attorney's Office about the investigation?"

5               He says:  "Yes."

6               "And one of the ways in which he did

7     that was through letter correspondence that he sent

8     to our office, correct?"

9               "Correct."

10              "And you were aware at the time that he

11    was corresponding with our office via letter; is

12    that right?"

13              He says:  "That's correct."

14              "And you were aware one of the purposes

15    of those letters was to communicate to the U.S.

16    Attorney's Office that the relationship between

17    Apple and Mr. Rowland and Ms. Wilson-Foley's

18    campaign was legitimate and lawful, correct?"

19              And he says:  "Correct."

20              "And, in fact, you knew at the time that

21    that wasn't the case."

22              He says:  "I did."

23              "And those letters were sent to the U.S.

24    Attorney's Office with your authority, correct?"

25              "That's correct."

1          "And I understand that you may not have

2    reviewed the final drafts of these letters."

3          "Correct."

4          "But you understood that they were being

5    sent?"

6          "I did."

7          "And you understood that they contained

8    misleading and false information."

9          He says:  "That's correct."

10         Your Honor, the proponent of the

11   attorney-client privilege does have the burden to

12   show that a privilege exists, but once a privilege

13   does exist, when there is a crime fraud, the

14   proponent who wants to find the exception, the

15   person pushing the exception, has to show that there

16   is a reason to believe that a crime of fraud

17   occurred in this instance.

18         THE COURT:  And that the statements were

19   in furtherance of it.

20         MR. BRENNAN:  That the statements were

21   in furtherance; that the communication with the

22   attorney was in furtherance of the crime fraud.

23         THE COURT:  Why does this not say that?

24         MR. BRENNAN:  I just wanted to caveat

25   before I got there, that is an objective standard.

1    So whether the evidence shows that that is the case,

2    it's not whether Mr. Foley says it's the case, it's

3    not whether anyone else says that there was a crime

4    fraud, it is simply whether the evidence -- there is

5    a preponderance of the evidence to believe that the

6    conversations were in furtherance of the fraud.

7              THE COURT:  And why would an objective

8    -- by an objective standard that not be -- that

9    probable cause standard not be met by his testimony

10   that he understood that the attorney letters

11   contained misleading and false information which

12   could only have gotten there through him?

13             MR. BRENNAN:  Well, actually he says he

14   did not review them all, and when we looked at I

15   think Exhibit 262, if I may, your Honor, most of

16   that information Ms. Santos says comes from Brian

17   Bedard.

18             My point with the preamble, in part,

19   your Honor, is to say the defense wants it both

20   ways, that these are both true and they are

21   fraudulent, and in an objective standard they are

22   either one or the other.

23             Now we do believe -- we have questioned

24   him on this because we do believe they were intended

25   to give us the impression that there was a

legitimate arrangement, that they were advocacy on

the part of the attorney.

THE COURT:  That they were in

furtherance of a fraud.  I understand the weirdness

of this.

MR. BRENNAN:  They were in furtherance

--

THE COURT:  But if they were in

furtherance of a fraud by Mr. Foley on the

government, isn't the privilege waived, weird as it

may be as to the use to which Mr. Rowland's counsel

may intend to make?  They are the essence of, at

least, impeachment.

MR. BRENNAN:  Your Honor, in instances

that are in furtherance of a fraud that is the case.

If they are trying to perpetrate a fraud on the

government and these are in furtherance of it, then

the privilege is waived.

THE COURT:  And you say the defendant

can't say this was in furtherance of a fraud, but

they were true.

MR. BRENNAN:  They cannot prove the

necessity to find the exception if their position is

that they are true.  And actually, as Ms. Santos

explained when she was up here, I find the letters

1    misleading.  They were misleading to the

2    investigation, they wanted to shut down the

3    investigation.  But the actual statements in here

4    are not necessarily not true.  Mr. Foley will say, I

5    believe, that he made those statements, that he had

6    X meetings, that they were under the auspices of a

7    cover, but that those things occurred.  And then the

8    attorneys on his behalf, advocating on his behalf,

9    reiterated those statements to us in letters that he

10   did not fully review, but that he understood would

11   give us that impression.  That's true, but there is

12   a fine line I think between fraud giving us directly

13   false statements -- that's why it's so hard to prove

14   obstruction many times, giving us directly false

15   statements and using the facts that you have to

16   advocate for your client.

17             THE COURT:  But that's the nature of

18   omitted statements or selectively chosen statements,

19   it is not infrequently the basis for perpetrating a

20   fraud.  Right?

21             MR. BRENNAN:  Correct, in contexts that

22   don't involve I think the attorney-client

23   communication.  What concerns me here is that there

24   are -- there is a valid representation that any

25   attorney has for their client and --

1          THE COURT:  But not to be able to use

2    the attorney-client privilege as a means of

3    perpetrating a fraud.  That's the "in furtherance

4    of" requirement.

5          MR. BRENNAN:  That is correct, but --

6          THE COURT:  Doesn't this look pretty

7    much like that's what it was?

8          MR. BRENNAN:  To me it looks like, your

9    Honor, Mr. Foley is giving them statements that they

10   can use to advocate on his behalf.  I mean, I have

11   reviewed them, you know, since we got to court and

12   the order was signed.  I had not seen them before.

13   But I do think --

14         THE COURT:  I mean, I can anticipate a

15   somewhat odd cross-examination that, in essence, he

16   must have been lying to the grand jury or

17   perpetrating a fraud on the government through all

18   of the representations, all the information he gave

19   his counsel to give to the government.  But at some

20   point along the line Mr. Foley is not telling the

21   truth, and thus, doesn't that go to the heart of the

22   defendant's right to cross-examine on issues of

23   credibility, even though it's a somewhat peculiar

24   mode to say as to which part he is lying to?

25         MR. BRENNAN:  I do think -- there are

the letters.  Not all of these form the basis of the

letters.  So a few of those are separate.  But there

are the letters that come from the basis of these.

They are statements of his agent, his attorney, and

he can be cross-examined on those letters.  He has

been asked about those letters.  He says he believes

they were to be misleading.  But he didn't review

them all.  But I think most --

THE COURT:  But what Mr. Weingarten

wants to make sure is that this business about I

didn't review them all, I didn't review final

drafts, et cetera, doesn't give him room to walk

away from testimony that in -- from representations

that are contrary to his testimony.  What's wrong

with that?

MR. BRENNAN:  Well, I'm looking for 262

here.  From -- so 262 is all this.  I apologize, I

meant 263.  But I can speak about 262 if you would

like, your Honor.

THE COURT:  Well, we've got a whole

bunch of stuff that isn't claimed as privilege on

262.  We're just focussed on the top letter.  Do you

want to look at 263, you say?

MR. BRENNAN:  So 263, what I see is

attachment of an attorney work product from reviews,

from conversations that Jessica Santos had with

Brian Bedard, as it says in the e-mail.  It says,

"Attached is just a draft of a letter we're going to

send to the government."  I don't know how much

information Hubie wants to give the government.  But

before" --

THE COURT:  I don't think you should be

reading this.

MR. BRENNAN:  I apologize.  Thank you,

your Honor.

In any case, the e-mail indicates that

the information in the letter comes from Brian

Bedard.  They put the letter together.  A version of

the letter is sent to us.

THE COURT:  Okay, anything further?

MR. BRENNAN:  I think the only thing

that it could be used for is to actually show he

received the letter.  That one, yes.

So, your Honor, on the McGinley issue,

261, I believe -- no, 251, your Honor.  I don't

believe there is anything in this that is untrue and

I don't expect that Mr. Foley will walk away from

it.  I think he will say that he did not give Mr.

McGinley all the facts, but I think he will

basically describe the conversation that he lists

1  here in 251.

2          Mr. Weingarten said in regards to 251 we

3  believe this document to be true.  He mentioned he

4  believes the other documents to be true.  I just do

5  believe that if they do believe the document to be

6  true it's very difficult for them to meet the burden

7  of showing a crime fraud.

8          THE COURT:  It's just a bit odd who the

9  proponent of these e-mails is, isn't it?

10          MR. BRENNAN:  Yes, your Honor.  In 261,

11  your Honor, Mr. Weingarten said that there were --

12  that Foley will say --

13          THE COURT:  Let me just stop you for a

14  second.  So if he is getting legal advice in order

15  to perpetrate his fraud, in order to understand how

16  to make his representations, selectively choose his

17  information, et cetera, why doesn't that fall under

18  it as well?

19          MR. BRENNAN:  You mean with Mr.

20  McGinley?

21          THE COURT:  Correct.

22          MR. BRENNAN:  I actually -- your Honor,

23  I do believe that would be crime fraud.  And I do

24  believe that's partially what Mr. Foley has

25  testified about.  I do believe at that instance that

his communication is when the act is going on, when
the fraud itself is being perpetrated.

These are communications with regard to
his defense to the criminal investigation. In
instances where someone in a criminal investigation
would provide their attorney with a fake document or
something that was, you know, somebody else's
fingerprints to give them over to us to mislead us,
that would clearly be crime fraud. I think -- I
have no problem with being aggressive on the issue
of crime fraud. I think providing your attorney
with the facts that you have to advocate on your
behalf, which a number of these are, if not all of
them, is a step over the line, and that is very
delicate.

THE COURT: But you say that the
McGinley advice --

MR. BRENNAN: The McGinley advice I do
believe -- I believe your Honor's assessment of it
being crime fraud is correct.

THE COURT: So I thought you were
earlier saying that the e-mails weren't necessary
because the defendant has the letters to the
government that he told the grand jury were false
and fraudulent. Why is necessity the analysis we're

using here if we are looking at the attorney-client

-- an exception to the attorney-client privilege.

MR. BRENNAN:  It is not, your Honor.  I

do believe that Mr. Weingarten made a very

impassioned advocacy as to why this was very

important to present their defense.  However, the

letters themselves are drawn from this and they are

there.  It does not have any bearing whether on the

objective standard crime fraud occurred.  That is

correct.

I think just on the law, however, the

party proposing that these statements are true does

not meet the -- cannot show that there is an

exception to the attorney-client privilege.  And he

made -- Mr. Weingarten made a necessity argument to

be able to cross-examine Brian Foley, but they have

the letters to be able to do that.

THE COURT:  Okay, anything else?

MR. BRENNAN:  There is an ancillary

issue on the privileged communications, but if we're

going further on these particular ones, I'll just

raise it with the Court later.  Or I can bring it up

right now, if you want.

THE COURT:  So, Mr. Weingarten, you said

you would be submitting something that tags the

letters to the government with what's in those.

        MR. WEINGARTEN:  Sure.

        THE COURT:  But there's a more basic
question that's raised, and that is the defendant
has the burden of showing that the statements
contained in the attorney-client communications were
in furtherance of a fraud.

        MR. WEINGARTEN:  Yes.

        THE COURT:  And you point to the grand
jury testimony saying any of the facts that Foley
provided to counsel to be passed on to the
government he has acknowledged are false.

        MR. WEINGARTEN:  Yes.

        THE COURT:  But how does that give
you -- how can you be in the position to claim that
the contents of the attorney-client privilege are
false or in furtherance of a fraud in order to claim
the exception while simultaneously saying, aah, but
they are true.

        MR. WEINGARTEN:  I don't think my
subjective belief about their truthfulness is
relevant at all.  Mr. Foley vitiated the privilege.
The privilege, when he said what he said --

        THE COURT:  So you are just saying that
your purpose is to say this is not a truthful

1   witness.

2           MR. WEINGARTEN:  I want to cross-examine

3   him on it.  I think the vitiation of the

4   attorney-client privilege took place when he said

5   what he said to the government, I submitted those

6   letters through my lawyer to perpetrate a hoax.

7           Now we obviously believe he did it

8   post-deal to curry favor, to get his deal.  That's

9   what we believe.  We believe the original statements

10  are true.  Obviously we believe it.  That's why this

11  is a little weird.  But once he says that and the

12  privilege is gone, then we can do with those -- I

13  mean, just for one second think about if the

14  government in a normal case was coming in with that

15  kind of evidence, with a statement from somebody

16  that I used my lawyer to submit a false document to

17  the government.  The privilege would be gone in a

18  nanosecond, and it should be equally gone here.

19          If I may just make one more point.  I'm

20  surprised to hear the prosecutor say, okay, well,

21  obviously crime fraud with Paton & Boggs, because in

22  the course of this deal he had a communication with

23  Paton & Boggs and Paton & Boggs gave him advice and

24  he somehow used it or distorted it or twisted it,

25  but that when he uses a lawyer to submit documents

1    to the government that he is now claiming were false

2    to perpetrate a coverup, that that's not a crime

3    fraud.  I mean, it seems unlikely that those

4    representations accurately represent the law.

5              THE COURT:  All right.  Thank you.

6              Well, I'm persuaded by the grand jury

7    testimony of Mr. Foley that the communications that

8    provided counsel with the factual representations

9    they made to the government were, and intended to

10   be, misleading and false, that the defendant has met

11   the crime-fraud exception.  I do want to see that

12   matched up to make sure that we're not overbroad,

13   but I think that the theory that the defense raises,

14   based on Mr. Foley's grand jury testimony, that

15   anything that was part of the misleading and false

16   information provided to the lawyers and unwittingly

17   passed on as truthful to the government ought to be

18   the subject of cross-examination.  Let's go to --

19             MR. BRENNAN:  Your Honor?

20             THE COURT:  Yes.

21             MR. BRENNAN:  My apologies.  May I just

22   follow up on two ancillary issues to this one?

23             THE COURT:  Certainly.

24             MR. BRENNAN:  Thank you, your Honor.

25   Just as a follow up on the privilege issue, we have

1   asked the defendant that any other material, because

2   there are two attorneys' offices, Mr. Santos's and

3   Patton & Boggs, that were not property of the

4   defendant, that were turned over when we attempted

5   to turn over the potentially privileged materials,

6   we'd just ask that the remaining ones that are not

7   these seven be isolated and destroyed.

8           THE COURT:  Any problem with that?  All

9   right then, anything other than the seven exhibits

10  that are potentially the subject of the crime-fraud

11  exception defense counsel is directed to destroy as

12  having been inadvertently disclosed and as

13  indisputably containing attorney-client privilege

14  that's not claimed to have been waived.

15          MR. BRENNAN:  Thank you, your Honor.

16  And then the second issue was, in testimony of Mr.

17  Foley, the issue of Mr. McGinley's advice, I do

18  believe it is fair I think for the defense to

19  cross-examine Mr. Foley on what he said to Mr.

20  McGinley.  It is prior -- I think it will be a prior

21  inconsistent statement.  But Mr. McGinley's advice

22  of blessing the thing as lawful should not be

23  something delved into.  The lawfulness of the

24  ultimate situation is something that is in the

25  prospect of the Court, and whether I think Mr.

1  McGinley -- eliciting a lot of testimony on Mr.

2  McGinley's telling Brian Foley that this situation

3  was lawful is likely to be misleading to the jury,

4  confusing to the jury, and irrelevant to the facts

5  at trial.

6           THE COURT:  But if McGinley says it's

7  lawful to do A and B, and that is what Mr. Foley is

8  trying to make it look like, why doesn't that fall

9  under the exception?

10          MR. BRENNAN:  I think that does, your

11  Honor.  I do expect that to come out in testimony.

12  I do expect that will come out in his direct

13  testimony, I do, but, however, any sort of reference

14  at any other point to Mr. -- to pressing the issue

15  that Mr. McGinley said Brian Foley's situation or

16  what Brian Foley was trying to do was lawful --

17          THE COURT:  Mr. Weingarten has specified

18  that it's only these seven exhibits and nothing else

19  that is subject to or is claimed as subject to the

20  exception.  So I wouldn't anticipate hearing

21  anything else about McGinley's advice beyond the

22  substance of what's in his e-mail.

23          Am I stating your position correctly?

24          MR. WEINGARTEN:  What I just heard, the

25  crime-fraud exception was waived, Judge.  No, I'm

just kidding.  No, you stated it correct.

MR. BRENNAN:  So other than that, I
think there would be no argument that this was legal
because an attorney like Mr. McGinley said it was
legal.

THE COURT:  Right.  I mean, the whole
claim by the defendant is that he's taking a legal
proposition and trying to make his facts look like
it.  I realize this is going to spillover into the
admissibility of the expert witness that remains
under advisement, which may ultimately be left up to
the jury, but I need to get a little more to see
what actually, when it comes time, the defendant is
offering by way of that expert testimony.  Okay.

Now, we have the motion about Mr. Foley
explaining what the defendant meant by "I get it,"
which is becoming rather a favorite phrase, isn't
it?  Sort of a contagion.

It seems to me that the rule provides
that if there is a factual basis for the impression
or the perception or the understanding that makes it
something other than speculation, that 701 permits
it.  So why don't I have to wait to see what that
basis is?  The government says that this is
deliberately ambiguous, that Mr. Foley can testify

about what he personally and rationally perceived

from his dealings with Mr. Rowland, that he believed

that the two had an understanding, which the

government argues hatches the alleged conspiracy,

and that that would help the jury understand, while

at the same time -- and that there's certain actions

that Foley took in light of that understanding.  It

seems to me this is a ripe area for

cross-examination of, you understand that through

your own lens, your own self-interested lens, but

isn't the following also true.

Why should I preclude it as a matter of

law when, in fact, Mr. Foley's testimony may show --

may give a reason for his understanding that Mr.

Rowland was aware he was participating in an illegal

and pretextual scheme?

MR. WEINGARTEN:  Judge, I think it's

been extensively briefed.  They have a version of

what "I get it" means, we have our version.  Why not

leave it up to the jury?  What they're saying -- and

there is nothing exotic about it.  There is nothing

that the jury is not going to understand.  They can

draw their own inferences.  I would simply say this:

The equivalent, what they want to do is essentially

say, Mr. Foley, what did you mean -- what did --

what do you think Mr. Rowland meant when he said "I get it"?  What he's going to say, what they want him to say is he was going to enter into a criminal conspiracy with me.  In other words, he's guilty. And that is pure invasion of the province of the jury.  We cited all kinds of cases that that is frowned about.  He's offering an opinion about the guilt of the defendant.  You can offer your opinion about what someone means if it's exotic, if the jury wouldn't otherwise understand it, if it's a gang thing, if it's a foreign thing, if it's an obscure thing.  This is very, very straightforward.  They have their story, we have our story, let the jury decide.  Foley shouldn't get on the stand and say, in my opinion John Rowland is guilty.  That's the essence of what they want him to do.

THE COURT:  Who wants to respond to that further from the government?

MR. BRENNAN:  Thank you, your Honor. Your Honor --

THE COURT:  I don't really know exactly what the question is, or questions will be put to Mr. Foley.  I strongly doubt it's quite as Mr. Weingarten anticipates or that the answer is quite as directed.

1            MR. BRENNAN:  Correct, your Honor.  I

2   expect it will be more along the lines of, what did

3   you understand?  What did you understand that to

4   mean when you received it?  And something along the

5   lines of, I understood it to mean that we were in

6   agreement, that he understood by taking him on at

7   Apple through whatever this consultancy arrangement

8   we're going to get, I was going to be getting his

9   services on the campaign, that I would be paying him

10  this way because I can't pay him -- because we can't

11  pay him through the campaign.  The "I get it" is the

12  indicia of coming to the meeting of the minds for

13  Mr. Foley.

14            THE COURT:  Why is that not what the

15  jury is going to conclude of everything that they

16  hear?

17            MR. BRENNAN:  The jury is going to

18  conclude a lot more, about the FEC reports, about

19  the false document, all these other things.  What

20  this is, is -- the statement "I get it" is vague.

21  It is vague.  And as we can see, Mr. Weingarten has

22  his argument, we have our argument.

23            THE COURT:  And why not leave it there?

24            MR. BRENNAN:  Because it is helpful for

25  the jury to hear from someone involved in the events

what the vague language means.

THE COURT:  It's the "it" you are after.

MR. BRENNAN:  We need to be able to ask Brian Foley -- it is the "it," you are correct, your Honor.  We need to ask Brian Foley why do you think -- why did you keep paying Mr. Rowland?  And he's going to say, I kept paying Mr. Rowland because I thought we got it, I got what we were paying for. And why do you think that?  One, he told me "I got it."  Secondly, he started to do all of this campaign work, which totally meant I got it, that I did get it, that we had this mutual understanding. Third, what he did at Apple, that was just a pretext to some extent.

So we need to be able to elicit that testimony from Mr. Foley as to why he would keep paying him, why this activity would go on.  And "I get it," his understanding of "I get it" is key to that.  It is his first indicia that they are on the same page.  And then Mr. Rowland shows up to the next meeting trotting out an offer from another campaign, and they use the offer from another campaign to negotiate the fee.

THE COURT:  Chronologically you've inverted them?

MR. BRENNAN:  There's a first meeting where he pitches the services on the campaign, there's a period of contemplation, should we hire Mr. Rowland for the campaign, then there is a -- this e-mail a few days after that first meeting that says, hey, I had a brief chat with Lisa, I get it, let's you and I meet.

And then they meet a second time where at the beginning of that meeting he says, okay, this other candidate wants to hire me and he's offering me 7,500 to 8,500 dollars a month, and that that indicates to Mr. Foley that he was right on "I get it," that we had this -- we understood each other, because he's talking about the campaign again.  And so Foley counters with --

THE COURT:  Because he could work for the other candidate while working for Apple if that was, in fact, his purpose to work for Apple.

MR. BRENNAN:  That is correct, your Honor.

THE COURT:  But he couldn't do it if he was on the payroll of two campaigns.

MR. BRENNAN:  If the payments were for the campaign, then he couldn't work for Mr. Greenberg.  If he was really getting a nursing

1   company home job and it was just about working for a

2   nursing home company, then the whole Mr. Greenberg

3   portion of that conversation is irrelevant.

4           THE COURT:  So the context of why Mr.

5   Foley did this, that and the other, explained by Mr.

6   Rowland's saying "I get it" in the context of what

7   was given, doesn't seem to me to be the speculative

8   opinion that he's guilty that Mr. Weingarten is

9   fearful of.  But -- and so I'm not going to grant

10  the motion.  That does not mean that I will not hear

11  objections to the form of the questions as they are

12  asked.  So a question that said, what did you

13  understand Mr. Rowland to mean when he said I get

14  it, and saying, I understood that the conspiracy was

15  being formed at that moment, that's not going to

16  fly.

17          Okay.  All right, I'm going to deny the

18  motion without prejudice to object to the form of

19  the questions and any substance that runs afoul of

20  not explaining Mr. Foley's actions or understandings

21  in reference to what Mr. Rowland had said to him.

22          The motion in limine to exclude

23  hypothetical scenarios, 105, the portion regarding

24  Romero-Grossman is moot, I gather, because she's not

25  going to be asked what she would have done after she

1   left the campaign to have her baby.

2            MR. MATTEI:  Your Honor, I think so.

3   The only caveat there is if the defense inquires of

4   Ms. Grossman about what her view of the arrangement

5   was in light of the information that was available

6   to her.  I think then we would come back on redirect

7   and talk about, you know, the significance of what

8   she would have done had she known otherwise.  So

9   that's the only caveat I want to make.  We certainly

10  are going to ask Ms. Grossman did you know this,

11  were you told this, were you told that.  Absent

12  opening the door by the defense on cross, we won't

13  ask that follow up.  I just want to make that clear.

14           THE COURT:  With respect to Michael

15  Clark, we had previously ruled that Mr. Clark's

16  testimony wasn't precluded.  The offer was, in

17  essence, that Clark's testimony was going to be that

18  without knowing that Mr. Rowland was a paid

19  consultant for the Wilson-Foley campaign, assuming

20  that for the purposes of his testimony, he couldn't

21  respond effectively by criticizing her clean

22  government campaign promises, or whatever they were.

23  That seems different from what he would have done if

24  he had known, since one of the reasons why the

25  Wilson-Foley campaign didn't want Mr. Rowland as a

publicly disclosed campaign consultant, as we've characterized it for shorthand, was because of toxicity. Isn't it pretty self-evident that -- oh, because Mr. Clark had been previously the one who investigated Mr. Rowland and was running on a clean government campaign.

So it seems to me that that's not speculative, what he would have done, nor is it really necessary to ask that overtly since it's pretty obvious that his testimony that he'd been unable to respond and unable to criticize her was the result of the secrecy. So I'm not sure what is hypothetical about that.

MR. WEINGARTEN: Your Honor, I frankly hadn't anticipated the Clark thing today. So -- and I don't think he's going to testify this week. So maybe there can be exchanges and we can table this one.

THE COURT: All right. Well, that's my approach to it if that is helpful to you in framing your further discussions. The only other thing that we have that the government hasn't had a chance to respond to --

MR. MATTEI: The trial memo about consistent statements, your Honor.

1              THE COURT:  Right.

2              MR. MATTEI:  We just got that, I think,

3    today.

4              THE COURT:  Right.  I mean if the

5    witness is going to testify that he said, A, B, C, D

6    and E, and all that these other witnesses, Fischer,

7    Katz, are going to say is he told me the same thing,

8    isn't that an impermissible prior consistent

9    statement?

10             MR. MATTEI:  0h, I think it is unless,

11   you know, the defense cross-examines Mr. Greenberg

12   and suggests that either his testimony was a recent

13   fabrication or due to some improper motive.  So we

14   had anticipated that they would cross-examine Mr.

15   Greenberg and suggest that his testimony here and

16   his revelations in 2012 were the product of some

17   sort of improper motive.  Maybe they're not going to

18   do that.  If they do do that, then these statements

19   will come in I think as consistent statements

20   because they were made prior to any improper motive

21   emerged.  What the defense has suggested is they're

22   going to attack his credibility generally, and so

23   then I think the question is, well, in what way are

24   you going to attack his credibility.  Are you going

25   to suggest that he's testifying here under some

improper motive.  If they are, then I think these

statements -- and there's a couple of them -- would

come in as prior consistent statements if they're

going to suggest that he's fabricated this in some

way.

So basically the answer is we understand

what the rule is.  We had anticipated that they

probably would elicit testimony triggering the

admissibility of these statements, and if they

don't, we won't offer them as consistent statements.

They might be admissible under some other rationale,

but --

THE COURT:  All right.  So you hold the

outcome of the motion in your hand, Mr. Weingarten.

Anything further that we need to discuss

before we begin trial tomorrow at 9:00?

MR. MATTEI:  Well, your Honor, in the

hopes that we might be able to be efficient

tomorrow --

THE COURT:  Oh, we have very high hopes

about efficiency.

MR. MATTEI:  We were in discussion with

defense about what exhibits we expected to offer

through our first witness, what exhibits they

expected to offer.  There are a number of their

1  exhibits that we expect to object to or that we're

2  not quite sure what the purpose of the offer will

3  be.  We can do that now so that the Court has some

4  context for understanding when they're admitted

5  tomorrow or --

6  THE COURT:  Why don't you do this:  So

7  the witnesses tomorrow are Mr. Greenberg.

8  MR. MATTEI:  And Mr. Fischer.

9  THE COURT:  And Mr. Fischer.

10  MR. MATTEI:  I don't think we'll get

11  beyond that.

12  THE COURT:  And I didn't notice that

13  your exhibit books broke it out by witness.

14  MR. MATTEI:  They do not.

15  THE COURT:  Could you identify, each of

16  you, what you -- at least the large picture of what

17  you anticipate being the exhibits for Fischer and

18  Greenberg, and the defense at the same time.  At

19  least I will have a chance to look at the exhibits.

20  MR. MATTEI:  Yeah, I think we can, your

21  Honor.

22  THE COURT:  And then between now and

23  then you'll decide what you are objecting to or not.

24  MR. MATTEI:  So for the government, it's

25  going to be largely our 500 series of exhibits.

1    We'll be offering a couple of photos which are in

2    the 700 series.  I don't think there will be any

3    objections there.

4              For the defense -- your Honor, I guess

5    what might be helpful, there are just a couple of

6    exhibits that I think would be helpful to know what

7    the purpose is.  So for us the defense has indicated

8    there're a couple of articles that they might use

9    with Mr. Greenberg.  So obviously we'll have some

10   hearsay and relevance there.

11             THE COURT:  Do you have exhibit numbers

12   for those?

13             MR. MATTEI:  Yes, your Honor.  Defense

14   Exhibit 4 and Defense Exhibit 254.

15             They've also marked some IRS filings of

16   the Simon Foundation, which is the charitable

17   foundation founded by Mr. Greenberg, as Exhibits 291

18   through 293.  They've identified FEC reports, as far

19   as we can tell every FEC report filed by Mr.

20   Greenberg in connection with his 2010 race.  We're

21   not sure what the purpose of those are.

22             THE COURT:  And those exhibit numbers

23   are what?

24             MR. MATTEI:  Well, they're somewhere in

25   the 350 to 446 range.  There is almost 100 FEC

reports that the defense -- and State Election

Enforcement Commission reports that the defense has

marked. I don't know which ones are Greenberg and

which ones are Lisa Wilson-Foley's lieutenant

governor race.

And then, finally, Exhibit 258, which is

an attack ad that was aired by the Wilson-Foley

campaign against Mr. Greenberg. It wasn't on the

list of exhibits that the defense told us they were

going to use, but it is on their exhibit list.

Those are the ones that I think I just wanted to

front we are likely to have serious issues with.

There are a number of others that -- for

example, Defense Exhibits 1 through 5 and some

others that we think raise some hearsay concerns,

but we can probably deal with those on the fly.

That's the general universe, your Honor.

THE COURT: All right, I'll take a look

at those exhibits. If necessary, shall we plan to

be here at 8:30 to see if there's anything that

needs to be taken up or can be taken up? Otherwise,

you get to have extra coffee. Why don't we recess

with that.

Thank you very much. We stand in

recess.

1          (Proceeding concluded 6:30)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2          I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6                              11/18/15

7                               Date

8

9                    /S/   Sharon Montini

10                      Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25